IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

RICHARD KAPELA DAVIS, MICHAEL )     CIVIL NO. 11-00144 LEK-BMK
HUGHES, DAMIEN KAAHU, ROBERT )
A. HOLBRON, JAMES KANE, III, )
ELLINGTON KEAWE, KALAI POAHA, )
TYRONE KAWAELANILUA`OLE )
NA`OKI GALDONES, )
                      )
        Plaintiffs, )
                      )
     vs. )
                      )
NEIL ABERCROMBIE, in his )
official capacity as the )
Governor of the State of )
Hawaii; TED SAKAI, in his )
official capacity as the )
Director of the Hawaii )
Department of Public Safety; )
CORRECTIONS CORPORATIONS OF )
AMERICA, )
                      )
        Defendants. )
_____ )

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

SEP 3 0 2012

at 1 o'clock and 50 min. P.M. Days
SUE BEITIA, CLERK

## ORDER DENYING PLAINTIFF RICHARD KAPELA DAVIS'S AND PLAINTIFF JAMES KANE III'S MOTION FOR PRELIMINARY INJUNCTION

Before the Court is Plaintiff Richard Kapela Davis's
and Plaintiff James Kane III's (collectively "Moving Plaintiffs")
Motion for Preliminary Injunction ("Motion"), filed on
April 26, 2012. [Dkt. no. 75.] Defendants Neil Abercrombie, in
his official capacity as the Governor of the State of Hawaii,
Jodie Maesaka-Hirata, in her official capacity as Interim
Director of the Hawaii Department of Public Safety, and
Corrections Corporation of America ("CCA", all collectively
"Defendants") filed their memorandum in opposition on

July 30, 2012, and the Moving Plaintiffs filed their reply on August 31, 2012. [Dkt. nos. 120, 154.]

This matter came on for an evidentiary hearing on September 17, 2012. Appearing on behalf of the Moving Plaintiffs were Sharla Manley, Esq., and Moses Haia, III, Esq., and appearing on behalf of Defendants were Rachel Love, Esq., and April Luria, Esq. The Court heard live testimony from Ben Griego, Sarah Blank, and Kaiana Haili. After careful consideration of the Motion, supporting and opposing documents, the testimony at the hearing, and the arguments of counsel, the Moving Plaintiffs' Motion is HEREBY DENIED for the reasons set forth below.

## BACKGROUND

Plaintiffs Richard Kapela Davis, Michael Hughes, Damien Kaahu, Robert A. Holbron, James Kane III, and Elington Keawe (collectively "Plaintiffs") filed their Complaint for Declaratory and Injunctive Relief and Damages ("Complaint") in state court on February 7, 2011. The Complaint sought: declaratory relief that Defendants violated Plaintiffs' constitutional and statutory rights to the free exercise of their religion; injunctive relief preventing Defendants from exercising policies that caused this injury to Plaintiffs; and damages pursuant to 42 U.S.C. § 1983. [Dkt. no. 1-2.] Defendants

removed this action on March 8, 2011 based on federal question jurisdiction. [Notice of Removal at ¶ 3.]

On November 14, 2011, Plaintiffs filed their Amended Complaint for Damages and for Classwide Declaratory and Injunctive Relief ("First Amended Complaint").[1] [Dkt. no. 42.] The First Amended Complaint alleges the following claims relevant to the instant Motion:

- violation of Plaintiffs' right to the free exercise of their religion pursuant to the First and Fourteenth Amendments of the United States Constitution as to access to sacred items ("Count III");
- violation of Plaintiffs' equal protection rights pursuant to the Fourteenth Amendment of the United States Constitution as to access to sacred items ("Count VIII");
- violation of Plaintiffs' right to free exercise of their religion pursuant to Article I, Section 4 of the Hawai`i State Constitution as to access to sacred items ("Count XIII");
- violation of Plaintiffs' equal protection rights pursuant to Article I, Section 5 of the Hawai`i State Constitution as to access to sacred items ("Count XVIII"); and
- violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, et seq. ("RLUIPA"), as to access to sacred items ("Count XXIV").

## I.  **Motion**

The Moving Plaintiffs are Hawai`i citizens who were convicted and sentenced for crimes under Hawai`i law. Plaintiff

---

[1] As of the date of this Order, Plaintiffs have not yet filed their motion for class certification. The Court also notes that neither Plaintiffs' Second Amended Complaint for Damages and for Classwide Declaratory and Injunctive Relief nor Plaintiff Tyrone Kawaelanilua`ole Na`oki Galdones's Supplemental Complaint for Damages and for Classwide Declaratory and Injunctive Relief, both filed August 22, 2012, are currently before the Court. [Dkt. nos. 145, 146.]

3

Davis is an inmate at Saguaro Correctional Center ("Saguaro"), and Plaintiff Kane is an inmate at Red Rock Correctional Center ("Red Rock"). Both facilities are in Arizona. [First Amended Complaint at ¶¶ 35, 38, 42.] The instant Motion concerns the Moving Plaintiffs' "personal Native Hawaiian prayer object[s]": Plaintiff Davis's kukui nut, which is one-inch in diameter ("Davis Prayer Object"), which Defendants determined was contraband; and Plaintiff Kane's turtle pendant ("Kane Prayer Object"), which Defendants allegedly defiled. [Motion at 2-3.] The Motion seeks the following relief:

- an order requiring Defendant Abercrombie and Defendant Maesaka-Hirata (collectively "State Defendants") to instruct CCA, Saguaro, and its agents and employees "to execute all necessary administrative protocol to restore" the Davis Prayer Object; [id. at 2;]
- an order requiring CCA, Saguaro, and its agents and employees "to immediately execute all necessary administrative protocol to restore" the Davis Prayer Object; [id. at 3;]
- an order requiring the State Defendants to instruct CCA, Red Rock, and its agents and employees "to execute all necessary administrative protocol to allowing" Plaintiff Kane to replace the Kane Prayer Object; [id.;]
- an order requiring CCA, Red Rock, and its agents and employees "to execute all necessary administrative protocol allowing" Plaintiff Kane to replace the Kane Prayer Object; [id.;]
- an order requiring Defendants, and their agents and employees, "to comply with certain and specific protocol as to the handling and care of Native Hawaiian personal items[;]" [id.;]
- an award of attorneys' fees and costs incurred in bringing the instant Motion; [id. at 4;] and
- any other appropriate relief [id.].

The Moving Plaintiffs argue that Defendant Abercrombie, as the State's chief executive, is responsible for the supervision and management of the state entities and employees

4

that execute the State's prison regulations and procedures and monitor the out-of-state correctional facilities where State inmates are serving their sentences. Defendant Maesaka-Hirata is the State official responsible for overseeing the implementation of Haw. Rev. Stat. Chapter 353, including Haw. Rev. Stat. § 353-16.2, which governs the transfer of State inmates to out-of-state facilities ("Out-of-State Inmates"). The Moving Plaintiffs argue that the State Defendants must guarantee the Out-of-State Inmates' rights, privileges, and immunities secured by the Hawai`i State Constitution and the United States Constitution, as well as state and federal laws. [Mem. in Supp. of Motion at 2-3.] CCA is a private, for-profit corporation that has contracts with the State to manage Saguaro, Red Rock, and other facilities where the Out-of-State Inmates are incarcerated pursuant to State contracts. [Id. at 3 (citing Motion, Decl. of Andrew B. Sprenger ("Sprenger Decl."), Exh. A (example of contract)).] Plaintiffs argue that the federal government provides the State with funds for the administration of criminal corrections, and these funds are used to pay CCA for its services. [Id. at 3.]

## A.    **Plaintiff Davis Background**

Plaintiff Davis states that, in or around June 2006, while he was incarcerated at Diamondback Correctional Facility ("Diamondback"), an Oklahoma facility managed by CCA, Defendants

5

authorized John Keola Lake, "a revered and well-respected *kumu*,"[2] to meet with him and other practitioners of the Native Hawaiian religion.  Plaintiff Davis found Kumu Lake's visit to be "spiritually healing."  [Davis Decl. at ¶ 24.]  According to Plaintiff Davis, during Kumu Lake's visit, Defendants "authorized him to give" Plaintiff Davis the Davis Prayer Object, "a small cloth pouch containing a kukui nut wrapped in a *upena* (net), and tied off with a *pupu* (shell)."  [Id. at ¶ 25.]  The Davis Prayer Object is "a symbol of enlightenment and knowledge with the *upena* representing the net that binds and holds us together, and the *pupu* symbolizing the three *pikos* (center)."  [Id.]  Kumu Lake also told Plaintiff Davis that it was to remind him of Kumu Lake's teachings and his time with other Native Hawaiian Religion practitioners, as well as to give him "spiritual comfort" after Kumu Lake left.  [Id. at ¶ 26.]  At some point after receiving the Davis Prayer Object from Kumu Lake, Plaintiff Davis was transferred to Saguaro.

Plaintiff Davis kept the Davis Prayer Object in his possession and used it daily in his prayers and chants, and to gain and sustain his *mana*.  He also used it in dances, other religious protocol, and other communal religious activities.  It was particularly important to him for times when he could not

---

[2] A *kumu* is a teacher.  [Motion, Decl. of Ty Preston Kāwika Tengan ("Tengan Decl.") at ¶ 18.]

6

participate in group religious activities. It also provided him
with spiritual comfort because it was from his homeland and he is
thousands of miles away from his family, community, culture, and
homeland. [Id. at ¶¶ 27-29.]

On February 20, 2012, "Case Manager Blank" confiscated
the Davis Prayer Object during a routine search of Plaintiff
Davis's cell. Plaintiff Davis tried to explain its religious
significance, which Blank refused to acknowledge. Blank referred
to it as a "'rock' or a 'nut,'" which [Plaintiff Davis] found
demeaning and insensitive to [his] religion." [Id. at ¶ 30.]
Blank determined that the Davis Prayer Object was contraband, and
gave Plaintiff Davis the choice between destroying it or sending
it away. Plaintiff Davis mailed it to his attorney for
safekeeping. [Id. at ¶ 32; Sprenger Decl. at ¶ 4, Exh. C
(Disposition of Non-Allowable Property form for "Nut").]
Plaintiff Davis states that the possession of the Davis Prayer
Object "is critical to [his] Native Hawaiian religion," and its
deprivation is causing him "strong spiritual injury" and is
causing him to "grow spiritually weaker by the day[.]" [Davis
Decl. at ¶ 33.] Plaintiff Davis states that "[i]t is [his]
understanding that other religions are allowed to retain
spiritually significant objects as part of their religious
practices such as Christians." [Id. at ¶ 32.] Thus, he asserts

that the confiscation of his prayer object "is patently discriminatory." [Id.]

## B. **Plaintiff Kane Background**

Plaintiff Kane states that, in or around 2007, Red Rock authorized him to possess the Kane Prayer Object, which his father gave him. Plaintiff Kane used it daily in his prayers and chants and to gain and sustain his *mana*. It was particularly important to him when he was not able to participate in group religious activities. He kept it in his possession and it provided him with spiritual comfort because it was from his homeland and because his father made it. [Motion, Decl. of James Kane, III ("Kane Decl.") at ¶¶ 18-20.]

Plaintiff Kane states that, on February 7, 2012, Red Rock employees conducted a routine search of his cell. The Kane Prayer Object was in his cell during the search. After the search, Plaintiff Davis discovered that it was broken. He asserts that Red Rock employees must have broken it because they were the only ones in the cell during the search. [Id. at ¶ 21.] Plaintiff Kane states "[i]t is [his] understanding that Red Rock employees are instructed to respect and avoid mishandling sacred objects belonging to inmates of other religions." [Id. at ¶ 22.] He feels "a strong spiritual injury" because the Kane Prayer Object is permanently damaged and he believes that its destruction was discriminatory, "demeaning and insensitive to

8

[his] religion." [Id. at ¶¶ 22-23.] Plaintiff Kane completed an Informal Resolution form regarding the incident. [Sprenger Decl., Exh. D.]

### C. **Background Regarding the Native Hawaiian Religion**

The Moving Plaintiffs state that they learned their Native Hawaiian religion through immersion in Hawaiian culture and religion. The Native Hawaiian religious and spiritual beliefs originate and are interpreted from the traditional Native Hawaiian culture and community. [Davis Decl. at ¶¶ 4-6; Kane Decl. at ¶¶ 4-5.] The Native Hawaiian religion involves, *inter alia*, observing rituals and performing activities which acknowledge `aumākua and *akua* (deities) and their relationship with their *kulāiwi* (native land). The recognition of elements of nature and caring for the environment are critical to their faith because ancestral spirits and deities live in nature. Thus, all people, places, plants, and animals have *mana*. The term *mana* is loosely translated as spiritual power. Prayer, chanting, hula, and other religious protocol produce *mana*. [Davis Decl. at ¶¶ 7-10; Kane Decl. at ¶¶ 6-7; Tengan Decl. at ¶¶ 8-10.[3]] At the hearing, Spiritual Advisor Kaiana Haili testified that the Native

---

[3] Dr. Tengan is "a practitioner and a scholar of Native Hawaiian cultural and religious practices." [Tengan Decl. at ¶ 3.] He is fluent in the Hawaiian language and has a Ph.D. from the University of Hawai`i at Mānoa, Department of Anthropology. He is also a professor of ethnic studies and anthropology. His academic career is focused upon the study of Native Hawaiian culture and religion. [Id. at ¶¶ 3-6.]

Hawaiian religion is more of a spirituality that comes out of the native Hawaiians' commune with the environment. It is familial-based and the components of it vary from family to family and from one geographic area to another. Thus, an object, such as a kukui nut, may be sacred to one practitioner, but not to another.

Dr. Tengan states that Native Hawaiian religion practitioners may possess small objects that represent and manifest the *mana* of `aumākua and *akua* and ancestors. They use the items in rituals and protocols of the faith. A *kūpuna*, *kahu*, or *kumu*, (respected elders or teachers) may give the practitioner the object to transmit and perpetuate *mana*. [Tengan Decl. at ¶¶ 18, 21-22.] The object can be a personal item, "kept exclusively by the practitioner at all times." [Id. at ¶ 23.] A kukui nut and a turtle-shaped object are examples of such sacred objects. The kukui nut represents enlightenment and knowledge, and is also a manifestation of the deity Lono. A turtle symbolizes the deity Kanaloa and represents an `aumākua of some Native Hawaiian families. [Id. at ¶¶ 24-25.] According to Dr. Tengan, Native Hawaiian religion practitioners who are denied possession of their sacred objects suffer spiritual injuries, and such injuries are exacerbated when the practitioners, such as the Out-of-State Inmates, are separated from their land, culture, and family. [Id. at ¶¶ 29-30.]

10

D.    **Argument**

The Moving Plaintiffs argue that the deprivation of their prayer objects violates their rights under the RLUIPA, as well as their rights to the free exercise of their religion and to equal protection under the United States Constitution and under the Hawai`i State Constitution.  [Mem. in Supp. of Motion at 7.]  The Moving Plaintiffs seek a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) and (b).  [Id. at 11.]

The Moving Plaintiffs first argue that they are likely to succeed on their RLUIPA claims.  They emphasize that RLUIPA claims require a more stringent standard of review for prison regulations than the standard for constitutional claims set forth in Turner v. Safley, 482 U.S. 78, 89-90 (1987), and they argue that RLUIPA has an expanded concept of religious exercise than that in First Amendment case law.  [Id. at 12-13.]  Plaintiff Davis and Plaintiff Kane each established through his testimony that the possession of his respective prayer object is a religious exercise for purposes of the RLUIPA.  Further, Dr. Tengan's declaration establishes that their possession is consistent with the religious and spiritual beliefs of the Native Hawaiian religion.  The Moving Plaintiffs assert that they are suffering spiritual injury because of the deprivation of their prayer objects, and they argue that Defendants cannot prove that those objects pose any danger to the Moving Plaintiffs, other

inmates, or prison staff.  The Moving Plaintiffs emphasize that
Defendants previously allowed them to retain the prayer objects,
recognizing the objects' importance to their faith.  The Moving
Plaintiffs argue that they have established that their beliefs
are sincerely held and that their retention and use of the prayer
objects are religious beliefs.  [Id. at 14-16.]

The Moving Plaintiffs next contend that Defendants'
regulations place a substantial burden on their religious
practice.  They argue that Defendants' restriction of the Davis
Prayer Object forces him to choose "to either engage in religious
activities without his prayer object (and thus preclude their
need to foster their *mana*) or accept the fact that he cannot
engage in meaningful prayers and chanting practices while in his
cell."  [Id. at 17.]  As to Plaintiff Kane, it is undisputed that
his possession of the Kane Prayer Object was allowed under
Defendants' regulations.  The Moving Plaintiffs argue that the
defilement of the Kane Prayer Object forces him to choose "to
either engage in religious activities without his prayer object
for fear that the Defendants may further damage it or accept the
fact that his use of his pendant runs the risk of being damaged
or defiled again without any recourse."  [Id. at 18.]  All of
these options are unacceptable for the practice of the Moving
Plaintiffs' faith, and this causes them spiritual injury.  The
Moving Plaintiffs therefore contend that Defendants' regulations

12

place a substantial burden on their religious beliefs without a compelling justification. [Id. at 17-18.]

Defendants have the burden of establishing that the prohibition of the Davis Prayer Object and "their determination that KANE's turtle pendent is not an item of sufficient religious worth to be respected and handled with care" are supported by a compelling governmental interest. [Id. at 18.] The Moving Plaintiffs argue that Defendants cannot do so because the objects at issue do not pose a risk to security or safety. [Id. at 19.] The Moving Plaintiffs argue that the refusal to allow them to keep their prayer objects is evidence of "Defendants' systematic rejection of the legitimacy of the Native Hawaiian religion." [Id. at 20.] The Moving Plaintiffs further argue that there is no evidence that Defendants considered, and rejected as ineffective, less restrictive measures of dealing with the Moving Plaintiffs' prayer objects. The Moving Plaintiffs therefore argue that they are likely to succeed on the merits of their RLUIPA claims. [Id.]

As to their First Amendment claims, the Moving Plaintiffs argue that it is beyond dispute that their possession and use of their prayer objects are protected by the First Amendment. They also contend that it is beyond dispute that Defendants' regulations substantially burden the exercise of

their religious beliefs. [Id. at 21-22.] The Moving Plaintiffs argue that all of the Turner factors weigh in their favor.

First, there is no legitimate penalogical interest that is rationally related to the regulations prohibiting the Moving Plaintiffs from possessing their prayer objects. The Moving Plaintiffs allege that Defendants use their own subjective determination of what is a religious item to determine what is contraband, and they systematically deny Native Hawaiian religion practitioners the right to practice their religion, either by deeming items contraband or by failing to handle allowable items with due care. According to the Moving Plaintiffs, Defendants "readily deprive" Native Hawaiian religion practitioners of their sacred objects because Defendants do not afford the Native Hawaiian religion the same recognition as other religions, such as Islam or Catholicism. There is no basis to distinguish between religions and therefore there is no basis for Defendants' regulations restricting the possession of objects sacred in the Native Hawaiian Religion. [Id. at 23-24.]

Second, the Moving Plaintiffs argue that Defendants' actions have substantially burdened their practice of their religion. [Id. at 24-25.] As a result of Defendants' denial of Plaintiff Davis's prayer object and the defilement of Plaintiff Kane's prayer object, they are "denie[d] all means of [their] religious expression." [Id.]

14

Third, the Moving Plaintiffs argue that Plaintiff Davis's possession of his prayer object will not impact the guards, inmates, or prison resources, as evidenced by the fact that Plaintiff Davis possessed the object for years without incident. [Id. at 25.] They also argue that there would be minimal impact if the Court requires Defendants to adopt "specific administrative protocol for the respectful treatment of Native Hawaiian prayer objects during a cell search . . . to prevent future defilement of KANE (and other's) [sic] sacred objects." [Id. at 25-26.]

Fourth, the Moving Plaintiffs assert that Defendants allow inmates of other faiths to retain personal religious items and Defendants treat those items with proper care during cell searches. Defendants could apply the same standards to objects sacred to the Native Hawaiian religion at a de minimis cost to the prisons. [Id. at 26.] The Moving Plaintiffs therefore argue that they are likely to prevail on the merits of their First Amendment claims.

As to their Equal Protection claims, the Moving Plaintiffs argue that, because Defendants allow inmates of other faiths to retain personal religious items and because Defendants treat those items with proper care, "no other conclusion can be drawn except that Defendants have not established the difference between Defendants' treatment of DAVIS and KANE and their

treatment of other inmates is reasonably related to legitimate penalogical interests." [Id. at 28.] Thus, denying the Moving Plaintiffs equal religious liberties violates the Equal Protection Clause of the Fourteenth Amendment and the Moving Plaintiffs are likely to succeed on the merits of their Equal Protection claims. [Id.]

The Moving Plaintiffs argue that the same analyses apply to their state constitution free exercise and equal protection claims, and therefore they are likely to succeed on the merits of those claims. [Id. at 28-30.]

The Moving Plaintiffs assert that they will suffer irreparable injury in the absence of a preliminary injunction because they are being deprived of a central tenet of their religion, causing them to suffer a continual and irreparable spiritual injury. [Id. at 30-31.] Further, they argue that the balance of hardships tips in their favor. Defendants will not suffer any substantial hardship if the Court orders them to provide the Moving Plaintiffs access to their prayer items, as evidenced by the fact that the Moving Plaintiffs possessed the items for years without incident. Further, Defendants already have a protocol in place for the handling of sacred items of other religions and that protocol can be applied to Native Hawaiian sacred items as well. [Id. at 31-32.]

As to the last preliminary injunction requirement, the Moving Plaintiffs argue that granting the Motion is in the public's interest. The public has a strong interest in protecting constitutional rights and rights under federal law. Further, 42 U.S.C. § 1006 and article XII, section 7 of the state constitution recognize Native Hawaiians' right to practice their religion. [Id. at 34.]

The Moving Plaintiffs argue that, pursuant to 18 U.S.C. § 3626(a)(1) and (2), the relief requested in the Motion "is narrowly tailored to restore DAVIS and KANE's religious rights to the status quo which permitted them access to personal sacred items in their cell[,]" [id. at 32-33,] and is the least intrusive means to correct the violations. The Moving Plaintiffs therefore contend that the requested relief is appropriate under the circumstances of this case. [Id. at 33-34.]

Finally, the Moving Plaintiffs argue that a security bond pursuant to Rule 65(c) is not necessary. This Court should exercise its discretion and waive the requirement of a bond because the relief requested will not pose unnecessary financial risks on Defendants. [Id. at 36-37.]

## II. **Defendants' Opposition**

In their memorandum in opposition, Defendants emphasize that Plaintiff Davis failed to disclose his prayer object on the Allowable Personal Property Inventory form ("Inventory Form")

that he completed and signed on August 11, 2007 upon his transfer

to Saguaro.  [Mem. in Opp. at 3, Aff. of Assistant Warden

Ben Griego ("Griego Aff."), Exh. E.]  The Inventory Form states,

*inter alia*:

> I acknowledge that I am responsible for all
> personal property recorded on my property form to
> include additions and deletions as well as
> property issued by the contracting agency and that
> the facility will only accept the responsibility
> for items inventoried and secured by facility
> staff.
>
> I further understand that the property form,
> including any additions, is considered to be the
> complete accounting of personal property in my
> possession.  As **other items will be considered
> contraband and disposed of in accordance with the
> current procedures "Control of Contraband"**.  I am
> subject to disciplinary action for possession of
> contraband.

[Griego Aff., Exh. E (emphasis added).]  Assistant Warden Griego

states that, if a kukui nut had been found in Plaintiff Davis's

possession upon his transfer, "it would have been confiscated and

disposed of as contraband at that time."  [Griego Aff. at ¶ 37.]

Defendants emphasize that the First Amended Complaint

does not contain any allegations regarding how inmate cell

searches are conducted and what may be seized during those

searches.  Further, the items at issue in the instant Motion are

not listed in the "sacred items" allegations in the First Amended

Complaint.  [Mem. in Opp. at 3-4 (citing First Amended Complaint

at ¶ 49).]

**A.   Background Regarding Native
     Hawaiian Religious Practices**

Saguaro, through the State Department of Public Safety

("DPS"), provides the services of Native Hawaiian spiritual

advisor Kaiana Haili to registered Native Hawaiian inmates.

Advisor Haili usually visits Saguaro four times a year to lead

the opening and closing celebrations for the Makahiki season,[4]

and the summer and winter solstice celebrations.  He also advises

DPS and Saguaro on the provision of Native Hawaiian religious

programming.  [Griego Aff. at ¶ 9.]  In addition to these

celebrations, Saguaro provides a celebratory meal to the entire

inmate population in recognition of King Kamehameha Day in June

and Price Kuhio Day in March.  [Id. at ¶ 18.]  Saguaro provides

practitioners of the Native Hawaiian religion with weekly

religious services, a weekly ninety-minute hula class/service, a

weekly ninety-minute Hawaiian ritual/ceremony class/service, and

a weekly two-and-a-half hour Hawaiian language class.  This is

more programming than is provided to any other religious group at

Saguaro.  In addition, the assistants for the Native Hawaiian

classes met for an hour once a month.  Advisor Haili structured

---

[4] "The Makahiki season is signaled by the rising of the
Makali`i (Pleiades) Constellation in October-November of each
year.  The Makahiki season ends by the setting of Makali`i
(Pleiades) Constellation in February-March of each year."  [First
Amended Complaint at ¶ 47.]  There are ceremonies, including
customary and traditional activities, marking the beginning and
the end of the Makahiki season.  [Id. at ¶ 48.]

the language class, and he provides suggested readings and lesson plans to guide the participants in the classes/services. [Id. at ¶¶ 19-21.]

In late June/early July 2011, Assistant Warden Griego, after consulting with Advisor Haili, compiled a list of religious items that Native Hawaiian religion practitioners may keep in their cells. According to Assistant Warden Griego, Advisor Haili never stated that it was necessary to include an individual kukui nut on that list. In a May 2010 email, Advisor Haili stated that he was bringing ten kukui nut lei to Saguaro for use in the summer solstice ceremony and in group activities, and he requested that his "Assistants" be allowed to keep their lei in their cells in ziploc bags. The email explained the significance of the kukui nut, but Advisor Haili not include either a kukui nut or a kukui nut lei in his recommendations for the list of items that inmates are allowed to retain in their cells. [Griego Aff., Exh. A (email string dated May 27, 2010 between, inter alia, Advisor Haili and Assistant Warden Griego).] At the hearing, Advisor Haili testified that he intended to give the lei to the assistants to recognize their growth and achievement in a type of graduation ceremony. Advisor Haili did not testify as to whether Plaintiff Davis was one of the intended recipients of the lei. When Advisor Haili learned that the assistants would not be

able to keep the lei in their cells, he brought other lei for communal use. Those lei are kept in the Saguaro chapel.

Ultimately, the warden of Saguaro approved the following items for retention by Native Hawaiian religion practitioners in the general inmate population ("Retention List"):

> a. Lava Lava: a single rectangular cloth worn as a skirt; . . .
> b. Ti leaf lei: twisted and woven no longer than 30 inches[;] . . .
> c. Hawaiian Sea Salt; 2-3 ounces . . . to be stored in a small zip lock baggie[;] . . .
> d. Coconut oil: approximately 2-3 ounces; . . .
> e. Amulet.

[Griego Aff. at ¶ 25.] At the hearing, Assistant Warden Griego testified that the Retention List is memorialized in an email, but was not reduced to a form. He stated that he believes the Retention List was distributed to the unit managers and shift captains at Saguaro. Case Manager Blank testified that she keeps a copy of the Retention List in her office so that she can refer to it, but she also testified that she did not receive a copy of the list until March 2012.

Red Rock also has a list of allowable property, and inmates are allowed to possess a medallion such as the Kane Prayer Object. [Mem. in Opp., Aff. of Carl Richey ("Richey Aff.") at ¶¶ 8-10, Exh. A (CCA policy re Inmate/Resident Property).]

21

In addition to the items on the Retention List, Saguaro retains the following items in its chapel for use during weekly Native Hawaiian meetings and celebrations:

> history books, CD's, DVDs, language books, seven (7) ½ gourds, four (4) gourd double, seven (7) ukuleles, twenty-three (23) malo/loin cloths, lele/alter tri pod, alter shelf, lono makua/staff, gourd with decorations, thirty-five (35) kiahei lei and muslin cloth (cape and necklace), hulu lei (feather lei), kukui lei (nut lei), two (2) pheasant pelts, two (2) uli uli (instrument), serving cups, two (2) lama, forty-eight (48) artificial anklet and bracelets, kiahei/muslin cloth, five pu/conch shells (instruments), two (2) puloulou/kapu sticks, four (feather) kahili, puone/nose flute, koko maoloha/net, five pa/wooden platters, ipuwai/water gourd, Konana (2 boards and 48 pieces), ulu mika/HI bowling (game), two (2) Lava Lava, Drum, and serving bowls.

[Griego Aff. at ¶ 27.]

### B.  **Cell Searches**

In accordance with CCA policy, Saguaro and Red Rock conduct frequent, unannounced searches of inmates' cells and other areas of the facility to address and/or prevent the presence of contraband, missing or stolen property, escapes, and other disturbances.  The searches are done in an orderly manner and, when possible, the area is left the way it was found.  The staff are to respect inmates' personal property and are not to carelessly discard, misplace, or break it.  The inmate's presence during the search is not required.  [Griego Aff. at ¶¶ 4-8; Mem. in Opp., Aff. of Warden Bruno Stolc ("Stolc Aff.") at ¶¶ 4-8.] Saguaro and Red Rock conduct the searches "as often as necessary

to promote the safety and security of the facility." [Griego Aff. at ¶ 4; Stolc Aff. at ¶ 4.] At the hearing, Assistant Warden Griego testified that, during each shift, three randomly chosen cells are searched in each "pod".

### 1. **Confiscation of Davis Prayer Object**

Case Manager Sarah Blank testified at the hearing that she discovered the Davis Prayer Object during a search of Plaintiff Davis's cell on February 20, 2012. She testified that the pouch which the kukui nut was in also contained two sewing needles, as well as thread matching the thread around the kukui nut. The needles were made of blue plastic and were three to three-and-a-half inches long. Case Manager Blank testified inmates can be authorized to keep such needles for certain types of hobby craft. She checked Saguaro records and determined that Plaintiff Davis was not authorized to have the needles because his hobby craft had been terminated and his hobby craft supplies were supposed to be sent out of the facility. During his testimony, Assistant Warden Griego testified that the pouch was a concern because it could conceal other items, including contraband.

Case Manager Blank testified that she conducted three searches of Plaintiff Davis's cell within a couple of months. The February 20, 2012 search was the first. In the second search, she found another pouch with a kukui nut. She confirmed

that the original kukui nut and pouch she confiscated in the February 20, 2012 search had been sent out of Saguaro, and thus this was another kukui nut in a similar style of bag. Plaintiff Davis was advised of the consequences he could face if he did not turn the second kukui nut and pouch in to prison officials, but Plaintiff Davis did not turn them in. Case Manager Blank conducted a third search to try to find the items, but she could not find them.

According to Assistant Warden Griego, the February 20, 2012 search was the first time Saguaro found a kukui nut in the possession of Plaintiff Davis or any other inmate. Case Manager Blank consulted with Assistant Warden Griego to determine if an inmate could keep such an item in his cell. Assistant Warden Griego determined that it should be confiscated as contraband because it was not on the list of items that Native Hawaiian religion practitioners could retain in their cells. [Griego Aff. at ¶¶ 31-32.] Defendants emphasize that neither Assistant Warden Griego nor any other Saguaro official was privy to the meeting between Kumu Lake and Plaintiff Davis at Diamondback, and they emphasize that Plaintiff Davis did not disclose the possession of the kukui nut when he was transferred to Saguaro. Thus, Defendants assert that Plaintiff Davis affirmatively misled Saguaro officials and he consented to having the item treated as contraband. [Mem. in Opp. at 8.] At the hearing, Assistant

24

Warden Griego testified that Advisor Haili never opined that having either a single kukui nut or a kukui nut in the manner in which Plaintiff Davis kept it was a requirement for a Native Hawaiian religion practitioner.

## 2. **Alleged Damage to Kane Prayer Object**

Defendants acknowledge that Plaintiff Kane was allowed to keep his turtle pendant in his cell. [Id. at 9.] Although Plaintiff Kane alleges that CCA employees damaged the item during a cell search, Defendants deny that any CCA employee took or damaged Plaintiff Kane's items. Defendants emphasize that CCA employees are required to handle inmates' property with respect and to leave the cell in the condition in which they found it. [Id. (citing Richey Aff. at ¶¶ 4-6, 44, 50).]

Defendants argue that, by filing an Informal Resolution form, and then a grievance regarding the alleged loss of property, Plaintiff Kane "short-circuited" the exhaustion process and deprived Red Rock of the opportunity to respond to his allegations. [Id.] Plaintiff Kane should have filed a property loss claim before initiating a grievance. His grievance was therefore premature and was denied. [Richey Aff. at ¶¶ 45-53, Exh. D (Plaintiff Kane's March 28, 2012 grievance).] Defendants emphasize that the CCA employees who allegedly damaged the Kane Prayer Object are not parties to this case, and the First Amended Complaint does not allege that CCA failed to conduct cell

25

searches in a respectful and/or reasonable manner, nor does it allege that Defendants failed to adopt protocols for cell searches addressing religious items that CCA employees may encounter during those searches. [Mem. in Opp. at 9-10.]

C.   **Argument**

Defendants note that the Motion does not merely seek to maintain the status quo, it seeks to require Defendants to immediately change their policies and/or protocols. Defendants argue that such mandatory relief requires this Court to impose a more stringent standard. [Id. at 12.]

Defendants also argue that this Court lacks jurisdiction to grant a preliminary injunction on claims that are not in the First Amended Complaint. Although the First Amended Complaint addresses the prohibition of certain items in inmate cells, neither kukui nuts nor turtle pendants/amulets are listed among the sacred items described in the First Amended Complaint, and the First Amended Complaint does not allege any claims based on destruction of religious property. [Id. at 12-13.] Defendants argue that, because the relief sought in the Motion is beyond the claims in this action, Plaintiff's Rule 65 motion is effectively a motion for permanent relief. [Id. at 14-15.]

Defendants next argue that Plaintiff Kane failed to exhaust his administrative remedies through the inmate grievance procedure. Pursuant to Policy 14-6, if an inmate believes that

his property has been lost or damaged due to the negligence of a
Red Rock employee, he must submit to the Property Officer, within
seven days of the incident, page one of the 14-6D Lost/Damaged
Stolen Property Claim form ("14-6D Form").  Policy 14-6 describes
the investigation process, the procedure for obtaining
compensation for sustained claims, and the appeal and grievance
process if the claim is denied.  [Id. at 15-16 (citing Richey
Aff. at ¶¶ 3, 11-17).]  The Richey Affidavit also describes the
grievance process, including the Request for Service, Informal
Resolution, and Formal Grievance.  [Richey Aff. at ¶¶ 18-43.]
Plaintiff Kane, however, submitted an incomplete 14-6D Form, and
filed a Formal Grievance before the warden or the administrative
duty officer made a final recommendation.  Richey asserts that,
had Plaintiff Kane properly completed the 14-6D Form and proven
that Red Rock staff was at fault for damaging his property,
Plaintiff Kane would have been compensated for his loss.  [Id. at
¶¶ 48-49, 52.]  Defendants argue that the failure to exhaust his
available administrative remedies precludes Plaintiff Kane from
seeking injunctive relief.  [Mem. in Opp. at 17.]

        Defendants next argue that the Moving Plaintiffs are
not likely to succeed on the merits because the Moving
Plaintiffs' claims ask this Court to interfere with day-to-day
prison management.  Defendants argue that, although RLUIPA
imposes a stricter standard than Turner, Congress did not intend

RLUIPA to undermine prison operations. RLUIPA still requires courts to give due deference to prison administrators regarding regulations and procedures necessary to maintain order, security, and discipline, consistent with the prisons' limited resources. [Id. at 17-19.]

Defendants argue that Plaintiff Kane cannot prevail on his claims because the merely negligent damage to the Kane Prayer Object cannot support liability under RLUIPA or § 1983. Further, if Red Rock employees did destroy the Kane Prayer Object, it would be a violation of CCA policy and CCA would provide financial restitution. Thus, Plaintiff Kane cannot establish that the alleged violation of his rights was the result of government policy or custom. Defendants also emphasize that the employees who allegedly damaged the Kane Prayer Object are not parties to this action, and this Court lacks jurisdiction to issue a preliminary injunction against non-parties. Although the Moving Plaintiffs couch their request as seeking a preliminary injunction requiring Defendants to adopt a policy requiring respectful and careful handling of property during cell searches, such a policy already exists and there is no live controversy. [Id. at 20-22.]

As to Plaintiff Davis, Defendants argue that the dispossession of his kukui nut was not a substantial burden on the exercise of his religion. Defendants emphasize that the

kukui nut is not on the list of approved items for Native Hawaiian religion practitioners. Defendants argue that Plaintiff Davis does not need his kukui nut to exercise his religious beliefs, and there are other Native Hawaiian artifacts, including kukui nut lei, available to him in the prison chapel. Defendants argue that the failure to include the kukui nut in the First Amended Complaint, and Plaintiff Davis's failure to disclose it on the Inventory Form demonstrate that the absence of the kukui nut is not a substantial burden because it does not force him to act contrary to his religious beliefs. [Id. at 22-25.]

Defendants emphasize that prison security is a compelling governmental interest for purposes of the RLUIPA and that, by failing to disclose the kukui nut on the Inventory Form, Plaintiff Davis agreed that it was contraband. Defendants argue that the kukui nut has not been determined to be a legitimate object needed for individual worship, as opposed to group ceremonial activities. [Id. at 25 (citing Griego Aff. at ¶¶ 22, 37-38, Exh. A).] Defendants argue that there is a compelling interest in maintaining security by precluding the possession of items not on the Retention List, and Defendants note that no other inmate who is a Native Hawaiian religion practitioner has ever demanded to possess a kukui nut. Further, Advisor Haili noted in his 2010 email that kukui nuts cannot be touched by other people. Defendants argue that this would pose a risk of

violence if inmates were allowed to possess kukui nuts and cell mates or CCA employees handle them. [Id. at 26 (citing Griego Aff., Exh. A).]

Defendants also argue that the exclusion of kukui nuts from the Retention List is "the least restrictive means to achieve the compelling interest of balancing religious needs with the exclusion of contraband." [Id.] Defendants emphasize that a kukui nut is comparable to a candle because it has flammable oils and there is a potential for violence if other inmates handle an inmate's kukui nut. Defendants also point out that kukui nut lei are available in the prison chapel for use during worship in a supervised environment. Defendants assert that the Moving Plaintiffs have not established that individual practitioners of the Native Hawaiian religion need to retain kukui nuts in their cells. [Id. at 26-27.]

Defendants argue that neither Plaintiff Davis nor Plaintiff Kane is likely to prevail on his free exercise claims. Plaintiff Kane will not prevail because either this Court lacks jurisdiction or he has alleged a negligence-based tort that does not implicate religious liberties. Plaintiff Davis will not prevail because Saguaro officials have a legitimate, penalogical interest in controlling contraband, avoiding fire hazards, and limiting the amount of property inmates may possess in their cells. Defendants contend that the policy on kukui nuts is

reasonably related to these interests. Defendants emphasize that Plaintiff Davis can worship through the items that he is allowed to keep in his cell and by participating in the regular programs offered at Saguaro. In light of Plaintiff Davis's failure to provide notice of his possession of the kukui nut and the fact that Advisor Haili never demanded that inmates be allowed to possess kukui nuts in their cells, Defendants' ban was reasonable and, if necessary, Defendants can address problems with kukui nuts one step at a time. Defendants also contend that Plaintiff Davis cannot prevail on his free exercise claims because Saguaro has been extremely accommodating to the practitioners of the Native Hawaiian religion, even providing more programs than are available to practitioners of other religions. [Id. at 27-30.]

Defendants next argue that neither Plaintiff Davis nor Plaintiff Kane is likely to prevail on his equal protection claims. First, the Moving Plaintiffs rely only on their understanding of what inmate practitioners of other religions are entitled to. Second, prisons need not provide the same liberties to all religions. Defendants also argue that they do treat religions equally, as evidenced by the fact that a Native Hawaiian religion inmate may keep an amulet, just as a Catholic inmate may keep a crucifix or a Jewish inmate may keep a Star of David. Defendants also argue that they treat all religious objects with respect during cell searches. Defendants have made

31

numerous efforts to provide Native Hawaiian religion practitioners with religious opportunities, as evidenced by the number of items that they may keep in their cells, the number of items available in the chapel, and the amount of programs/services offered. Defendants therefore contend that there is no disparate treatment, and this Court should deny the preliminary injunction. [Id. at 30-32.]

Defendants further argue that neither Plaintiff Davis nor Plaintiff Kane is likely to suffer irreparable harm. The fact that the Kane Prayer Object was broken by an as yet unproven person does not prevent Plaintiff Kane from acquiring another one. He also had the opportunity to seek compensation from the offending party, if he could prove who was responsible. Thus, his injury is not irreparable. As to Plaintiff Davis, Defendants emphasize that he did not acquire the Davis Prayer Object until 2006, and that he failed to disclose it upon his transfer to Saguaro in 2007. His failure to disclose it, Plaintiffs' failure to include it in the First Amended Complaint, and the fact that Advisor Haili never insisted that inmates be allowed to retain kukui nuts in their cells all undermine Plaintiff Davis's claim of irreparable injury, particularly in light of the religious items and programs that he does have access to. [Id. at 33-34.]

Finally, Defendants argue that the public interest weighs against a preliminary injunction. The public's interest

in the safe, secure, and orderly administration of prisons outweighs the Moving Plaintiffs' interest in a preliminary injunction.  Insofar as only the inmates at Saguaro and Red Rock would be affected by a preliminary injunction, Defendants acknowledge that this factor is not determinative.  Defendants, however, argue that the Court should deny relief to Plaintiff Davis based on unclean hands because he concealed the kukui nut for five years.  [Id. 35-36.]

## III. **Reply**

In their reply, the Moving Plaintiffs argue that this Court should grant the Motion as to Plaintiff Kane because Defendants admit that he is allowed to possess the Kane Prayer Object and that it should be replaced.  [Reply at 1.]

The Moving Plaintiffs reiterate that they are likely to succeed on the merits of their RLUIPA claim because they have demonstrated that Defendants substantially burdened their "religious practice of retaining personal sacred objects" and that this a part of the Native Hawaiian religion.  [Id. at 4.] The Moving Plaintiffs emphasize that Assistant Warden Griego was aware of the religious significance of the kukui nut.  [Id. at 6-7 (discussing Griego Aff., Exh. A).]  They also argue that they have demonstrated Defendants' "pattern and practice of confiscating these items or defiling them when conducting cell searches."  [Id. at 5.]  The Moving Plaintiffs argue that,

33

although Assistant Warden Griego states that he understands kukui
nuts may be flammable, there is no evidence that Plaintiff
Davis's possession of the item was an actual or threatened
security risk when he possessed it at Diamondback or at Saguaro
before it was confiscated.  Further, Defendants could have
employed other, less restrictive alternatives, such as placing
the Davis Prayer Object in the chaplain's custody, but there is
no evidence that Defendants considered such options.  [Id. at 5-
6.]  At the hearing, the Moving Plaintiffs also argued that
Defendants could allow Plaintiff Davis to keep the kukui nut in a
clear ziploc bag, which would prevent him from concealing
contraband and would allow Saguaro officials to inspect it
without touching it.

        The Moving Plaintiffs reiterate that they are likely to
succeed on the merits of their free exercise claims.  They argue
that Defendants' position that Plaintiff Davis is free to use
communal sacred objects in lieu of the Davis Prayer Object
ignores the *mana* that Kumu Lake imparted to him through the item.
[Id. at 7-8.]  Dr. Tengan submitted additional testimony that
personal sacred objects are not interchangeable with communal
ones, but he acknowledges that communal sacred objects also have
*mana*.  Further, when a *kahu* or *kūpuna* gives someone a sacred
object and other people touch it, the *mana* transmitted with the
object diminishes.  If someone takes the object, the *mana* is

34

stolen. According to Dr. Tengan, a Native Hawaiian religion practitioner could not properly exercise his religious beliefs by using a communal object instead of a personal one. Further, when a Native Hawaiian religion practitioner uses a sacred object, the practitioner's *mana*, and the *mana* of the `aumākua and *akua* that the practitioner invokes when he uses the object, also accrues to the object. Thus, Dr. Tengan opines that the spiritual injury suffered from the loss of a personal sacred object cannot be remedied through the use of communal objects. [Reply, Decl. of Ty Preston Kāwika Tengan ("Suppl. Tengan Decl.") at ¶¶ 4-5, 7-8.] In particular, Kumu Lake was the *kahuna nui* (high priest) of the largest heiau in Hawai`i, and Kumu Lake has passed away since he gave Plaintiff Davis the Davis Prayer Object. Thus, it is irreplaceable. [<u>Id.</u> at ¶ 6.]

Plaintiff Davis also states that, on or about March 13, 2012, Case Manager Blank and Unit Manager Cook confiscated his *malo* (loincloth) and his *kihei* (cape) from him. He uses these articles of clothing during Native Hawaiian rituals and ceremonies. Pursuant to Saguaro's policy regarding confiscated items, Plaintiff Davis chose to donate the items to a charity of the facility's choice. [Reply, Suppl. Decl. of Richard Kapela Davis ("Suppl. Davis Decl.") at ¶¶ 20, 24.] The Moving Plaintiffs argue Defendants are aware of the items' religious significance, but they still confiscate such items and infringe

upon the constitutional rights of inmates who are Native Hawaiian religion practitioners. The Moving Plaintiffs argue that confiscating the items and forcing the inmates to either mail them out of the facility or donate them to charity is not the least restrictive means of achieving security. [Reply at 8-9.]

The Moving Plaintiffs argue that Plaintiff Davis will prevail on his equal protection claim because Defendants' policy allowing possession of one religious medallion or amulet only accommodates religions where the personal sacred object is a medallion or amulet. The policy does not accommodate the Davis Prayer Object, and there is no principled means to distinguish between the Davis Prayer Object and religious medallions or amulets. [Id. at 9.]

The Moving Plaintiffs argue that the irreparable harm to their constitutional rights weighs sharply in favor of granting the Motion. [Id. at 10.] Neither of the Moving Plaintiffs can replace his prayer object. Plaintiff Kane's father made the Kane Prayer Object to impart *mana* to his son. Plaintiff Kane's father, however, is no longer able to make such items. Plaintiff Kane cannot order a replacement from a vendor, but he acknowledges that another *kūpuna* or *kumu* could decide upon an amulet for him and make it. [Reply, Suppl. Decl. of James Kane, III ("Suppl. Kane Decl.") at ¶¶ 6-7.]

The Moving Plaintiffs reiterate that granting a preliminary injunction would not prejudice Defendants. They acknowledge Defendants' interest in regulating such items through administrative processes, and they emphasize that both of them followed the administrative procedures and went through the grievance process to report their losses. Defendants only complain that Plaintiff Kane followed one of two processes. The Moving Plaintiffs, however, argue that it was reasonable for Plaintiff Kane to forego the property destruction process because the Kane Prayer Object is not just a piece of property. Thus, the Moving Plaintiffs contend that the failure to use that process is not fatal to the Motion. The Moving Plaintiffs argue that Defendants have not identified any interest serious enough to outweigh the strong public interest in ensuring that native peoples are able to practice their religion, even while incarcerated. [Reply at 11-13.]

The Moving Plaintiffs reiterate that Plaintiff Davis kept the Davis Prayer Object for years without incident, and they argue that he never tried to conceal it. [Id. at 12.] According to Plaintiff Davis, it was not on the Inventory Form because he did not put it in the box of his belongings that was sent to Saguaro ahead of him. Instead, he kept it in a bag with some other items that he could not part with for two weeks. The bag was taken from him before he boarded the flight to Arizona. A

37

number of days after his arrival at Saguaro, a nurse in the
medical unit returned the bag, with the Davis Prayer Object but
without his medication, to Plaintiff Davis.  Plaintiff Davis
asked for a religious inventory sheet to report the Davis Prayer
Object, but he was informed that there was no such form.  The
Saguaro chaplain told him that he did not need to declare the
object on a form.  Plaintiff Davis never tried to conceal the
object and, although his cell had been searched prior to
February 20, 2012, the object had never been confiscated.
[Suppl. Davis Decl. at ¶¶ 9-15.]  Thus, the Moving Plaintiffs
argue that Plaintiff Davis does not have unclean hands.  [Reply
at 12.]

        The Moving Plaintiffs argue that this Court does have
jurisdiction to grant the Motion because there is a close nexus
between the allegations regarding sacred objects in the First
Amended Complaint and the conduct at issue in the Motion.  They
emphasize that the First Amended Complaint seeks permanent
injunctive relief guaranteeing access to sacred objects.  Thus,
they argue that: the relief sought in the Motion is the same type
of relief sought in the First Amended Complaint; the Motion
involves the same parties; and the Motion relies on the same
constitutional provisions and statutes.  The Moving Plaintiffs
also argue that, whether the Court characterizes the relief

sought in the Motion as mandatory or prohibitory, they have met their burden of proof. [Id. at 14-16.]

Finally, the Moving Plaintiffs argue that a preliminary injunction against Defendants also binds their "'officers, agents, servants, employees, and attorneys,' even if they are not named parties[.]" [Id. at 16 (quoting Fed. R. Civ. P. 65(d)(2)(B)).] Thus, a preliminary injunction against CCA would bind the individual CCA employees who conduct cell searches or who otherwise come into contact with inmates' sacred objects. [Id.]

## STANDARD

This Court has recognized that:

> In general, the standard for a temporary restraining order or a preliminary injunction is as follows:
>
>> "[I]njunctive relief is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 376 (2008). The standard for granting a preliminary injunction and the standard for granting a temporary restraining order are identical. See Haw. Cnty. Green Party v. Clinton, 980 F. Supp. 1160, 1164 (D. Haw. 1997); Fed. R. Civ. P. 65.
>
> Sakala v. BAC Home Loans Servicing, LP, CV. No. 10-00578 DAE-LEK, 2011 WL 719482, at *4 (D. Hawai`i Feb. 22, 2011) (alteration in original).
>
>> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

39

preliminary relief, that the balance of
equities tips in his favor, and that an
injunction is in the public interest. <u>Am.</u>
<u>Trucking Ass'ns v. City of Los Angeles</u>, 559
F.3d 1046, 1052 (9th Cir. 2009) (quoting
<u>Winter v. Natural Res. Def. Council, Inc.</u>,
--- U.S. ----, 129 S. Ct. 365, 374, 172 L.
Ed. 2d 249 (2008)) (explaining that, "[t]o
the extent that [the Ninth Circuit's] cases
have suggested a lesser standard, they are no
longer controlling, or even viable" (footnote
omitted)); <u>see also</u> <u>Winter</u>, 129 S. Ct. at
374-76 (holding that, even where a likelihood
of success on the merits is established, a
mere "possibility" of irreparable injury is
insufficient to warrant preliminary
injunctive relief, because "[i]ssuing a
preliminary injunction based only on a
possibility of irreparable harm is
inconsistent with [the Supreme Court's]
characterization of injunctive relief as an
extraordinary remedy that may only be awarded
upon a clear showing that the plaintiff is
entitled to such relief").

<u>Painsolvers, Inc. v. State Farm Mut. Auto. Ins.</u>
<u>Co.</u>, 685 F. Supp. 2d 1123, 1128-29 (D. Hawai`i
2010) (footnote and some citations omitted)
(alterations in original). The Ninth Circuit has
held that its "serious questions" version of the
sliding scale test for preliminary injunctions
survives <u>Winter</u> to the extent that, a court may
grant a preliminary injunction where the plaintiff
(1) "demonstrates . . . that serious questions
going to the merits were raised and the balance of
hardships tips sharply in the plaintiff's
favor[,]" and (2) satisfies the other <u>Winter</u>
factors, likelihood of irreparable injury and that
the injunction is in the public interest.
<u>Alliance for the Wild Rockies v. Cottrell</u>, 632
F.3d 1127, 1134-35 (9th Cir. 2011) (citation and
block quote format omitted) (some alterations in
original).

<u>Aliah K. ex rel. Loretta M. v. Haw., Dep't of Educ.</u>, 788 F. Supp. 2d 1176, 1186-87 (D. Hawai`i 2011) (footnote omitted).[5]

Specifically regarding requests for preliminary injunctions addressing prison conditions, 18 U.S.C. § 3626(a)(2) provides:

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity

---

[5] The Ninth Circuit has stated the sliding scale test as follows:

> "A preliminary injunction is appropriate when a plaintiff demonstrates 'either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor.'" <u>Lands Council v. Martin (Lands Council II)</u>, 479 F.3d 636, 639 (9th Cir. 2007) (quoting <u>Clear Channel Outdoor Inc. v. City of Los Angeles</u>, 340 F.3d 810, 813 (9th Cir. 2003)). These two options represent extremes on a single continuum: "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." <u>Id.</u>

<u>Lands Council v. McNair</u>, 537 F.3d 981, 987 (9th. Cir. 2008) (en banc) (some citations and internal quotation marks omitted) (alteration in <u>Lands Council</u>).

set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

## DISCUSSION

### I. Jurisdiction

At the outset, this Court must address Defendants' argument that this Court does not have jurisdiction to rule upon the Moving Plaintiffs' Motion because it addresses items and seeks relief that Plaintiffs did not plead in the First Amended Complaint. "A preliminary injunction may be granted only when the 'intermediate relief [is] of the same character as that which may be granted finally.'" Parmer v. Alvarez, Civil No. 09-0412 DMS (NLS), 2009 WL 4544132, at *2 (S.D. Cal. Dec. 1, 2009) (quoting De Beers Consol. Mines v. U.S., 325 U.S. 212, 220, 65 S. Ct. 1130, 89 L. Ed. 1566 (1945)) (citing Johnson v. Couturier, 572 F.3d 1067, 1084 (9th Cir. 2009) (noting that injunction was inappropriate in De Beers because the court lacked jurisdiction); Kaimowitz v. Orlando, 122 F.3d 41, 43 (11th Cir. 1997) (court should not issue an injunction if injunction deals with a matter lying wholly outside the issues in the underlying action); Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994) (to obtain injunctive relief, the party "must necessarily establish a

42

relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.")).

Although the First Amended Complaint does not specifically mention the Davis Prayer Object or the Kane Prayer Object, the First Amended Complaint requests, *inter alia*, the following relief:

> 11. Order Defendants to allow Plaintiffs and all other class members to exercise their Native Hawaiian religion by using and maintaining traditional and customary objects and items that are essential to expressing their religious belief and faith as requested by Plaintiffs[; and]
>
> . . . .
>
> 13. Order Defendants to develop a comprehensive plan and promulgate official policy guidelines on how Native Hawaiians who have been convicted and sentenced under the laws of the State of Hawaii can practice their religion on a regular and equal basis with all other religions represented at correctional facilities.

[First Amended Complaint at pg. 125.] Thus, the relief that the Moving Plaintiffs seek in the instant Motion is of the same character as some of the relief that Plaintiffs ultimately seek in this action. This Court therefore rejects Defendants' argument that this Court lacks jurisdiction to rule on the Motion because the Motion addresses items and seeks relief beyond the scope of the First Amended Complaint.

## II. **Exhaustion**

Before addressing the merits of the Moving Plaintiffs' request for a preliminary injunction, this Court must address

43

Defendants' argument that Plaintiff Kane's request for preliminary injunctive relief is barred because he failed to exhaust his administrative remedies. The Moving Plaintiffs argue that they both went through the prison grievance process to give their respective prisons the opportunity to address the confiscation/destruction of their respective prayer objects. [Reply at 11-12.] Although the Moving Plaintiffs have not presented any evidence supporting their argument that Plaintiff Davis exhausted his administrative remedies, "failure to exhaust is an affirmative defense" under the Prison Litigation Reform Act of 1996 ("PLRA"). See Jones v. Bock, 549 U.S. 199, 216 (2007). Insofar as Defendants have not argued that Plaintiff Davis's request for preliminary injunctive relief is barred because he failed to exhaust his administrative remedies, this Court need not address the exhaustion issue as to Plaintiff Davis.

The PLRA provides that: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The United States Supreme Court has held that exhaustion is mandatory, "regardless of the relief offered through administrative procedures." Booth v. Churner, 532 U.S. 731, 741 (2001) (footnote and citation omitted). The Supreme

Court has also recognized that:

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which means using *all steps* that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).

Woodford v. Ngo, 548 U.S. 81, 90 (2006) (some emphases in Woodford) (citation and quotation marks omitted).

Carl Richey, Red Rock's Grievance Coordinator and Property Officer, states that Red Rock's Policy 14-6, titled "Inmate/Resident Property" ("Policy 14-6"), "governs property, both personal and facility-issued, that inmates may retain in their possession. . . . and sets forth the claim procedure inmates must follow in the event that they believe personal property has been lost or damaged." [Richey Aff. at ¶¶ 2, 8, Exh. 3-A (Policy 14-6).] Section N.2 of Policy 14-6 governs claims regarding allowable property that has been lost/damaged. It states, in pertinent part:

> Property that has been lost or damaged due to CCA employee negligence will be eligible for claim investigation.
>
> a. If an inmate/resident wishes to request an investigation of property that has been lost or damaged due to CCA employee negligence, the inmate/resident must complete Page 1 of the 14-6D Lost/Damaged/Stolen Property Claim and forward to the Property Officer or

designee.  All claims must be submitted
within seven (7) calendar days of the
incident.

[Richey Aff., Exh. 3-A at 17.]

Pursuant to Policy 14-6, the Property Officer or

designee processes a claim and forwards it to the department head

who is assigned to investigate.  That person must complete the

investigation within fifteen days after the submission of the

claim.  [Id. at 18.]  Further, Policy 14-6, Section N.4 states,

in pertinent part:

> c. Once the investigation has been completed,
> Page 1 and Page 2 of the 14-6D and any
> corresponding paperwork will be returned to
> the Property Officer or designee for logging.

> d. If the claim proves valid and
> reimbursement/replacement is recommended, it
> will be forwarded to the Warden/Administrator
> or Administrative Duty Officer who will be
> the final authority in the award of any
> compensation.

> e. The Warden/Administrator or Administrative
> Duty Officer shall review and approve/
> disapprove the recommendation within seven
> (7) calendar days of receipt.

> f. In the event a claim does not prove valid and
> replacement/reimbursement is denied the
> inmate/resident may submit a 14-6 E Denied
> Property Claim Appeal to the Warden/
> Administrator.

[Id.]  The Warden/Administrator's decision on the Denied Property

Claim Appeal "is final and concludes the claim process, unless

otherwise specified in the facility management contract."  [Id.

at 20, § N.7.d.]  If the inmate is not satisfied with the outcome

of the property claim process, he may file a grievance regarding the Warden/Administrator's decision. [Richey Aff. at ¶ 17.]

Red Rock Policy 14-5, applicable to Hawai`i inmates only, governs the grievance process ("Policy 14-5"). [Id. at ¶ 18, Exh. 3-C at 1.] Property issues are not directly grievable and "must be addressed in accordance with property procedures in place at the facility[.]" [Richey Aff., Exh. 3-C at 4.] Policy 14-5, section K states, inter alia: "With the exception of emergency grievances, inmates/residents are required to utilize the informal resolution process concerning questions, disputes, or complaints prior to the submission of a formal grievance." [Id. at 5.] If the inmate is not satisfied with the response to the informal grievance, he may submit a formal grievance to the Grievance Officer within five days. [Id. at 6, § K.3.c.] Section P.1 states, in pertinent part:

> If an inmate/resident is not satisfied with the decision of a formal or emergency grievance, the inmate/resident may complete the appeal section of the 14-5B and resubmit the grievance. Inmates/residents are entitled to appeal all adverse decisions, even those made on a purely procedural basis including but not limited to the expiration of a time limit. . . .

[Id. at 9.] "Barring extraordinary circumstances, a grievance will be considered settled if the decision at any step is not appealed by the inmate/resident within the given time limit." [Id., § P.3.]

47

Plaintiff Kane submitted an Informal Resolution form along with page 1 of the 14-6D Form. The Informal Resolution form is dated February 17, 2012 and states that the staff received it on February 21, 2012. Page 1 of 14-6D Form cites to the Informal Grievance form for the explanation of the circumstances surrounding the lost/damaged/or stolen property. [Richey Aff., Exh. 3-D.[6]] Plaintiff Kane did not obtain a final recommendation from the Warden or Administrative Duty Officer on his damaged property claim. [Richey Aff. at ¶ 48.] The Red Rock staff responded to Plaintiff Kane's informal grievance on March 12, 2012. The response states that the commander who searched Plaintiff Kane's cell stated that neither he nor his team confiscated the items identified in the Information Resolution form.[7] [Id., Exh. 3-D, Informal Resolution form at 2.]

On March 28, 2012, Plaintiff Kane submitted a Formal Grievance. [Richey Aff. at ¶ 49, Exh. 3-D.] On March 29, 2012, Richey informed Plaintiff Kane that his Formal Grievance was denied and that the staff denied removing the Kane Prayer Object during the cell search. Richey instructed Plaintiff Kane "he

---

[6] Exhibit 3-D contains multiple documents, but the exhibit is not consecutively paginated.

[7] Plaintiff Kane alleged that, in addition to the Kane Prayer Object, two other items were lost or damaged. [Richey Aff., Exh. 3-D, Form 14-6D at 1.] Those items are not at issue in the instant Motion.

needed to first submit a property claim and that his attempt to bypass the process was not acceptable." [Id. at ¶ 50.]

Thus, Plaintiff Kane failed to complete the Policy 14-6 process before initiating the grievance process pursuant to Policy 14-5. The Moving Plaintiffs argue that Plaintiff Kane's failure to follow the Policy 14-6 process is excusable because the destruction of the Kane Prayer Object "was not like losing a piece of jewelry or an electronic device." [Reply at 12.] The Court rejects this argument because Policy 14-6 expressly governs Plaintiff Kane's possession of his religious amulet. [Richey Aff., Exh. 3-A at 7 § A.5.b ("Inmates/residents shall be allowed to possess religious medallions, rosaries, etc. upon approval of the Chief of Security, in coordination with the Chaplain.").] Thus, Plaintiff Kane was required to follow the Policy 14-6 process before initiating the grievance process, and Plaintiff Kane failed to do so.

Further, there is no evidence that Plaintiff appealed the denial of his Formal Grievance, as allowed pursuant to section P.1 of Policy 14-5. The Court therefore finds that Plaintiff failed to properly complete all steps of the administrative remedies which Red Rock provided. See Woodford, 548 U.S. at 90.

This Court acknowledges that some district courts within the Ninth Circuit have ruled that one inmate's exhaustion

"with respect to claim [sic] at issue at a preliminary injunction hearing regarding an inmates' [sic] class action against prison officials regarding prison conditions was sufficient to satisfy exhaustion requirement of PLRA for other class members." Thomas v. Schwarzenegger, No. 2:07-CV-02310 ODW, 2011 WL 4501002, at *2 (E.D. Cal. Sept. 27, 2011). Even assuming, *arguendo*, that this rule could apply to this case, it would not excuse Plaintiff Kane's failure to exhaust his administrative remedies as to the destruction of his prayer object. The First Amended Complaint addresses prison conditions in general. Although this Court has jurisdiction because Plaintiff Kane seeks injunctive relief as to one type of the issues addressed in the First Amended Complaint, Plaintiff Kane seeks relief as to the destruction of one specific item. No other plaintiff could have exhausted the administrative remedies as to the specific claim at issue in the instant Motion.

This Court therefore CONCLUDES that Plaintiff's failure to exhaust his available administrative remedies as to the destruction of the Kane Prayer Object precludes him from seeking a preliminary injunction addressing that issue. See § 1997e(a); Booth, 532 U.S. at 741. The Court therefore DENIES the Motion as to Plaintiff Kane.

## III. **Preliminary Injunction Analysis**

### A. **Plaintiff Kane**

For the sake of completeness, the Court also notes that, even if Plaintiff Kane had exhausted his administrative remedies, this Court would still deny the Motion as to Plaintiff Kane because he has not established that he is likely to suffer irreparable harm in the absence of a preliminary injunction. The Court recognizes that Plaintiff Kane alleges that Defendants violated his constitutional rights by destroying the Kane Prayer Object and, "[u]nlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." Nelson v. NASA, 530 F.3d 865, 882 (9th Cir. 2008), *reversed on other grounds*, 131 S. Ct. 746 (2011). Based upon the evidence currently before it, this Court finds that Plaintiff Kane has only established a monetary injury that can be later remedied by a damage award.

Defendants do not dispute that Plaintiff Kane is authorized to retain his turtle amulet in his cell, and they do not dispute that he would be allowed to keep a replacement amulet as long as it passed a security inspection. Defendants presented testimony that, if Plaintiff Kane had established, through the applicable administrative procedures, that Red Rock personnel were responsible for the destruction of his turtle amulet,

Plaintiff Kane would have been compensated for his loss. [Richey Aff. at ¶ 52.] Further, although Plaintiff Kane's father cannot make him another amulet, Plaintiff Kane admitted that "another *kupuna* or *kumu* [could] decide upon an amulet for [him] and . . . make it[,]" but "[i]t may cost him or her money to get the materials needed to make the amulet." [Kane Suppl. Decl. at ¶ 7.] Plaintiff Kane also assigned an estimated value of fifty dollars to his "HAWAIIAN AMULET". [Richey Aff., Exh. 3-D (14-6D Form) at 1.] At the hearing, Advisor Haili testified that he has looked for an on-line vendor of Hawaiian amulets, but he has been unable to find one who would be able to provide the amulets at a rate that the inmates could afford. His testimony, however, establishes that commercial purchase of Hawaiian amulets is available to remedy Plaintiff Kane's injury.

The Court acknowledges that Plaintiff Kane states that he "also want[s] to make sure that [his] Native Hawaiian sacred items are not desecrated again." [Kane Suppl. Decl. at ¶ 7.] Plaintiff Kane, however, has not established that there is an imminent danger that his sacred items will be desecrated again in the absence of a preliminary injunction. He states only:

> 22. It is my understanding that Red Rock employees are instructed to respect and avoid mishandling sacred objects belonging to inmates of other religions. I feel that the Red Rock's damage to my turtle amulet is discriminatory and I feel immediately and irreparably harmed by this continuing discrimination.

52

23. I also feel that Red Rock employee's [sic] damage to my turtle pendant was demeaning and insensitive to my religion. Because my turtle pendant is permanently damaged, I feel a strong spiritual injury.

[Kane Decl. at ¶¶ 22-23.] While the Court does not doubt the sincerity of Plaintiff Kane's testimony regarding the importance of his turtle amulet, the evidence currently before this Court indicates that monetary damages can remedy his injury, and there is nothing to support Plaintiff Kane's allegation that incidents like the cell search which damaged his amulet are systemic and likely to reoccur without a preliminary injunction.

Insofar as the likelihood of irreparable harm is a required element of either the <u>Winter</u> test alone or the serious questions analysis within the <u>Winter</u> test, Plaintiff Kane has not established that he is entitled to a preliminary injunction. The Court therefore DENIES the Motion as to Plaintiff Kane.

## B. **Plaintiff Davis**

Whether Plaintiff Davis is entitled to a preliminary injunction is a closer question.

### 1. **Likelihood of Success on the Merits**

#### a. **Count XXIV - RLUIPA**

RLUIPA provides in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government establishes that the burden furthers "a compelling

53

governmental interest," and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); <u>Warsoldier v. Woodford</u>, 418 F.3d 989, 994 (9th Cir. 2005).

The Supreme Court has recognized RLUIPA as "the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens . . . ." <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 714, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005). The statute itself reflects this intent stating, "This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g). <u>See also Warsoldier</u>, 418 F.3d at 995.

Congress effectuated this intent by distinguishing RLUIPA from traditional First Amendment jurisprudence in at least two ways. First, it expanded the reach of the protection to include any "religious exercise," including "any exercise of religion, whether or not compelled by or central to, a system of religious belief." <u>Cutter</u>, 544 U.S. at 715, 125 S. Ct. 2113 (quoting 42 U.S.C. § 2000cc-5(7)(A)). In fact, RLUIPA "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion." <u>Cutter</u>, 544 U.S. at 725 n.13, 125 S. Ct. 2113; 42 U.S.C. § 2000cc-5(7)(A). Second, as opposed to the deferential rational basis standard of <u>Turner v. Safley</u>, 482 U.S. 78, 89-90, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), RLUIPA requires the government to meet the much stricter burden of showing that the burden it imposes on religious exercise is "in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1)-(2). <u>See also Cutter</u>, 544 U.S. at 717, 125 S. Ct. 2113; <u>Warsoldier</u>, 418 F.3d at 994.

Greene v. Solano Cnty. Jail, 513 F.3d 982, 986 (9th Cir. 2008) (footnote omitted).

### 1)   **Religious Exercise & Substantial Burden**

This Court must first determine what "religious exercise" is at issue in this case. Plaintiff Davis urges the Court to construe this term as referring to his practice of using the Davis Prayer Object in his daily prayers and chants and to "gain and sustain [his] *mana*." [Davis Decl. at ¶ 27.]   Davis testified that he also used the Davis Prayer Object in dances, other individual religious protocol, and communal religious activities.   It provides him spiritual comfort in the midst of his separation from his homeland, particularly when he is unable to participate in group religious activities.   [Id. at ¶¶ 28-29.] At the hearing, Advisor Haili testified that the kukui nut symbolizes enlightenment, growth, and accomplishment.   Dr. Tengan provided testimony that a Native Hawaiian religion practitioner may possesses a small, personal object that represents the *mana* of his ʻaumākua and *akua*, and the practitioner may use the object in rituals and protocol.   He testified that a kukui nut could be an example of such an object.   [Tengan Decl. at ¶¶ 21, 23-24.]

Plaintiff Davis argues that, pursuant to Greene, this Court cannot construe "religious exercise" as the practice of his Native Hawaiian religion as a whole.   This Court agrees.   See

Greene, 513 F.3d at 988 ("RLUIPA's plain language and our caselaw interpreting it compel the conclusion that the 'religious exercise' at issue in Greene's lawsuit is group worship, not Christianity."). This Court finds that Plaintiff Davis has established that the possession and use of his prayer object is a religious exercise for purposes of RLUIPA. See Cutter, 544 U.S. at 720 ("[T]he 'exercise of religion' often involves not only the belief and profession but the performance of . . . physical acts [such as] assembling with others for a worship service [or] participating in sacramental use of bread and wine." (alterations in Cutter) (citation and quotation marks omitted)).

As to whether Saguaro's policy prohibiting Plaintiff Davis from possessing his prayer object constitutes a "substantial burden" on his religious exercise, this Court notes that the Ninth Circuit has stated, "[w]e have little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise." Greene, 513 F.3d at 988 (citations omitted). This Court therefore finds that Saguaro's policy prohibiting Plaintiff Davis from possessing his prayer object and requiring him to donate it to charity, destroy it, or send it out of the facility substantially burdened his religious exercise.

## 2)  Compelling Governmental Interest & Least Restrictive Means

It is well established that the government has a compelling interest in maintaining prison security. <u>Cutter</u>, 544 U.S. at 725 n.13. In particular, this Court is concerned with the fact that, when Case Manager Blank confiscated the Davis Prayer Object on February 20, 2012, it was in a hand-made pouch along with contraband items. Thus, the government interest at issue in the Motion is not merely prison security in general, but a specific threat to prison security posed by Plaintiff Davis's storage of his prayer item. Saguaro clearly has a compelling interest in preventing an inmate from using a religious item to conceal contraband. The key issue is whether Saguaro used the least restrictive means to protect that compelling interest.

Even under RLUIPA, courts are to accord deference to prison administrators on issues of prison security. <u>Cutter</u>, 544 U.S. at 732, 725. The prison administrators, however, "still must show that [they] 'actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.'" <u>Greene</u>, 513 F.3d at 989 (quoting <u>Warsoldier</u>, 418 F.3d at 999 ("[E]ven outside the context of a minimum security facility, [the defendant] cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.")

(citing United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 824, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000) (finding, in the context of a First Amendment challenge to speech restrictions, that "[a] court should not assume a plausible, less restrictive alternative would be ineffective"))).

The policy at issue in the instant Motion is Saguaro's policy that the Native Hawaiian religion practitioners in the general population may only keep the religious items identified on the Retention List in their cells. [Griego Aff. at ¶ 25.] Assistant Warden Griego compiled the Retention List after consultation with Advisor Haili in late June/early July 2011, and the Saguaro Warden approved the list. [Id. at ¶¶ 23, 25.] The compilation of the Retention List was an extended process, as evidenced by the fact that Advisor Haili discussed his suggestions for the list in an email dated May 27, 2010, which included a statement that "[a]fter three years we still have not come to a conclusion in the matter of personal items to be kept by individuals in their cells for daily prayer and communion." [Id., Exh. 1-A at 2.] Assistant Warden Griego included some of the items that Advisor Haili suggested, such as the amulet/pendant and sea salt, but he decided against the other items, including the *malo* and *kihei*. [Griego Aff. at ¶ 25, Exh. 1-A.] Although Case Manager Blank testified at the hearing that she did not receive a copy of the Retention List until after the

cell search during which she confiscated the Davis Prayer Object, she consulted with Assistant Warden Griego, and he determined that it was contraband because it was not on the Retention List. [Griego Aff. at ¶ 33.]

In addition, upon Plaintiff Davis's transfer to Saguaro, he was required to complete and sign the Inventory Form. The Inventory Form clearly states that all property not listed on the form is considered contraband and would be disposed of as such. Plaintiff Davis did not list the Davis Prayer Object on the Inventory Form. [Id., Exh. 1-E.] Although the Retention List was not in existence in August 2007 when Plaintiff Davis transferred to Saguaro, Assistant Warden Griego testified that, had a kukui nut been found in Plaintiff Davis's possession upon his transfer, it would have been confiscated as contraband. [Griego Aff. at ¶ 37.] Plaintiff Davis did not submit any evidence to contradict this.

The Court is not persuaded by Plaintiff Davis's testimony that the Davis Prayer Object is not on the Inventory Form because he did not put it in the box of his belongings that was sent ahead of him to Saguaro. [Suppl. Davis Decl. at ¶ 9.] The Inventory Form clearly asks the inmate to list ALL personal property, and Plaintiff Davis was apparently aware that he could add items to the pre-printed form, as evidenced by the numerous hand-written entries on the form. In addition, the Court is not

persuaded by Plaintiff Davis's testimony that he believed there would be a separate religious inventory sheet upon which he could declare the Davis Prayer Object. [Id. at ¶ 13.] Plaintiff Davis apparently knew that he could declare religious items on the Inventory Form, as evidenced by the fact that he declared his *kihei* and his *lava lava*. [Griego Aff., Exh. 1-E.] Even accepting Plaintiff Davis's testimony that Chaplain Miller told him that he did not need to declare the Davis Prayer Object on a form, that advice was clearly mistaken. Even if Plaintiff Davis reasonably believed that he did not have to declare the Davis Prayer Object, after it was confiscated, he knew he was not authorized to have such an object and he still obtained an concealed a similar object. Based upon the evidence before this Court in the instant Motion, this Court rejects Plaintiff Davis's argument that the Retention List was a pretext. Further, the Court finds that Saguaro's policy of limiting an inmate's possession of personal items, including religious items, to a previously approved list of items was the least restrictive means of accomplishing the compelling governmental interest.

The Court emphasizes that the issue presented in Plaintiff Davis's request is a narrow one. The issue is not whether Saguaro should amend its Retention List, or its generally applicable policies regarding the possession of personal items, to allow an inmate to retain a sacred item of his choice, nor is

the issue whether Plaintiff Davis should be allowed to retain his
specific prayer object.  The issue currently before this Court
with respect to Plaintiff Davis's RLUIPA claim is whether, under
the particular circumstances of this case, Saguaro's enforcement
of its legitimately adopted Retention List and personal property
policies violated Plaintiff Davis's rights under the RLUIPA.
Based upon the foregoing analysis, although there is a
substantial burden on Plaintiff Davis's religious exercise,
Saguaro employs the least restrictive means to further a
compelling governmental interest.  This Court therefore CONCLUDES
that Plaintiff Davis is not likely to succeed on the merits of
his RLUIPA claim.

### b.    **Count III - Federal Free Exercise Claim**

Plaintiff Davis also argues that the deprivation of his
prayer object violated his First Amendment right to the free
exercise of his religion.  The Ninth Circuit has stated that:

> "When a prison regulation impinges on
> inmates' constitutional rights, the regulation is
> valid if it is reasonably related to legitimate
> penalogical interests."  Turner v. Safley, 482
> U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64
> (1987); see also Ward v. Walsh, 1 F.3d 873, 876-77
> (9th Cir. 1993) (holding that Turner still applies
> to free exercise claims of prisoners after
> Employment Division, Dep't of Human Resources v.
> Smith, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed.
> 2d 876 (1990)).  Turner sets forth four factors to
> be balanced in determining whether a prison
> regulation is reasonably related to legitimate
> penalogical interests:

> (1) Whether there is a "'valid, rational
> connection' between the prison regulation and
> the legitimate governmental interest put
> forward to justify it";
> (2) Whether there are "alternative means of
> exercising the right that remain open to
> prison inmates";
> (3) Whether "accommodation of the asserted
> constitutional right" will "impact . . .
> guards and other inmates, and on the
> allocation of prison resources generally"; and
> (4) Whether there is an "absence of ready
> alternatives" versus the "existence of
> obvious, easy alternatives."
>
> Turner, 482 U.S. at 89-90, 107 S. Ct. 2254
> (quoting Block v. Rutherford, 468 U.S. 576, 586,
> 104 S. Ct. 3227, 82 L. Ed. 2d 438 (1984)).

Shakur v. Schriro, 514 F.3d 878, 884 (9th Cir. 2008) (alteration in Shakur).

As to the first Turner factor, insofar as this Court has concluded that the relevant Saguaro regulations satisfy the higher compelling governmental interest/least restrictive means analysis of the RLUIPA, this Court also concludes that the regulations satisfy the less stringent valid, rational connection to a legitimate governmental interest factor. Thus, this factor weighs strongly in Defendants' favor.

As to the second Turner factor, Advisor Haili testified that, while the use of the Davis Prayer Object would definitely enhance the practice of Plaintiff Davis's belief system, the lack of the Davis Prayer Object does not devalue Plaintiff Davis's prayers and chants. Plaintiff Davis also has access to communal

kukui nut lei that are retained in the Saguaro chapel, and he can participate in the weekly services and classes for Native Hawaiian religion practitioners. [Griego Aff. at ¶ 27, 19.] Thus, Plaintiff Davis has alternate means of exercising his right to practice his religion. This factor weighs strongly in favor of Defendants.

In the Court's view, the third and fourth Turner factors are related. It is unclear what the alternative regulations would be which would allow Plaintiff Davis to retain his prayer object. The impact on the guards, other inmates, and prison resources would depend upon what the alternate system is. While it may seem simple to say that Plaintiff Davis should be allowed to retain his kukui nut, such a decision would arguably require a regulation stating that each practitioner of any religion is allowed to retain a religious item of his choice, as long as it satisfied certain security standards. Administering such a system would have a significant impact on the guards and prison resources in general. This Court therefore concludes that the third and fourth Turner factors are either neutral or weigh slightly in favor of Defendants.

Having considered all of the Turner factors, this Court CONCLUDES that Plaintiff Davis is unlikely to prevail on the merits of his federal free exercise claim because the regulations

and policies at issue in the instant Motion are reasonably related to legitimate penalogical interests.

c.   **Count XIII - State Free Exercise Claim**

Plaintiff Davis also contends that the deprivation of his prayer object violated his free exercise rights under the state constitution.  The Hawai`i Supreme Court has stated:

> In order to find an unconstitutional infringement on Appellant's religious practices [in violation of the first amendment to the United States Constitution and article I, section 4 of the Hawai`i Constitution],
>
>> it [is] necessary to examine whether or not the activity interfered with by the state was motivated by and rooted in a legitimate and sincerely held religious belief, whether or not the parties' free exercise of religion had been burdened by the regulation, the extent or impact of the regulation on the parties' religious practices, and whether or not the state had a compelling interest in the regulation which justified such a burden.
>
> State ex rel. Minami v. Andrews, 65 Haw. 289, 291, 651 P.2d 473, 474 (1982).  Accord Wisconsin v. Yoder, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972). . . .

Korean Buddhist Dae Won Sa Temple of Haw. v. Sullivan, 87 Hawai`i 217, 247, 953 P.2d 1315, 1345 (1998) (alterations in Sullivan) (quoting Dedman v. Board of Land & Natural Resources, 69 Haw. 255, 260-61, 740 P.2d 28, 32 (1987), *cert. denied*, 485 U.S. 1020, 108 S. Ct. 1573, 99 L. Ed. 2d 888 (1988)).

This Court has already discussed each of the factors in the state free exercise analysis in the analysis of either

Plaintiff Davis's RLUIPA claim or his federal free exercise claim. Thus, for the reasons stated *supra*, this Court CONCLUDES that Plaintiff Davis is unlikely to prevail on the merits of his state free exercise claim.

### d. **Count VIII - Federal Equal Protection Claim**

Plaintiff Davis also argues that the deprivation of his prayer object violates his Fourteenth Amendment equal protection rights because "Defendants allow inmates of other faiths to retain personal religious items in their cells[.]" [Mem. in Supp. of Motion at 27-28.] This district court has stated that:

> The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all similarly situated persons should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). An Equal Protection claim can be stated in one of two ways. First, a plaintiff can allege that "defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." See Barren v. Harrington, 152 F.3d 1193, 1194-95 (9th Cir. 1998) (citing Washington v. Davis, 426 U.S. 229, 239-40 (1976)). Alternatively, if the claims do not involve a suspect classification, a plaintiff can establish an equal protection "class of one" claim by alleging that she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Squaw Valley Dev. Co. v. Goldberg, 375 F.3d 936, 944 (9th Cir. 2004).

Kaeo-Tomaselli v. Pi`ikoi Recovery House for Women, No. CIV. 11-00670 LEK, 2011 WL 5572603, at *2 (D. Hawai`i Nov. 16, 2011).

"If the statute employs a suspect class (such as race, religion, or national origin) or burdens the exercise of a constitutional right, then courts must apply strict scrutiny, and ask whether the statute is narrowly tailored to serve a compelling governmental interest." Ball v. Massanari, 254 F.3d 817, 823 (9th Cir. 2001) (citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 219, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995)).

Although a classification based on religion is a suspect classification, the only evidence that Plaintiff Davis offers that similarly situated inmates of other religions are treated more favorably is his unsubstantiated statement that "[i]t is my understanding that other religions are allowed to retain spiritually significant objects as part of their religious practices such as Christians." [Davis Decl. at ¶ 32.] Plaintiff Davis provides no evidence that inmates of other religions are subject to more favorable policies and regulations regarding possession of religious items. Further, while not directly on point as to the issue of possession of religious items, the Court notes that Defendants presented testimony that Saguaro provides Native Hawaiian religion practitioners with "more weekly programing services than any other religion." [Griego Aff. at ¶ 19.] Based on the evidence before this Court, Plaintiff Davis has not established that Saguaro treats inmates who practice the Native Hawaiian religion less favorably than it treats inmates of

other religions.  Thus, there is no suspect classification.
Insofar as Plaintiff Davis bases his Motion on the existence of a
suspect classification and the alleged failure to meet the test
applicable to suspect classifications, this Court need not
address whether the relevant policies and regulations meet the
less stringent tests applicable to other classifications.  This
Court therefore CONCLUDES that Plaintiff Davis is unlikely to
prevail on his federal equal protection claim.

### e.  Count XVIII - State Equal Protection Claim

Finally, Plaintiff Davis argues that the deprivation of
his prayer object violates his right to equal protection under
the state constitution because "Defendants accommodate other
faiths by allowing them to retain personal religious objects in
their cell."  [Mem. in Supp. of Motion at 30.]

Article I, section 5 of the Hawaii Constitution
provides, in relevant part, that "[n]o person shall be deprived
of life, liberty or property without due process of law, nor be
denied the equal protection of the laws, nor be denied the
enjoyment of the person's civil rights or be discriminated
against in the exercise thereof because of race, religion, sex or
ancestry."  As with the federal equal protection analysis,
Hawai`i courts apply the strict scrutiny test "where equal
protection challenges involve 'suspect' classifications or

fundamental rights." <u>Nagle v. Bd. of Educ.</u>, 63 Haw. 389, 392, 629 P.2d 109, 111-12 (1981) (footnotes omitted).

As stated *supra*, Plaintiff Davis has not established that Saguaro treats inmates who practice the Native Hawaiian religion less favorably than it treats inmates of other religions. This Court therefore CONCLUDES that Plaintiff Davis is unlikely to prevail on his state equal protection claim.

## 2. **Likelihood of Irreparable Harm**

It is true that "an alleged constitutional infringement will often alone constitute irreparable harm." <u>Monterey Mech. Co. v. Wilson</u>, 125 F.3d 702, 715 (9th Cir. 1997) (citation and quotation marks omitted). This Court, however, has recognized that, where a plaintiff fails to establish a likelihood of success on the merits of its civil rights claim, without more, the Court should not presume irreparable harm. <u>Am. Promotional Events, Inc.-Nw. v. City & Cnty. of Honolulu</u>, 796 F. Supp. 2d 1261, 1283 (D. Hawai`i 2011). Insofar as this Court has concluded that Plaintiff Davis has not established a likelihood of success on the merits of any of the claims relevant to the instant Motion, Plaintiff Davis is not entitled to the presumption of irreparable harm. This Court must therefore examine the evidence presented to determine whether Plaintiff Davis has proven a likelihood of irreparable harm.

Plaintiff Davis has argued that his prayer object is irreplaceable because Kumu Lake passed away and therefore cannot make Plaintiff Davis a replacement object. [Suppl. Tengan Decl. at ¶ 6.] As Plaintiff Kane recognized, however, another respected *kumu*, *kahu*, or *kupuna* could decide upon and fashion a replacement object. In fact, at the hearing on the Motion, Case Manager Blank testified that she discovered a similar kukui nut in a pouch during a second cell search after the February 20, 2012 search. She confirmed that the kukui nut and pouch were not the same items that she discovered during the February 20, 2012 cell search; those items had already been sent out of the facility. She testified that Plaintiff Davis was questioned about the second kukui nut and pouch and was advised of the consequences that he could face if he did not turn the items in. Plaintiff Davis, however, never turned in the second kukui nut and pouch. Although Case Manager Blank and others conducted a third cell search to try to find the second kukui nut and pouch, they were unable to do so.

Although Plaintiff Davis cannot obtain a new prayer item from Kumu Lake, Plaintiff Davis was able to obtain a comparable prayer object to the one confiscated on February 20, 2012. This Court therefore CONCLUDES that the likelihood of irreparable harm in the absence of a preliminary injunction is minimal.

### 3. Balance of the Equities

"To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." Univ. of Hawai`i Prof'l Assembly v. Cayetano, 183 F.3d 1096, 1108 (9th Cir. 1999). As previously noted in the discussion of the Turner factors, the burden imposed by a preliminary injunction allowing Plaintiff Davis to retain his prayer object could be significant because it may require Saguaro to allow all inmates of all faiths to possess religious objects of their choice, subject to certain safety restrictions. Plaintiff Davis has presented testimony that he feels a strong spiritual injury every day without the Davis Prayer Object. [Davis Decl. at ¶ 33.] While the Court does not question the sincerity of Plaintiff Davis's religious beliefs, the Court does question the sincerity of his claim of spiritual injury, in light of the testimony that he kept contraband in the pouch that held his Davis Prayer Object and the testimony that he obtained and refused to turn in a second kukui nut and pouch. Even giving Plaintiff Davis the benefit of the doubt, this Court FINDS that the balance of the equities is, at best, neutral.

### 4. Public Interest

This Court has recognized the following principles relevant to the public interest inquiry:

> The plaintiffs bear the initial burden
> of showing that the injunction is in the
> public interest. See Winter [v. Natural
> Resources Defense Council, Inc.], [555 U.S.
> 7,] 129 S. Ct. [365,] 378 [(2008)]. However,
> the district court need not consider public
> consequences that are "highly speculative."
> In other words, the court should weigh the
> public interest in light of the likely
> consequences of the injunction. Such
> consequences must not be too remote,
> insubstantial, or speculative and must be
> supported by evidence.
>
> Finally, the district court should give
> due weight to the serious consideration of
> the public interest in this case that has
> already been undertaken by the responsible
> state officials . . . who unanimously passed
> the rules that are the subject of this
> appeal. See Golden Gate Rest. Ass'n [v. City
> and County of San Francisco], 512 F.3d [1112]
> at 1127 [(9th Cir. 2008)] ("The public
> interest may be declared in the form of a
> statute." (internal quotation marks
> omitted)); see also Burford v. Sun Oil Co.,
> 319 U.S. 315, 318, 63 S. Ct. 1098, 87 L. Ed.
> 1424 (1943) ("[I]t is in the public interest
> that federal courts of equity should exercise
> their discretionary power with proper regard
> for the rightful independence of state
> governments in carrying out their domestic
> policy." (internal quotation marks omitted)).
> Stormans, Inc. v. Selecky, 586 F.3d 1109, 1139-40
> (9th Cir. 2009) (some citations and quotation
> marks omitted). The public interest inquiry
> primarily addresses the impact on non-parties
> rather than parties.

Am. Promotional Events, 796 F. Supp. 2d at 1284-85 (alterations

in Am. Promotional Events).

This Court also FINDS that the public interest factor

is neutral. While the public has a strong interest in ensuring

that native people are able to practice their religious beliefs,

even while incarcerated, the public also has a strong interest in the safe and orderly administration of correctional facilities.

### 5. **Summary of Factors**

Having considered all of the relevant factors, this Court CONCLUDES that, under either the <u>Winter</u> test alone or the serious questions analysis within the <u>Winter</u> test, Plaintiff Davis has not established that he is entitled to the preliminary injunction requested in the Motion.

The Court emphasizes that the rulings in the instant Order are solely for the purposes of the limited issues that Plaintiff David and Plaintiff Kane placed before the Court. The Court expresses no opinion at this time on the merits of the claims brought by Plaintiffs on behalf of the purposed class.

### CONCLUSION

On the basis of the foregoing, Plaintiff Richard Kapela Davis's and Plaintiff James Kane III's Motion for Preliminary Injunction, filed April 26, 2012, is HEREBY DENIED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, SEPTEMBER 30, 2012.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge