FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
*Mar 31, 2014*
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RICHARD KAPELA DAVIS, MICHAEL HUGHES, DAMIEN KAAHU, ROBERT A. HOLBRON, JAMES KANE, III, ELLINGTON KEAWE, KALAI POAHA, TYRONE KAWAELANILUA`OLE NA`OKI GALDONES,<br><br>          Plaintiffs,<br><br>     vs.<br><br>NEIL ABERCROMBIE, in his official capacity as the Governor of the State of Hawaii; TED SAKAI, in his official capacity as the Director of the Hawaii Department of Public Safety; CORRECTIONS CORPORATIONS OF AMERICA,<br><br>          Defendants. | CIVIL NO. 11-00144 LEK-BMK |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND
DENYING IN PART PLAINTIFF ROBERT HOLBRON'S COUNTER-MOTION
FOR SUMMARY JUDGMENT ON HIS CLAIMS; AND GRANTING IN PART
AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AGAINST DEFENDANTS AS TO THEIR CLAIMS UNDER
THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT**

On July 31, 2013, Defendants Ted Sakai, in his official

capacity as the Interim Director of the Department of Public

Safety ("Defendant Sakai" and "DPS"), and Corrections Corporation

of America ("CCA", collectively "Defendants") filed their Motion

or Summary Judgment ("Defendants' Motion").[1]  [Dkt. no. 361.]

Plaintiffs Richard Kapela Davis, Tyrone Galdones, Michael Hughes,

Damien Kaahu, James Kane, III, Ellington Keawe, and Kalai Poaha

(collectively "the Joint Plaintiffs") filed their memorandum in

opposition on January 7, 2014.[2]  [Dkt. no. 465.]  Plaintiff

Robert A. Holbron ("Plaintiff Holbron") filed a joint memorandum

in opposition to Defendants' Motion and a Counter-Motion for

Summary Judgment on His Claims ("Holbron's Counter-Motion") on

December 23, 2013.  [Dkt. no. 452.]  Defendants filed their reply

in support of Defendants' Motion ("Defendants' Reply"), and their

memorandum in opposition to Holbron's Counter-Motion ("Counter-

---

[1] Defendant Neil Abercrombie, in his official capacity as
the Governor of the State of Hawai`i ("Defendant Abercrombie"),
was also one of the moving defendants, but after the filing of
Defendants' Motion, this Court granted his motion for judgment on
the pleadings, and dismissed all claims against him with
prejudice.  [Motion for Judgment on the Pleadings, filed 6/7/13
(dkt. no. 322); Order Granting Defendant Neil Abercrombie's
Motion for Judgment on the Pleadings, filed 9/13/13 (dkt. no.
390) ("9/13/13 Order").]  The 9/13/13 Order is also available as
Davis v. Abercrombie, Civil No. 11-00144 LEK-BMK, 2013 WL 5204982
(D. Hawai`i Sept. 13, 2013).  Thus, "Defendants" in this order
refers to only Defendant Sakai and CCA.

[2] On January 6, 2014, Huy filed an amicus curiae brief in
support of the Joint Plaintiffs' opposition to Defendants' Motion
("Amicus Brief").  [Dkt. no. 463.]  "Huy is a nationally
recognized, 501(c)(3) non-profit organization . . . which seeks
to enhance religious, cultural, and other rehabilitative
opportunities for imprisoned Indigenous People, including
American Indians and Native Hawaiians."  [Motion for Leave to
File Amicus Curiae Brief in Supp. of Pltfs.' Opp. to Summary
Judgment, filed 12/20/13 (dkt. no. 439), at 1.]  Defendants filed
their memorandum in opposition to the Amicus Brief on
January 13, 2014.  [Dkt. no. 475.]

Motion Opposition") on January 13, 2014.  [Dkt. nos. 483, 482.]

Plaintiff Holbron filed his reply in support of his Counter-

Motion ("Holbron's Reply") on January 17, 2014.  [Dkt. no. 489.]

On October 31, 2013, the Joint Plaintiffs and Plaintiff

Holbron (all collectively, "Plaintiffs") filed their Motion for

Partial Summary Judgment Against Defendants as to Their Claims

Under the Religious Land Use and Institutionalized Persons Act

("Plaintiffs' Motion").  [Dkt. no. 417.]  Defendants filed their

memorandum in opposition on December 23, 2013, and Plaintiffs

filed their reply ("Plaintiffs' Reply") on January 13, 2014.

[Dkt. nos. 441, 476.]

These matters came on for hearing on January 27, 2014.

Appearing on behalf of Defendants were David Lewis, Esq., and

Jodie Roeca, Esq., and appearing on behalf of Plaintiffs were

Sharla Manley, Esq., and Leina`ala Ley, Esq.  After careful

consideration of the motions, supporting and opposing memoranda,

and the arguments of counsel, Defendants' Motion is HEREBY

GRANTED IN PART AND DENIED IN PART, Plaintiffs' Motion is HEREBY

GRANTED IN PART AND DENIED IN PART, and Holbron's Counter-Motion

is HEREBY GRANTED IN PART AND DENIED IN PART for the reasons set

forth below.

## BACKGROUND

Plaintiffs Davis, Hughes, Kaahu, Holbron, Kane, Keawe,

and Poaha filed the Second Amended Complaint for Damages and for

Classwide Declaratory and Injunctive Relief ("Second Amended Complaint") on August 22, 2012.  [Dkt. no. 145.]  Plaintiff Galdones also filed his Supplemental Complaint for Damages and for Classwide Declaratory and Injunctive Relief ("Supplemental Complaint") on August 22, 2012.  [Dkt. no. 146.]

Plaintiffs are all Hawai`i residents who were convicted and sentenced for committing criminal violations of Hawai`i law. The Second Amended Complaint alleges that, during all periods relevant to the instant case, they were incarcerated at either Saguaro Correctional Center ("Saguaro") or Red Rock Correctional Center ("Red Rock").[3]  Each Plaintiff is of Native Hawaiian ancestry and is a practitioner of the Native Hawaiian religion. Saguaro and Red Rock are private prisons in Arizona, operated by CCA.  The State of Hawai`i houses inmates at CCA's facilities pursuant to various contracts.  [Second Amended Complaint at ¶¶ 7-10, 12(c), 17-18; Supplemental Complaint at ¶¶ 7-10, 12(c), 17-18.]  In the instant case, Plaintiffs allege that Defendants have prohibited them from exercising their constitutional and statutory right to practice their faith.

The Second Amended Complaint alleges the following claims:

---

[3] As of May 30, 2013, the Hawai`i inmates who were assigned to Red Rock were permanently transferred to Saguaro. [Defs.' Motion, Concise Statement of Facts in Supp. of Defs.' Motion ("Defs.' CSOF"), Decl. of Warden Thomas ("Thomas Decl.") at ¶ 5; id., Decl. of Warden Stolc ("Stolc Decl.") at ¶ 5.]

- Violation of Plaintiffs' right to the free exercise of their religion pursuant to the First and Fourteenth Amendments of the United States Constitution as to daily worship practices ("Count I"), the observance of Makahiki[4] ("Count II"), access to sacred items ("Count III"), access to sacred space ("Count IV"), and access to a spiritual advisor ("Count V");

- Violation of Plaintiffs' equal protection rights pursuant to the Fourteenth Amendment of the United States Constitution as to daily worship practices ("Count VI"), the observance of Makahiki ("Count VII"), access to sacred items ("Count VIII"), access to sacred space ("Count IX"), and access to a spiritual advisor ("Count X");

- Violation of Plaintiffs' right to free exercise of their religion pursuant to Article I, § 4 of the Hawai`i State Constitution as to daily worship practices ("Count XI"), the observance of Makahiki ("Count XII"), access to sacred items ("Count XIII"), access to sacred space ("Count XIV"), and access to a spiritual advisor ("Count XV");

- Violation of Plaintiffs' equal protection rights pursuant to Article I, § 5 of the Hawai`i State Constitution as to daily worship practices ("Count XVI"), the observance of Makahiki ("Count XVII"), access to sacred items ("Count XVIII"), access to sacred space ("Count XIX"), and access to a spiritual advisor ("Count XX");

- Violation of Plaintiffs' rights relating to native Hawaiian customary and traditional practices pursuant to Article XII, § 7 of the Hawai`i State Constitution and Haw. Rev. Stat. § 1-1 as to the observance of Makahiki ("Count XXI");

- Violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq.* ("RLUIPA"), as to daily worship practices ("Count XXII"), the observance of Makahiki ("Count XXIII"), access to sacred items

---

[4] Plaintiffs allege that "[t]he Makahiki season is signaled by the rising of the Makali`i (Pleiades) Constellation in October-November of each year.  The Makahiki season ends by the setting of Makali`i (Pleiades) Constellation in February-March of each year."  [Second Amended Complaint at ¶ 47.]  There are ceremonies, including customary and traditional activities, marking the beginning and the end of the Makahiki season.  [Id. at ¶ 48.]

("Count XXIV"), access to sacred space ("Count XXV"), and access to a spiritual advisor ("Count XXVI").

The Supplemental Complaint states that Plaintiff Galdones "hereby joins in and asserts COUNTS I through XXVI of the Amended Complaint[5] on his own behalf and on behalf of all those similarly situated." [Supplemental Complaint at ¶ 124.] The Supplemental Complaint also asserted an additional claim alleging that Defendants retaliated against him, in violation of both federal law and state law. [Id. at ¶¶ 125-37.] This Court dismissed Galdones's retaliation claim under federal law for failure to exhaust his administrative remedies. [Order Granting in Part and Denying in Part Defendants' Motion to Dismiss for Failure to Exhaust, filed 4/11/13 (dkt. no. 286) ("4/11/13 Order"), at 28-29.[6]] Thus, Plaintiff Galdones's only remaining claims are his state law retaliation claim and the claims that are asserted in the Second Amended Complaint. Plaintiff Galdones, however, is not one of the named Plaintiffs in the Second Amended Complaint, although he is within the proposed Class and Segregation Subclass described in the Second Amended Complaint. [Second Amended Complaint at ¶¶ 23-24.]

─────────────

[5] Plaintiffs' Amended Complaint for Damages and for Classwide Declaratory and Injunctive Relief, [filed 11/14/11 (dkt. no. 42),] alleged the same twenty-six claims that Plaintiffs allege in the Second Amended Complaint.

[6] The 4/11/13 Order is available at 2013 WL 1568425.

6

On September 13, 2013, this Court dismissed Count XXI with prejudice as to all Defendants.  9/13/13 Order, 2013 WL 5204982, at *22.

Plaintiffs' Motion seeks partial summary judgment on the limited issue of whether they have established, for purposes of their RLUIPA claims, that the following activities at issue in this case are "religious exercises" for purposes of RLUIPA: "(1) daily outdoor congregational meetings; (2) the establishment of a modest outdoor sacred altar; (3) access to sacred garments and sacred items; (4) participation in religious services observing the Opening and Closing of the Makahiki Season; and (5) regular and frequent meetings with a spiritual advisor." [Mem. in Supp. of Pltfs.' Motion at 1.]

Defendants' Motion seeks summary judgment in their favor as to all of Plaintiffs' claims, and Holbron's Counter-Motion seeks summary judgment in his favor as to all of his claims.

### DISCUSSION

I.  **Scope of this Order and Order to File Motion Regarding Claims Seeking Damages**

The scope of this order is limited to Plaintiffs' claims seeking prospective declaratory and injunctive relief.  In light of the analysis in Discussion section II of the 9/13/13 Order, this Court DIRECTS Defendants to file a motion for summary judgment addressing: 1) whether sovereign immunity and the

42 U.S.C. § 1983 definition of a "person" precludes Plaintiffs'

claims seeking either damages or retrospective equitable relief

against Defendant Sakai; and 2) whether CCA stands in the shoes

of DPS for purposes of the sovereign immunity analysis and the

§ 1983 "person" analysis.  Defendants shall file their motion by

**May 13, 2014**.  This Court cautions Defendants that, insofar as

sovereign immunity may be considered an affirmative defense, <u>see</u>

<u>In re Bliemeister</u>, 296 F.3d 858, 861 (9th Cir. 2002), if they

fail to file the motion by **May 13, 2014**, this Court will deem the

sovereign immunity defense waived.  To the extent that any of the

pending motions seek summary judgment as to any claims seeking

damages or any claims seeking retrospective equitable relief, the

motions are DENIED WITHOUT PREJUDICE.

## A.    <u>Out-of-Facility Transfers</u>

Insofar as this Court will not address any of

Plaintiffs' claims seeking either damages or retroactive

equitable relief, this order will not address the merits of:

Plaintiffs' claims regarding any religious exercise at Red Rock

because the Hawai`i inmates who were incarcerated at Red Rock

have been "permanently" transferred to Saguaro;[7] [Defs.' Reply,

Decl. of Warden Thomas ("Thomas Reply Decl.") at ¶ 5;] or

---

[7] In this order, this Court will only address religious
policies/customs at Red Rock either in the context of what
alternatives may be available at Saguaro or as examples of the
types of burdens that Plaintiffs allege they experience as a
result of Defendants' restrictions on their religious activities.

Plaintiff Poaha's claims because he is no longer incarcerated at either Saguaro or Red Rock; [id. at ¶ 9 ("All Plaintiffs are currently incarcerated at [Saguaro], with the exception of inmate Poaha who transferred out of [Saguaro] to Halawa Correctional Facility on January 15, 2013.")].  There is not enough evidence in the current record for this Court to determine whether or not there is a reasonable expectation that any Plaintiff will be transferred to Red Rock, or that Plaintiff Poaha has a reasonable expectation of being transferred out of Halawa Correctional Facility ("Halawa") and back to Saguaro in the future.  If there is no reasonable expectation of transfer, the respective claims seeking prospective declaratory and injunctive relief will be moot.  See Johnson v. Moore, 948 F.2d 517, 519 (9th Cir. 1991).  This Court therefore DENIES the pending motions WITHOUT PREJUDICE to the extent that they seek summary judgment as to Plaintiffs' claims seeking prospective declaratory and injunctive relief regarding Red Rock and as to Plaintiff Poaha's claims seeking prospective declaratory and injunctive relief regarding Saguaro.

**B.     Plaintiff Holbron**

Holbron's Counter-Motion addresses his claims that are unique from the other Plaintiffs' claims because of Holbron's security status.  To the extent that Plaintiff Holbron's claims are the same as the other Plaintiffs' claims, he joined in the

Joint Plaintiffs' memorandum in opposition to Defendants' Motion. [Holbron's Counter-Motion at 2 n.2.]

At Saguaro, Plaintiff Holbron was in administrative segregation until he moved to the Special Housing Incentive Program ("SHIP"), which has three levels, known as SHIP I, SHIP II, and SHIP III.  SHIP I is the most restrictive, and SHIP III is the least restrictive.  He was in SHIP from approximately April 2009 until February 2012.  [Holbron Decl. at ¶¶ 8-17; Joint Pltfs.' Responsive CSOF, Decl. of Sharla Manley ("Manley Responsive Decl."),[8] Exh. 6, filed 12/23/13 (dkt. no. 485) (sealed exhibit - SHIP policies).]  Plaintiff Holbron voluntarily chose to remain in SHIP from some time in Fall 2010 until February 1, 2012.  [Thomas Reply Decl. at ¶ 27; Counter-Motion Opp., Decl. of David C. Lewis, Exh. 3 (agreement regarding Plaintiff Holbron's status as a SHIP III Permanent Porter).]  Thus, Plaintiff Holbron is apparently no longer in any form of restricted housing at Saguaro.  There is not enough evidence in the current record for this Court to determine whether or not there is a reasonable expectation that he will be placed in a form of restricted custody at Saguaro in the future.  If there is no reasonable expectation of such placement, Plaintiff Holbron's claims seeking prospective declaratory and injunctive relief

_____

[8] The exhibits to the Manley Responsive Declaration are included in docket numbers 466 through 470.

regarding restricted custody at Saguaro will be moot.  This Court therefore DENIES the pending motions WITHOUT PREJUDICE to the extent that they seek summary judgment as to Plaintiff Holbron's claims seeking prospective declaratory and injunctive relief regarding restricted custody at Saguaro.  Plaintiff Holbron's remaining claims seeking prospective declaratory and injunctive relief are the same as the other Plaintiffs' claims.

C. **Plaintiff Galdones's State Law Retaliation Claim**

In addition to his claims alleged in the Second Amended Complaint, Plaintiff Galdones has a pending state law retaliation claim, as alleged in the Supplemental Complaint.  Plaintiff Galdones alleges that Defendants retaliated against him for "exercis[ing his] First Amendment rights to file prison grievances, otherwise seek access to the courts, and practice [his] religion."  [Suppl. Complaint at ¶ 131.]  Plaintiff Galdones alleges that he was charged with violations of Saguaro inmate policies based on an incident in the Native Hawaiian culture class on or about April 25, 2012.  As a result of the charges, Plaintiff Galdones was placed in disciplinary segregation from about April 2012 to June 2012.  [Id. at ¶¶ 40, 90-91, 93.]  He alleges that the charges were a form of retaliation for his "attempt[] to ensure that appropriate protocols were followed during the Hawaiian class" and his

"attempt to practice Native Hawaiian religious activities" in connection with the class.  [Id. at ¶¶ 90-91.]

The Galdones Declaration, which Plaintiff Galdones signed on October 28, 2013, states that he is in the general inmate population at Saguaro.  [Joint Pltfs.' Amended Separate Concise Statement of Facts in Opp. to Defs.' Motion, filed 1/6/14 (dkt. no. 466) ("Joint Pltfs.' Responsive CSOF"), Decl. of Tyrone Galdones ("Galdones Decl.") at ¶ 64.]  Thus, he is no longer in disciplinary segregation as a result of the alleged retaliation.  The Supplemental Complaint also alleges that:

> 117. The charges against GALDONES will harm him even after he returns to general population. As a result of those charges, GALDONES will be barred from working **for six months**. Prior to the wrongful charges, GALDONES worked as a porter and earned wages that he used for hygiene items.
>
> 118. As a result of Defendants' wrongful charges against him, GALDONES will be barred from participating in hobby shop where he crafts objects that have cultural significance to him as a Native Hawaiian and that he sends to his family in Hawaii.
>
> 119. As a result of Defendants' wrongful charges against him, Plaintiff GALDONES will be restricted in the amount of participation he can engage in as a member of the Hawaiian classes offered by Defendants at Saguaro.

[Suppl. Complaint at ¶¶ 117-19 (bold emphasis added).]

Plaintiffs filed the Supplemental Complaint on August 22, 2012, when Plaintiff Galdones was apparently still experiencing the effects of the alleged retaliation.  Based on the allegations in

paragraph 117, the ban from working as a result of the charges is clearly over.  The Supplemental Complaint does not specify a duration of the hobby shop ban or the restriction on Plaintiff Galdones's participation in the Native Hawaiian classes.  The Galdones Declaration, however, does not state that Plaintiff Galdones was subject to these restrictions when he signed the declaration.  The declaration discusses the classes, but states only that Saguaro forces him to choose between either a hula class or a chants/rituals class and that there is often not enough room in the classes to accommodate all inmates who want to participate.  [Galdones Decl. at ¶¶ 30-31.]  Thus, there is no evidence that Plaintiff Galdones is currently experiencing the effects of the alleged retaliation.  There is not enough evidence in the current record for this Court to determine whether or not there is a reasonable expectation that Plaintiff Galdones will suffer further alleged retaliation or that he will suffer further effects of the alleged retaliation for the April 2012 incident. If there is no reasonable expectation either of such retaliation or further effects of the previous retaliation, Plaintiff Galdones's request for prospective declaratory and injunctive relief as to his state law retaliation claim will be moot.  This Court therefore DENIES the pending motions WITHOUT PREJUDICE to the extent that they seek summary judgment as to Plaintiff Galdones's request for prospective declaratory and injunctive

13

relief as to his state law retaliation claim.  Plaintiff

Galdones's remaining claims seeking prospective declaratory and

injunctive relief are the same as the other Plaintiffs' claims.

This Court now turns to the merits of the two motions

that are within the scope of this order.

## II.  **Plaintiffs' Motion**

RLUIPA "protects institutionalized persons who are

unable freely to attend to their religious needs and are

therefore dependent on the government's permission and

accommodation for exercise of their religion."  Cutter v.

Wilkinson, 544 U.S. 709, 721 (2005).  RLUIPA provides that:

> No government shall impose a substantial burden on
> the religious exercise of a person residing in or
> confined to an institution, as defined in section
> 1997 of this title, even if the burden results
> from a rule of general applicability, unless the
> government demonstrates that imposition of the
> burden on that person--
>
> > (1) is in furtherance of a compelling
> > governmental interest; and
> >
> > (2) is the least restrictive means of
> > furthering that compelling governmental
> > interest.

42 U.S.C. § 2000cc-1(a).

> If a plaintiff produces prima facie evidence to
> support a claim alleging a violation of the Free
> Exercise Clause or a violation of section 2000cc
> of this title, the government shall bear the
> burden of persuasion on any element of the claim,
> except that the plaintiff shall bear the burden of
> persuasion on whether the law (including a
> regulation) or government practice that is

> challenged by the claim substantially burdens the
> plaintiff's exercise of religion.

42 U.S.C. § 2000cc-2(b).

Plaintiffs argue that there is no genuine issue of
material fact as to the issue of whether the practices identified
in the Second Amended Complaint are religious exercises for
purposes of RLUIPA.  RLUIPA defines "religious exercise" as
follows:

> (A) In general
>
> The term "religious exercise" includes any
> exercise of religion, whether or not compelled by,
> or central to, a system of religious belief.
>
> (B) Rule
>
> The use, building, or conversion of real property
> for the purpose of religious exercise shall be
> considered to be religious exercise of the person
> or entity that uses or intends to use the property
> for that purpose.

42 U.S.C. § 2000cc-5(7).  In other words, RLUIPA "**bars** inquiry
into whether a particular belief or practice is 'central' to a
prisoner's religion."  Cutter v. Wilkinson, 544 U.S. 709, 725
n.13 (2005) (emphasis added).  The United States Supreme Court in
Cutter also noted that "[t]he 'exercise of religion' often
involves not only belief and profession but the performance
of . . . physical acts [such as] assembling with others for a
worship service [or] participating in sacramental use of bread
and wine . . . ."  Id. at 720 (some alterations in original)
(citation and quotation marks omitted).

15

Similar to the analysis of First Amendment claims, in evaluating RLUIPA claims, courts "may not inquire into the 'truth, validity, or reasonableness' of [the p]laintiff's religious need to" engage in the practice at issue in the case, but the court may inquire into whether the plaintiff "is insincere about the religious nature of his desire to" engage in the practice.  Chernetsky v. Nevada, No. 3:06-CV-00252-RCJ, 2014 WL 910355, at *1 (D. Nev. Mar. 7, 2014) (citing Callahan v. Woods, 658 F.2d 679, 685 (9th Cir. 1981)); see also Johnson v. Nev. ex rel. Bd. of Prison Comm'rs, No. 3:11-cv-00487-HDM-VPC, 2013 WL 5428423, at *4 (D. Nev. Sept. 26, 2013) ("Similar to First Amendment jurisprudence, RLUIPA '. . . does not preclude inquiry into the sincerity of a prisoner's professed religiosity.'" (quoting Cutter, 544 U.S. at 725 n. 13)).  In Callahan, the Ninth Circuit noted that, "'[a] religious belief can appear to every other member of the human race preposterous, yet merit the protections of the Bill of Rights,'" 658 F.3d at 685 (quoting Stevens v. Berger, 428 F. Supp. 896, 899 (E.D.N.Y. 1977)), and "if the free exercise right were dependent on one's ability to establish the truth of one's beliefs, then the First Amendment guarantees might be rendered illusory," id. (citing United States v. Ballard, 322 U.S. 78, 87, 64 S. Ct. 882, 886, 88 L. Ed. 1148 (1944)).

16

A.   **Daily, Outdoor, Group Worship Gatherings**

"Religious exercise" "encompasses not only 'belief and profession,' but also involves physical acts, such as communal worship and participation in sacred rituals."  Brown v. Alden, No. CV-09-05089-CI, 2011 WL 5520429, at *7 (E.D. Wash. Oct. 13, 2011) (citing Cutter v. Wilkenson, 544 U.S. 709, 720, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005)).  It is well established that, for purposes of RLUIPA, "group worship within the prison context is protected religious exercise."  Id. (footnote omitted) (citing Cutter, 544 U.S. at 720; Greene v. Solano Cnty. Jail, 513 F.3d 982, 987-88 (9th Cir. 2008); McCabe v. Arave, 827 F.2d 634, 637 (9th Cir. 1987)).

Plaintiffs rely heavily upon the July 16, 2012 report of Plaintiffs' expert, Ty Preston Kāwika Tengan, Ph.D. ("the Tengan Report"),[9] as support for Plaintiffs' Motion.  The Tengan Report states, *inter alia*:

---

[9] The Tengan Report is attached to Plaintiffs' Concise Statement of Facts in Support of Their Motion ("Plaintiffs' CSOF") as Exhibit 1 to the Declaration of Ty Preston Kāwika Tengan.  [Filed 10/31/13 (dkt. no. 418-2).]

Dr. Tengan is "a practitioner and a scholar of Native Hawaiian culture and religious practices" and he is fluent in the Hawaiian language.  [Id. at ¶ 3.]  He received his doctorate from the Department of Anthropology at the University of Hawai`i at Mānoa in 2003, and he is an Associate Professor of ethnic studies and anthropology.  [Id. at ¶¶ 4-5.]  He has "dedicated [his] academic career to the study of Native Hawaiian culture and religion."  [Id. at ¶ 6.]

17

8.   In general, Native Hawaiian spiritual tenets and beliefs are manifested in the observance of certain rituals and other activities to acknowledge *aumākua* and *akua* (deities), ancestors, and are also expressed and perpetuated in the very essence of a people and their relationship to each other and to their *kulāiwi* (native land).

9.   Native Hawaiians continue to recognize that they are related to elements of nature - to the land, to the ocean, to the wind, to the rain. Nature is the domain of both ancestral spirits and Hawaiian deities . . . .

10.  One of the primary concepts in Native Hawaiian religion holds that all persons, places, plants, and animals are imbued with *mana*, which loosely translated means spiritual power.

. . . .

18.  Because traditional Native Hawaiian prayer, chant, dance and protocol are passed down from generation to generation by aural, visual, and kinesthetic means, it is vitally important that participants in Hawaiian religious activities meet regularly to practice appropriate prayer, chant, dance, and religious protocol. . . .

19.  . . . [S]uch prayers, chants, hula, and protocol cannot be learned from a book, but must be learned from a *kupuna*, *kahu*, *kumu* (respected elder or teacher) or others to whom the prayers, chants, hula, and protocol have been personally transmitted.

20.  Thus, Native Hawaiian religious practice includes not only individual prayer and chant, but also group prayer, chant, hula, and other activities that are essential to expressing religious belief and faith that increase the spiritual power - *mana* - of the individual and group.

21.  In general, the more participants in a specific spiritual activity who are performing

18

*pono* (righteous) activities, the more positive mana [sic] is created.

22.  Ideally, religious activities should be guided by a qualified *kahu, kumu, or kupuna*. However, at the very least, Native Hawaiian religious activities should be practiced and performed by participants in a communal setting . . . .

23.  Based upon the above discussions, it is not uncommon for Native Hawaiian religious practitioners to meet as a group outdoors at dawn to pray, chant and dance, meditate, and give offerings and commune with the land and the spirits as an essential expression of their religious belief and faith.

[Tengan Report at ¶¶ 8-23.]  In support of their position that "[g]reeting the sun daily is an important aspect of Native Hawaiian religion," [Pltfs.' CSOF at ¶ 17,] Plaintiffs rely on the Tengan Report and Ka`iana Haili's[10] deposition testimony that, for many practitioners of the Native Hawaiian religion, "when a Hawaiian woke up, the head male of the household would go to a small building called the hale mua, or the men's house. There he would feed his gods."  [Pltfs.' CSOF, Decl. of Sharla Manley ("Manley Decl."), Exh. I (Excerpts of Trans. of

_____

[10]  Haili, who acts as the spiritual advisor to the practitioners of the Native Hawaiian religion at Saguaro, testified that, from 2010 to the present, he had visited Saguaro an average of four times a year to provide religious programming services.  Two of the visits are usually associated with the opening and closing of the Makahiki season, and the other two visits are usually close to other ceremonial dates.  [Defs.' Responsive CSOF, Decl. of David C. Lewis ("Lewis Decl."), Exh. 2 (Excerpts of Trans. of 5/31/13 Depo. of Ka`iana Haili ("Defs.' Responsive Excerpts of Haili 5/31/13 Depo.") at 288.]

5/31/13 Depo. of Ka`iana Haili ("Pltfs.' Excerpts of Haili 5/31/13 Depo.")) at 247.]  This occurred on a daily basis.  [Id. at 342.]

Defendants argue that Plaintiffs have not established that the practices at issue are **their** religious exercises, as opposed to the religious exercises of third-parties.  Thus, Defendants argue that the Tengan Report and Haili's testimony are not enough to meet Plaintiffs' burden on summary judgment because they merely establish that certain religious protocols **could be** religious exercises for a practitioner of the Native Hawaiian religion.  Further, Defendants argue that there is a dispute of material fact as to whether the practices at issue in this case are religious, as opposed to cultural, or lifestyle, practices.  [Defs.' Amended Concise Statement of Facts in Supp. of Their Response to Pltfs.' Motion, filed 1/6/14 (dkt. no. 464) ("Defs.' Responsive CSOF"), at ¶¶ 1-4.]  Defendants rely on Haili's testimony that, the practices of the Native Hawaiian religion vary among islands, among districts within an island, and even among families.  [Id. (citing Defs.' Responsive Excerpts of Haili 5/31/13 Depo. at 244.]  Defendants also rely on Haili's testimony that, "I don't consider it a culture and I don't consider it a religion.  My easiest western word is lifestyle." [Id. (quoting Defs.' Responsive Excerpts of Haili 5/31/13 Depo. at 304).]

First, Defendants are correct that Plaintiffs did not
submit any declarations with Plaintiffs' CSOF describing their
individual religious exercises.  In ruling upon Plaintiffs'
Motion, this Court is not limited to considering the evidence
that Plaintiff submitted with Plaintiffs' CSOF.  See Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)
("Where **the record taken as a whole** could not lead a rational
trier of fact to find for the non-moving party, there is no
genuine issue for trial." (emphasis added) (citation and
quotation marks omitted)).  This Court will therefore consider
Plaintiffs' declarations submitted with the Joint Plaintiffs'
Amended Separate Concise Statement of Facts in Opposition to
Defendants' Motion ("Joint Plaintiffs' Responsive CSOF"), [filed
1/6/14 (dkt. no. 466),] in ruling on Plaintiffs' Motion.

Plaintiff Davis's declaration states, in pertinent
part:

> 8.   I sincerely believe that I must pray,
> chant and dance hula to express my sincerely held
> Native Hawaiian religious beliefs.
>
> . . . .
>
> 10.   I sincerely believe these prayers,
> chants, and hula must be done with other Native
> Hawaiian practitioners, as a group, to foster
> *mana*.
>
> . . . .
>
> 12.   I sincerely believe that nature is the
> home of both ancestral spirits and Hawaiian

21

deities.  I also believe that ho`ailona, or signs
from the gods, are communicated through nature.

13.  Because our akua (gods) are nature-
based, I must worship outdoors.

14.  I sincerely believe that Hawaiian
spiritual practices are not limited to a certain

day of the week.  Instead Hawaiian religion must
be practiced on a daily basis.

[Joint Pltfs.' Responsive CSOF, Decl. of Richard Davis ("Davis
Decl.") at ¶¶ 8-14.]  The other Plaintiffs who have a pending
RLUIPA claim based on the denial of daily, outdoor, group worship
(collectively, "the Daily Outdoor Worship Plaintiffs") submitted
substantively identical declarations on this issue.[11]  [Galdones
Decl. at ¶¶ 10-17; Joint Pltfs.' Responsive CSOF, Decl. of
Michael Hughes ("Hughes Decl.") at ¶¶ 8-14; id., Decl. of
Damien Kaahu ("Kaahu Decl.") at ¶¶ 8-15; id., Decl. of
James Kane III ("Kane Decl.") at ¶¶ 12-18.]

---

[11] For purposes of this order, the Daily Outdoor Worship
Plaintiffs are: Plaintiffs Davis, Galdones, Hughes, Kaahu, and
Kane.  This Court previously dismissed Plaintiff Keawe's federal
claims based on daily religious congregation for failure to
exhaust his administrative remedies.  4/11/13 Order, 2013 WL
1568425, at *13.  In light of Plaintiff Holbron's security
status, which is different than that of the other Plaintiffs,
Plaintiff Holbron does not challenge Defendants' failure to give
him daily access to a sacred outdoor space.  [Mem. in Supp. of
Holbron's Counter-Motion at 1 & n.1.]  Plaintiff Poaha also has a
pending RLUIPA claim regarding the ability to engage in daily,
outdoor, group worship.  As stated, supra Discussion section I,
Plaintiff Poaha does not have pending claims seeking prospective
declaratory and injunctive relief in light of his transfer to
Halawa.

Second, this Court cannot find that Haili's deposition testimony creates a genuine issue of fact as to the question of whether daily, outdoor, group worship is a "religious exercise" for purposes of the Daily Outdoor Worship Plaintiffs' RLUIPA claim.  Defendants take Haili's testimony about lifestyle as opposed to religion out of context.  Haili gave that testimony during the following exchange:

> Q.   And would the hula and the chant class, would that be considered purely a religious programming [sic] or is there a cultural aspect to it, can you even parse that out?
>
> A.   No, you can't really separate our culture from our, what the western deems religious.  It is all the same.  Our lifestyles are interspersed with our deities, our ancestral elevated family deities, aumakua or family protectors, all those things are interspersed into our daily lives as a lifestyle.  I don't consider it a culture and I don't consider it a religion. My easiest western word is lifestyle.

[Defs.' Responsive Excerpts of Haili 5/31/13 Depo. at 303-04.] Haili's testimony does not support Defendants' position that the practices at issue in this case may not be religious exercises because they are cultural or lifestyle practices.  Haili testified that practitioners of the Native Hawaiian religion interweave their religion and culture in their daily lives, and therefore he would not characterize something as being only a religious practice.  This testimony, taken in the context of Haili's testimony as a whole, supports the Daily Outdoor Worship Plaintiffs' position.

23

Nor does Haili's testimony that there are variances in the individual practices of practitioners of the Native Hawaiian religion support Defendants' position.  Haili acknowledged differences in practice, [id. at 244,] but he stated that many of these differences are due to the fact that the deity who the practitioner honored varied depending on who the practitioner's ancestors were.

> If you were a farmer, your highest deity that you would look to would be Lono, the god of agriculture.
>
> If you were a fisherman, the deity you would look to would be Kanaloa, the ocean.
>
> If you were a navigator, the stars, and . . . there are so many variances on that.  And that's just the highest deity.

[Id. at 246-47.]  Although the deities may have differed, practitioners of the Native Hawaiian religion shared some common practices.  For example, the male head of a household would go to the *hale mua* when he woke up to feed his gods.  [Id. at 247.]

Even viewing the record in the light most favorable to Defendants, see Crowley v. Bannister, 734 F.3d 967, 976 (9th Cir. 2013), this Court finds that there is no genuine dispute of material fact as to the issue of whether daily, outdoor, group worship is a religious exercise for purposes of Count XXII.  See Fed. R. Civ. P. 56(a).  This Court therefore GRANTS Plaintiffs' Motion insofar as this Court FINDS that, as to the Daily Outdoor

Worship Plaintiffs, group worship outdoors, on a daily basis, is a religious exercise for purposes of RLUIPA.

**B.    Observance of Makahiki**

Count XXIII alleges that Defendants violated RLUIPA when they banned Plaintiffs[12] from observing "the opening and closing days of the Makahiki Season in 2009-2011 with specific religious protocol."  [Second Amended Complaint at ¶¶ 439, 442, 445.]  The Second Amended Complaint also alleges:

> The ceremonies marking the beginning and end of Makahiki Season includes the following customary and traditional activities critical to the Native Hawaiian faith: a) a sunrise service; b) a two-hour session dressing the image of Lono, and preparing offerings and giving offerings, including chanting and dancing; c) a one-hour procession; d) a 30-minute opening prayer; e) a 1.5-hour session of traditional games; f) a two-hour session of chanting, prayer, and an awa ceremony; g) a three-hour ceremonial feast, food to be prepared by inmates serving the following ceremonial foods, ia ulaula (red fish), taro, sweet potato, pork, breadfruit, coconut, banana and the awa drink.  These activities should be performed outdoors by all practitioners, as well as attendance and presence of a *kahu* or other religious leaders.

[Id. at ¶ 49.]  Plaintiffs' Motion states that Plaintiffs requested authorization to observe the opening and closing of the Makahiki Season with most of these religious protocols, and they sought to have access to "their sacred garments, purification items, communal sacred items and an *akua loa* to assist them in

---

    [12] All Plaintiffs' RLUIPA claims regarding the observance of Makahiki are properly before this Court.

their worship activities." [Mem. in Supp. of Pltfs.' Motion at 31.] Plaintiffs' Motion ultimately requests a finding that "the observance of the opening and closing days of the Makahiki Season with certain religious protocol and sacred items as requested by Plaintiffs" is a religious exercise for purposes of RLUIPA. [Id. at 31-32.]

In support of this request, Plaintiffs rely on the following portions of the Tengan Report:

34. Makahiki is a fundamental annual religious event for Native Hawaiians, allowing them to honor Lono, the deity of peace, agriculture, fertility, and medicine.

35. The Makahiki season is a three to four month period signaled by the rising of the *Makali`i* (Pleiades) in October and/or November each year and begins a season of peace following the harvest. The season typically ends following the setting of *Makali`i* in February and/or March.

. . . .

37. Observance of the opening day and closing day of the Makahiki season are integrally important to Native Hawaiian religious and spiritual beliefs.

38. Traditionally, the *akua loa*, a 16-foot pole with a carved representation of Lono at the top and a crosspiece hung with sheets of tapa, fern and feather leis, was carried around each island from district to district, with the people paying tribute to the ruling chief and offering gifts in the form of food, crafts, featherwork, stone implements, lauhala mats and other products. Games and competitions between villages displayed the physical and mental prowess of the people.

39. Native Hawaiian religious practitioners may require ceremonial foods for offerings to

Lono.  The use of such foods is based upon
religious beliefs and practices first established
by Native Hawaiians prior to 1778.

40.  While the protocol in observing the
opening and closing days of Makahiki is based upon
religious beliefs and practices first established
by Native Hawaiians prior to 1778, the specific
practices and protocol depend on the
practitioner's island and/or *ahupua`a* (traditional
land division).

41.  Common practices accepted by most Native
Hawaiian religious practitioners in observing the
opening and closing days of Makahiki include but
are not limited to prayers, chanting, dancing,
offerings, cleansing ceremonies, `*awa* ceremonies,
games and competitions and ceremonial feasts.

[Tengan Report at ¶¶ 34-41.]  Defendants admit that "Makahiki

observance **can** be a practice of Native Hawaiians but specific

practices vary widely."  [Defs.' Responsive CSOF at ¶ 24-28

(emphasis in original).[13]]  Defendants also made qualified

admissions that the religious observance of the opening and

closing days of the Makahiki season originated prior to 1778 and

that there are common practices associated with the opening and

closing observances.  [Pltfs.' CSOF at ¶¶ 32-33;[14] Defs.'

Responsive CSOF at ¶¶ 32-33.]  Defendants admit that giving

special foods as a sacrament and partaking in representative

_____

[13] Defendants' Responsive CSOF contains several instances
where a single paragraphs responds to multiple paragraphs in
Plaintiffs' CSOF.

[14] Plaintiffs' CSOF paragraph 33 lists the examples of
common Makahiki practices identified in paragraph 41 of the
Tengan Report.

pieces are part of the observance of Makahiki, but they argue
that "a communal feast was not traditionally observed" and "[t]he
sacrament consisted of whatever was available to the
practitioners."  [Defs.' Responsive CSOF at ¶ 29-31 (citing Lewis
Decl., Exh. 1 (Excerpts of Trans. of 5/8/13 Depo. of Ka`iana
Haili ("Defs.' Responsive Excerpts of Haili 5/8/13 Depo.")) at
27-30, 186-88; Defs.' Responsive Excerpts of Haili 5/31/13 Depo.
at 316).]  Defendants also argue that, where a feast is observed
for the Makahiki season, there is no required menu.  [Pltfs.'
CSOF at ¶ 37; Defs.' Responsive CSOF at ¶ 37.]

     Plaintiffs' declarations describe their beliefs
regarding the observance of the Makahiki season.  [Davis Decl. at
¶¶ 57-65; Galdones Decl. at ¶¶ 50-58; Hughes Decl. at ¶¶ 48-56;
Kaahu Decl. at ¶¶ 53-61; Decl. of Robert A. Holbron, filed
12/20/13 (dkt. no. 436-4) ("Holbron Decl.") at ¶¶ 25-32; Kane
Decl. at ¶¶ 66-76; Keawe Decl. at ¶¶ 46-56.]  Plaintiff Davis
states, *inter alia,* that he "sincerely believe[s] that [he] must
observe the opening and closing days of Makahiki with an outdoor
sunrise ceremony, prayers, chanting, dancing, offerings,
cleansing ceremonies, drinking `awa ceremonies, games and
competitions and ceremonial feasts including the partaking of
special foods to honor the God, Lono."  [Id. at ¶ 61.]  The other
Plaintiffs' declarations contain substantively identical
statements.  [Galdones Decl. at ¶ 54; Hughes Decl. at ¶ 52; Kaahu

Decl. at ¶ 57; Holbron Decl. at ¶¶ 27-29; Kane Decl. at ¶ 70; Keawe Decl. at ¶ 50.]

Haili testified that there are nine sacramental offerings for Lono: "[f]resh water, awa, pig, red fish, sweet potato, banana, taro, ulu" and *lama* wood. [Defs.' Responsive Excerpts of Haili 5/8/13 Depo. at 27-28.] He described the giving of the sacrament during Makahiki, as: "after we fed the gods and have given the offerings on the lele, the altar, we've also taken a certain amount of those, not all of those foods, but the ones that we can afford." [Id. at 28.] They pray and then consume the sacrament to "ingest[] the God." [Id. at 29.] Haili testified that this is distinct from the *lu`au* (feast). A *lu`au* has the spiritual function of blessing something. Haili testified that a *lu`au* associated with a ceremony can be very small or very large, "depending on what you have to share," and it is not meant to be "a hardship on a community or anything." [Id. at 30-31.] In Hawai`i, if practitioners were not able to have a full feast "that was okay" because the purpose is to "fe[e]d the God." [Id. at 187.]

Haili testified that Makahiki was not traditionally observed with a feast. [Id. at 30.] In contrast, he also testified that, at Makahiki celebrations throughout Hawai`i, "probably the majority of the foods would be the same," including traditional *lu`au* foods of "lau lau, kalua pig, poke, fresh

29

fish", and there would also be the foods "that have to do with the deity." [Defs.' Responsive Excerpts of Haili 5/31/13 Depo. at 316.] The foods at a celebration, however, are subject to availability. See, e.g., id. ("We're not going to overfish if it's not available."). When asked to describe the importance of having a communal or celebratory meal after the Makahiki observance, Haili responded, "[i]t's on the lower profile of the scale." [Defs.' Responsive Excerpts of Haili 5/8/13 Depo. at 185-86.]

Even viewing all of the evidence in the light most favorable to Defendants, this Court finds that there is no genuine issue of material fact that the observance of the opening and closing days of the Makahiki season, as described in the Tengan Report,[15] is a religious exercise for purposes of

---

[15] Defendants contest Plaintiffs' CSOF regarding the timing of the observance of the Makahiki season. [Pltfs.' CSOF at ¶ 26; Defs.' Responsive CSOF at ¶ 24-28.] In support of their argument that the timing varies, Defendants submit various schedules for Makahiki celebrations that defense counsel identified on the internet. [Lewis Decl., Exh. 5 (Decl. of Jamie D. Guzman ("Guzman Responsive Decl.")), Exh. 1.] This Court notes that eight of the ten Makahiki events listed in the Guzman Responsive Declaration occurred in November, which is consistent with Dr. Tengan's description of the opening of the Makahiki season as occurring in October or November. The other two events occurred in January, which is not consistent with Dr. Tengan's description. This Court, however, finds that the Guzman Responsive Declaration and its exhibit do not raise a genuine issue of material fact as to when practitioners of the Native Hawaiian religion observe the Makahiki season. The schedules of the events do not indicate that the events are religious celebrations of the Makahiki season. Further, some of the

(continued...)

Count XXIII (Plaintiffs' RLUIPA claim regarding the observance of Makahiki).  This Court also finds that there is no genuine issue of material fact as to the following components of the observance of the opening and closing of the Makahiki season: an outdoor sunrise ceremony, prayers, chanting, dancing, offerings, cleansing ceremonies, `*awa* drinking ceremonies, games and competitions, ceremonial feasts, and sacramental offerings of special foods to honor Lono.  This Court finds that, for purposes of Plaintiffs' RLUIPA claim regarding the observance of Makahiki, these components, **in general**, constitute religious exercises.  This Court GRANTS Plaintiffs' Motion as to these matters.

As to any other elements of the observance of Makahiki and as to **the specific content and duration** of the outdoor sunrise ceremony, prayers, chanting, dancing, offerings, cleansing ceremonies, `*awa* drinking ceremonies, games and competitions, ceremonial feasts, and sacramental offerings, this Court finds that there are genuine issues of material fact which preclude summary judgment on the issue of what is necessary to

---

[15](...continued)
descriptions expressly acknowledge the traditional Makahiki season that began with the rising of the Pleiades and lasting approximately four months.  See id., Aloha International Makahiki Festival 2002; id., Star Advertiser article "Makahiki festivities a tribute to Hawaiian culture."  Thus, Defendants' submission does not raise a triable issue of fact as to the question of when the Makahiki season is celebrated by practitioners of the Native Hawaiian religion.

constitute religious exercises.  This Court DENIES Plaintiffs'

Motion as to these matters.

C.  **Access to Sacred Items**

Count XXIV alleges that Defendants violated RLUIPA when

they banned Plaintiffs[16] from

> accessing the following sacred items: *malo, kihei*
> and *pau* (native garments), block of *lama* wood,
> *kapa*, *pa`a kai* (sea salt), *apu* (coconut shell
> bowl), ti shoots and leafs, *kala* (seaweed), *`olena*
> (yellow ginger), a *kahili* (pole with cylindrical
> top covered with feathers, cloth, flora and/or
> painted), *pu kani* (conch shell), *pahu* (tree stump
> drum), *ipu* (gourd drum), *ipu heke* (double gourd
> drum), *`ohe ka eke`eke* (percussion instrument), *pu
> niu* (small knee drum), *`ohe hano ihu* (bamboo nose
> flute), *pu ohe* (bamboo shell horn), and *moena*
> (floor mats made of woven lauhala, grasses,
> natural fibers).

[Second Amended Complaint at ¶¶ 453, 459.]  The Second Amended

Complaint also alleges that access to these sacred items is "[a]

critical tenet of Native Hawaiian religion essential to the

expression of Plaintiffs' faith."  [Id. at ¶ 50.]

According to Plaintiffs' Motion, they requested access

to *malo, kihei, pā`ū, kūpe`e, and lei* for use in all religious

activities and ceremonies, including personal prayer.  Plaintiffs

---

[16] All Plaintiffs' RLUIPA claims regarding access to sacred
items are properly before this Court.  This Court notes that,
because Plaintiff Holbron was in administrative segregation
during the relevant time period, Count XXIV alleges that
Defendants violated RLUIPA by banning Plaintiff Holbron from
meeting with a *kahu* who would facilitate his access to the sacred
items at issue in Count XXIV.  [Second Amended Complaint at
¶¶ 456, 462.]

also argue that both Dr. Tengan and Haili recognize that practitioners of the Native Hawaiian religion sometimes use a small, sacred object or amulet, which represents and/or manifests the *mana* of their ancestors and deities, in their religious rituals and protocol.[17]   [Mem. in Supp. of Motion at 27-28.] Plaintiffs also requested access to the following items for purification in protection rituals: *ti* leaf, sea salt, *`ōlena*, and *moena*.   [Id. at 28.]   The remaining items identified in Count XXIV are communal items for group worship activities.   [Id. at 28-29.]

### 1.   Ceremonial Garments & Amulets

Defendants admit that practitioners of the Native Hawaiian religion may wear certain clothing, including *malo*, *kihei*, *pā`ū*, *kūpe`e*, and *lei* to express their faith and religious beliefs.   [Pltfs.' CSOF at ¶ 44; Defs.' Responsive CSOF at ¶ 44-48 (citing Defs.' Responsive CSOF at ¶ 35 (citing Tengan Report at ¶ 10)).]   Plaintiff Davis states that he sincerely believes he needs daily access to, *inter alia,* a *malo*, *kihei*, *pā`ū*, *kūpe`e*,

---

[17] Count XXIV does not expressly mention *kūpe`e*, *lei* or amulets/personal sacred objects.   As this Court noted in connection with Plaintiffs' motion for a preliminary injunction, the relief that Plaintiffs seek as to *kūpe`e*, *lei*, and amulets/personal sacred objects "is of the same character as some of the relief that Plaintiffs ultimately seek in this action."   See Davis v. Abercrombie, 903 F. Supp. 2d 975, 995 (D. Hawai`i 2012).   Thus, Plaintiffs' arguments regarding *kūpe`e*, *lei*, and amulets/personal sacred objects is within the scope of their RLUIPA claim in Count XXIV.   See id.

and *lei* "for Native Hawaiian worship activities," and he believes that he must wear these items during religious rituals and protocol.  [Davis Decl. at ¶¶ 30, 43.]  Further, being forced to share his *malo*, *kihei*, and *pā`ū* with other practitioners violates his religious beliefs because the *malo* and the *kihei* contain his *mana* and should be kept in his cell at all times.  [Id. at ¶¶ 35, 45.]  The other Plaintiffs' declarations contain substantively identical statements.  [Galdones Decl. at ¶¶ 32, 39, 42-44; Hughes Decl. at ¶¶ 30, 35, 37-39; Kaahu Decl. at ¶¶ 32, 38, 40-43; Holbron Decl. at ¶¶ 63-64; Kane Decl. at ¶¶ 44, 54, 59-61; Keawe Decl. at ¶¶ 27, 38-41.]

Defendants acknowledge that amulets may be used by practitioners of the Native Hawaiian religion.  [Pltfs.' CSOF at ¶ 53; Defs.' Responsive CSOF at ¶ 53.]  Haili testified that a Native Hawaiian practitioner's personal amulet connects him to his ancestors and his "innate religious, . . . spiritual beliefs."  [Pltfs.' Excerpts of Haili 5/8/13 Depo. at 265.]

The Davis Declaration states that an amulet is a "personal sacred object," and he sincerely believes that it "should be made by [him] or passed down to [him] by a *kahu*, *kumu*, or *kupuna*, rather than purchased through a vendor."  [Davis Decl. at ¶¶ 35-36.]  He sincerely believes that an amulet is necessary for his daily worship activities.  [Id. at ¶ 30.]  Davis previously possessed such an amulet, which a *kumu* gave him, but

Saguaro staff confiscated it.  Davis used the amulet "for prayers and guidance and to sustain *mana*."  [<u>Id.</u> at ¶ 39.]  The other Plaintiffs expressed similar beliefs regarding the role of amulets in their religious activities.  [Galdones Decl. at ¶¶ 32, 39-40; Hughes Decl. at ¶¶ 30, 35-36; Kaahu Decl. at ¶¶ 32, 38-39; Holbron Decl. at ¶ 65 (stating only that "[t]he amulet is something that I sincerely believe should be made by me or passed down to me by a *kahu*, *kumu*, or *kupuna*"); Kane Decl. at ¶¶ 44, 54-55, 56-58 (describing his beliefs and discussing his amulet that was damaged during a cell search); Keawe Decl. at ¶¶ 27, 28.]

Even viewing the record in the light most favorable to Defendants, this Court finds that there is no genuine issue of material fact as to whether Plaintiffs' use of *malo*, *kihei*, *pā`ū*, *kūpe`e*, *lei*, and amulets/personal sacred objects is a religious exercise for purposes of RLUIPA.

**2.   <u>Items for Protection and Cleansing</u>**

Plaintiffs' CSOF states:

50.   Further, Native Hawaiian religious practitioners typically perform a cleansing ceremony prior to the commencement of their communal rituals and protocol as an essential expression of their religious belief and faith. Such ceremonies are based upon religious beliefs and practices first established by Native Hawaiians prior to 1778.

51.   The following sacred items may be used for ritual purification: ti leaf, paakai (sea salt), olena (turmeric) and coconut oil.

[Pltfs' CSOF at ¶¶ 50-51 (citing Tengan Report at ¶ 31; Pltfs'

Excerpts of Haili 5/31/13 Depo. at 258, 273-74).]  Defendants

acknowledge that these can be practices of the Native Hawaiian

religion.  [Defs.' Responsive CSOF at ¶ 50-52.]

   Plaintiff Davis's declaration states:

   50.  I sincerely believe that items used for
protection and cleansing must be on-hand every
day.

   51.  *Pa`akai* (sea salt) is used for
purification.  *Kala* (seaweed) and *`ōlena* (yellow
ginger) are used for cleansing and religious
purification.

   52.  *Ti* leaf is used for protection.

   . . . .

   56.  I sincerely believe that I need a *moena*
(floor mats made of woven lauhala, grasses,
natural fibers) to connect to the earth during
daily prayers.  It transforms the space and it is
sacred because it is made of lauhala which is a
symbol of *po* or the afterlife.

[Davis Decl. at ¶¶ 50-52, 56.]  The other Plaintiffs'

declarations attest to substantively identical beliefs regarding

items necessary for protection and cleansing.  [Galdones Decl. at

¶¶ 45-47, 49; Hughes Decl. at ¶¶ 42-44, 47; Kaahu Decl. at ¶¶ 46-

48, 52; Holbron Decl. at ¶¶ 64-65; Kane Decl. at ¶¶ 62-65; Keawe

Decl. at ¶¶ 42-45.]

   Even viewing the record in the light most favorable to

Defendants, this Court finds that there is no genuine issue of

material fact as to whether Plaintiffs' use of *pa`akai*, *kala*,

`ōlena*, *ti* leaf, and *moena* is a religious exercise for purposes of RLUIPA.

### 3.    Items for Group Worship Activities

Plaintiffs argue that the remainder of the sacred items identified in Count XXIV, [Second Amended Complaint at ¶¶ 453, 459, quoted *supra*,] are "communal items required for group worship activities."  [Mem. in Supp. of Pltfs.' Motion at 28.] Plaintiffs assert that practitioners of the Native Hawaiian religion "must be able to access certain religious materials for daily use as an essential expression of their religious belief and faith."  [Pltfs.' CSOF at ¶ 49 (citing Tengan Report at ¶ 30; Pltf.'s Excerpts of Haili 5/31/13 Depo. at 285-86).]  Defendants respond that the items identified in Count XXIV are merely "'examples' of items that may be used by practitioners.  Certain items are not required/may be substituted depending on availability."  [Defs.' Responsive CSOF at ¶ 49 (some citations omitted) (citing Bush, et al. v. State of Haw., CV 04-00096 DAE-KSC, Decl. of Ka`iana Haili in Supp. of Response to Motion to Enforce Settlement Agreement Entered on May 13, 2005, filed 11/10/09 (dkt. no. 87-7) ("Haili Bush Decl."), at ¶ 14.b).] Haili's declaration in Bush states, in pertinent part:

> [A]ll of the sacred items required of Makahiki
> observers will be available to the prisoners.  The
> only exceptions are a kahili (pole with feathers,
> cloth, flora), `ohe ha eke `eke (percussion
> instrument), pu niu (small knee drum), and awa.
> Likewise, the kahili may be substituted with the

> image of Lono (two large wooden poles and kapa
> cloth), which will be provided.  The percussion
> instrument and small knee drum are traditionally
> used for a specific hula and not in observance of
> Makahiki as I was taught; therefore, these items
> are not needed for the November 28
> ceremonies. . . .

[Haili Bush Decl. at ¶ 14.b.]  The Haili Bush Declaration only

addresses the use of these items in Makahiki celebrations; the

declaration does not address whether there are other uses for

these items in the practice of the Native Hawaiian religion.

Further, even if this Court accepts the Haili Bush Declaration as

evidence that other items can be used as substitutes for some of

the items at issue in Count XXIV, the availability of a

substitute does not prove that the use of the original item is

not a religious exercise.  If the availability of substitutes is

relevant, it is relevant to the issue of substantial burden.

Thus, the Haili Bush Declaration does not raise a genuine issue

of fact as to whether the communal worship items addressed in

Count XXIV are part of the exercise of the Native Hawaiian

religion in general.

The Davis Declaration states, in pertinent part:

> I sincerely believe that I need to have daily
> access to the following sacred items for Native
> Hawaiian worship activities: . . . block of lama
> wood, *kapa* (cloth), . . . `apu (coconut shell
> bowl), ti shoots and leafs,[18] . . . , a *kāhili*

---

[18] Plaintiffs addressed the use of *ti* leaves in their
discussion of items necessary for purification and cleansing.
(continued...)

(pole with cylindrical top covered with feathers, cloth, flora and/or painted), *pū kani* (conch shell), *pahu* (tree stump drum), *ipu* (gourd drum), *ipu heke* (double gourd drum), `*ohe kā`eke`eke* (percussion instrument), *pūniu* (small knee drum), `*ohe hano ihu* (bamboo nose flute), [and] *pū`ohe* (bamboo shell horn) . . . .

[Davis Decl. at ¶ 30.]  The other Plaintiffs' declarations attest to substantively identical beliefs regarding these items. [Galdones Decl. at ¶ 32; Hughes Decl. at ¶ 30; Kaahu Decl. at ¶ 32; Holbron Decl. at ¶ 63; Kane Decl. at ¶ 44; Keawe Decl. at ¶ 27.]

Even viewing the record in the light most favorable to Defendants, this Court finds that there is no genuine issue of material fact as to whether Plaintiffs' use of these items for communal group worship is a religious exercise for purposes of RLUIPA.

### 4.   <u>Summary of Ruling</u>

This Court GRANTS Plaintiffs' Motion and FINDS that Plaintiffs' use of each of the sacred items addressed in Count XXIV is a religious exercise for purposes of RLUIPA.

---

[18](...continued) Although not expressly stated in Plaintiffs' submissions, this Court assumes that Plaintiffs have specifically mentioned *ti* shoots in addition to *ti* leaves because *ti* shoots have a separate purpose from *ti* leaves.

D. __Access to a Sacred Outdoor Space (Altar)__

Count XXV alleges that Defendants violated RLUIPA when they banned Plaintiffs[19] from "establishing an outdoor sacred space for worship." [Second Amended Complaint at ¶¶ 467, 470.] The Tengan Report explains the significance of a stone altar for practitioners of the Native Hawaiian religion:

> 43. In ancient times, *pu`uhonua* [(place of refuge)] lands provided relief to lawbreakers and those who unintentionally violated religious rules known as *kapu*. Because *pu`uhonua* lands were sacrosanct and inviolable, a wrongdoer was protected from harm or death after entering a *pu`uhonua.*
>
> 44. On a smaller scale, many families maintained intergenerational *pu`uhonua,* known as *Pohaku o Kane,* where the family went to seek relief from death, illness, or other misfortunes through prayer and offerings to the family *`aumakua.*
>
> 45. In contrast to large *pu`uhonua,* the *Pohaku o Kane* consisted of a single stone altar, surrounded by cultivated greenery such as ti leafs. The proper stone for use as a *Pohaku o Kane* was revealed to each family through a dream or other omen.

---

[19] The Plaintiffs who have a pending RLUIPA claim regarding access to a sacred outdoor space, including an altar, are Plaintiffs Davis, Galdones, Hughes, Kaahu, and Kane (collectively, "the Outdoor Altar Plaintiffs"). This Court dismissed Plaintiff Keawe's federal claims based on access to an outdoor altar on exhaustion grounds. 4/11/13 Order, 2013 WL 1568425, at *13. In light of his administrative segregation status, Plaintiff Holbron does not contest Defendants' failure to give him access to a sacred outdoor space. [Mem. in Supp. of Holbron's Counter-Motion at 1 & n.1.] Plaintiff Poaha does not have any pending claims seeking prospective declaratory and injunctive relief.

46.   Today, *pu`uhonua* and *Pohaku o Kane* continue to have cultural and religious significance as both symbols of redemption, and as important physical sites for religious ceremony and healing.

47.   Accordingly, it is not uncommon for Native Hawaiian religious practitioners to seek out traditional *pu`uhonua* lands when performing important ceremonies, or to set up a *Pohaku o Kane* as a focal point for religious activities and healing.

[Tengan Report at ¶¶ 42-47.]  In addition, the Outdoor Altar

Plaintiffs assert that:

65.   Native Hawaiian religious practitioners also acknowledge the sunrise with ceremonies and prayers near large boulders or pohaku which commemorate the farthest point to the north and the farthest point to the south as the sun rises.

66.   Consistent with the *Pohaku o Kane* concept, Kaina [sic] Haili has built a stone "kuahu" (altar for prayers and offerings) in his backyard.

67.   Such an altar should be made from natural materials, such as rock.

68.   Such an altar should be of interlinking rocks, approximately 4 feet by 4 feet in dimension.

69.   Advisor Haili recommended that Saguaro accommodate the request for a stone altar.

[Pltfs.' CSOF at ¶¶ 65-69 (citing Pltfs.' Excerpts of Haili

5/8/13 Depo. at 118-19, 161-62; Pltfs.' Excerpts of Haili 5/31/13

Depo. at 253-54, 294-95, 297-98).]

Defendants counter that these are merely Haili's

personal opinions.  [Defs.' CSOF at ¶ 67-69.]  Defendants

acknowledge that "[a]n altar may be used for weekly sacraments or ceremonies, but daily access is 'an exception.'"  [Id. at ¶ 66 (citing Defs.' Responsive Excerpts of Haili 5/8/13 Depo. at 135; Defs.' Responsive Excerpts of Haili 5/31/13 Depo. at 299).]  In his deposition, Haili testified that the practice of having a stone altar in one's yard or near one's home was a prevalent practice "for practitioners that managed to have a continuity in their family, which is an exception, to have three or four generations living in the same roof like my family in Waimea was for many generations."  [Defs.' Responsive Excerpts of Haili 5/8/13 Depo. at 135.]  Thus, even the evidence that Defendants rely upon establishes that the use of an outdoor, stone altar was a common practice for at least some practitioners of the Native Hawaiian religion.

Plaintiff Davis's declaration states:

17.  I sincerely believe that I must have access to at least two spiritually significant *pohaku* (rocks) to serve as a stone altar outside.

18.  I sincerely belief that this sacred space should have plants that are significant spiritually and would not object to sharing this space with other faiths.

19.  The stone altar is important because it is a symbolic place like a *heiau* (temple).  This altar is also the physical space for making religious offerings.

20.  In the same way that other religions are practiced in a church with religious symbols like a cross, the physical space of a stone altar or garden serves as a sacred space for prayer.

[Davis Decl. at ¶¶ 17-20.]  All of the other Outdoor Altar Plaintiffs' declarations contains substantively identical statements.  [Galdones Decl. at ¶¶ 19-20, 22-24; Hughes Decl. at ¶¶ 17-20; Kaahu Decl. at ¶¶ 17-21; Kane Decl. at ¶¶ 22-26.]

Even viewing the record in the light most favorable to Defendants, this Court finds that there is no genuine issue of material fact as to whether the Outdoor Altar Plaintiffs' use of a sacred outdoor space, with a stone altar, **in general**, is a religious exercise for purposes of RLUIPA.  This Court, however, finds that there are genuine issues of material fact which preclude summary judgment as to **the size and composition** of the sacred space and the altar.  This Court GRANTS Plaintiffs' Motion insofar as this Court FINDS that the Outdoor Altar Plaintiffs' use of a sacred outdoor space, with a stone altar, is a religious exercise for purposes of RLUIPA, but this Court DENIES Plaintiffs' Motion as to the size and composition of the outdoor space and the altar.

E.     **Regular Access to a Spiritual Advisor**

Count XXVI alleges that Defendants violated RLUIPA when they banned Plaintiffs[20] from "meeting with a spiritual advisor

---

[20] The relevant Plaintiffs for the RLUIPA claim regarding access to a spiritual advisor are Plaintiffs Holbron, Kane, and Keawe (collectively, "the Spiritual Advisor Plaintiffs").  This Court dismissed Plaintiffs Davis, Galdones, Hughes, Kaahu, and Poaha's federal claims regarding access to a spiritual advisor on exhaustion grounds.  4/11/13 Order, 2013 WL 1568425, at *13.

on a regular basis." [Second Amended Complaint at ¶¶ 475, 478.]

The Spiritual Advisor Plaintiffs assert:

> 73. From an early age, young Native
> Hawaiians learn through listening, watching, and
> participating in community life. Similarly,
> spiritual values and teachings are passed from
> generation to generation through the extended
> family and community, primarily through direct
> contact with those who are older and wiser and
> trained in spiritual matters. Thus, the presence
> and guidance of *kūpuna* [sic], *kahu*, *kumu*
> (respected elders or teachers) is vital to the
> transmission of spiritual knowledge to the Native
> Hawaiian community.
>
> 74. Native Hawaiian religion was mostly
> handed down through chanting, oral storytelling.
>
> 75. There is a traditional Hawaiian saying,
> "*He alo a he alo*," meaning "face-to-face," which
> demonstrates the importance of direct transmission
> of prayer, chant, dance, and other religious
> practices. Thus, such prayers, chants, dance, and
> religious protocol cannot be learned from a book,
> but must be learned from a *kupuna, kahu, kumu*
> (respected elder or teacher) or others to whom the
> prayers, chants, hula, and protocol have been
> personally transmitted.
>
> 76. Religious activities should be guided by
> a qualified *kahu, kumu, or kupuna*. However, at
> the very least, Native Hawaiian religious
> activities should be practiced and performed by
> participants in a communal setting to ensure that
> all participants are performing prayer, chant,
> dance and religious protocols properly and gain
> knowledge of their deeper meaning.

[Pltfs.' CSOF at ¶¶ 73-76 (citing Tengan Report at ¶¶ 17, 19, 22;

Pltfs.' Excerpts of Haili 5/31/13 Depo. at 248).] Defendants

respond that these statements merely represent Dr. Tengan's and

Haili's personal opinions.[21]  [Defs.' Responsive CSOF at ¶¶ 73-76.]  Defendants, however, have not identified any specific facts showing there is a genuine issue for trial as to whether regular access to a spiritual advisor is a religious exercise for purposes of the Spiritual Advisor Plaintiffs' RLUIPA claim.  See Makaeff v. Trump Univ., LLC, 736 F.3d 1180, 1189 (9th Cir. 2013) ("to avoid summary judgment, the non-movant [must] 'designate specific facts showing that there is a genuine issue for trial'" (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))).

Plaintiff Holbron stated in his declaration that he sincerely believes that he must meet with a spiritual leader of the Native Hawaiian religion as part of his religious worship. [Holbron Decl. at ¶ 51.]  He also emphasized that he believes mana is created in group prayer and chanting.  [Id. at ¶ 59.] Plaintiff Keawe described the same beliefs.  [Keawe Decl. at ¶¶ 14, 77.]

---

[21] Defendants also object on the ground that "[a] spiritual advisor is not required to observe Makahiki."  [Defs.' Responsive CSOF at ¶ 76 (citation omitted).]  Count XXVI, however, addresses regular access to a spiritual advisor in general, not only during specific celebrations, such as the Makahiki.  Defendants also raise arguments about what Saguaro provides to the practitioners of the Native Hawaiian religion who are in the general population, [id.,] but these arguments relate to the remainder of the RLUIPA analysis and are inapplicable to the religious exercise analysis.

Plaintiff Kane stated in his declaration that he sincerely believes that religious "prayers, chants, hula, and protocol must be learned from a *kupuna*, *kahu*, *kumu* (respected elders, teachers) or one to whom the prayers, chants, hula and protocol have been transmitted."  [Kane Decl. at ¶ 13.] Plaintiff Kane also emphasized his belief that *mana* is created in group prayer, chanting, and hula.  [Id. at ¶¶ 14-15.]  For example, Kane stated that, because Red Rock did not allow the practitioners of the Native Hawaiian religion to gather and to meet with a spiritual advisor, they "were not able to learn all the chants and protocols [they] needed to know for Makahiki." [Id. at ¶ 39.]  He also states, "[b]ecause I am not in Hawaii, I cannot request regular visits from a kumu because there is no one I know in Arizona who is trained in Native Hawaiian religion.  I do not have the financial means to bring someone from Hawaii to Arizona."  [Id. at ¶ 92.]

Based on the evidence that Plaintiffs presented about the Native Hawaiian religion in general, as well as the evidence presented specifically addressing the claims regarding access to a spiritual advisor, the Spiritual Advisor Plaintiffs have clearly established the significance of a spiritual advisor to a practitioner of the Native Hawaiian religion.  Defendants have not identified any specific evidence that raises a genuine issue for trial as to the question of whether regular access to a

spiritual advisor is a religious exercise for purposes of the Spiritual Advisor Plaintiffs' RLUIPA claim. This Court therefore GRANTS Plaintiffs' Motion IN PART as to Count XXVI and FINDS that the Spiritual Advisor Plaintiffs' regular access to a spiritual advisor is a religious exercise for purposes of their RLUIPA claim. This Court, however, finds that there are genuine issues for trial as to the question of what constitutes "regular" access and the question of what type of access is necessary for the Spiritual Advisor Plaintiffs' religious exercise. This Court DENIES Plaintiffs' Motion as to those aspects of Count XXVI.

**F.** **Summary of Ruling on Plaintiffs' Motion**

Plaintiffs' Motion is GRANTED IN PART AND DENIED IN PART. This Court GRANTS Plaintiffs' Motion insofar as this Court FINDS as follows:

- Daily, outdoor, group worship is a religious exercise for purposes of the Outdoor Worship Plaintiffs' RLUIPA claim (Count XXII).

- The observance of the opening and closing days of the Makahiki season, during the time frame described in the Tengan Report, is a religious exercise for purposes of Plaintiffs' RLUIPA claim regarding the observance of Makahiki (Count XXIII). Further, the following components of the observance of the opening and closing days of the Makahiki season are religious exercises: an outdoor sunrise ceremony, prayers, chanting, dancing, offerings, cleansing ceremonies, `awa drinking ceremonies, games and competitions, ceremonial feasts, and sacramental offerings of special foods to honor Lono.

- The use of each of the sacred items addressed in Plaintiffs' RLUIPA claim regarding access to sacred items (Count XXIV) is a religious exercise for purposes of RLUIPA.

• The Outdoor Altar Plaintiffs' use of a sacred outdoor space, with a stone altar, is a religious exercise for purposes of their RLUIPA claim (Count XXV).

• The Spiritual Advisor Plaintiffs' regular access to a spiritual advisor is a religious exercise for purposes of their RLUIPA claim (Count XXVI).

This Court DENIES Plaintiffs' Motion insofar as this Court FINDS that there are genuine issues for trial as to the following issues:

• whether any other elements of the observance of Makahiki are religious exercises for purposes of Count XXIV, and what is the specific content and duration required for the outdoor sunrise ceremony, prayers, chanting, dancing, offerings, cleansing ceremonies, drinking `awa ceremonies, games and competitions, ceremonial feasts, and sacramental offerings;

• what size and composition is required for the Outdoor Altar Plaintiffs' religious exercise; and

• what constitutes "regular" access to a spiritual advisor, and what type of access is necessary for the Spiritual Advisor Plaintiffs' religious exercise.

This Court now turns to the merits of Defendants' Motion.

## III. Defendants' Motion as to Plaintiffs in the General Inmate Population

Defendants' Motion seeks summary judgment in Defendants' favor as to all of Plaintiffs' claims. As noted *supra*, although Plaintiff Holbron alleges claims regarding religious access during restricted custody, those claims are outside of the scope of this order because Plaintiff Holbron is no longer in restricted custody and is currently in the general inmate population, as are the other Plaintiffs.

48

A.   __Claims Regarding Daily, Outdoor, Group Worship__

1.   __RLUIPA__

In order to prevail on their RLUIPA claim, the Daily
Outdoor Worship Plaintiffs must establish a prima facie case that
Defendants' policy/practice of denying them the ability to
participate in daily, outdoor, group worship, preferably at dawn,
constitutes a substantial burden on their religious exercise.
See Warsoldier v. Woodford, 418 F.3d 989, 994-95 (9th Cir. 2005)
(citing 42 U.S.C. § 2000cc-2(b)).  "If [the Daily Outdoor Worship
Plaintiffs] establish[] the prima facie existence of such a
substantial burden, on which [they] bear[] the burden of
persuasion, [Defendants] shall bear the burden of persuasion to
prove that any substantial burden on [the Daily Outdoor Worship
Plaintiffs'] exercise of [their] religious beliefs is both 'in
furtherance of a compelling governmental interest' and the 'least
restrictive means of furthering that compelling governmental
interest.'"  See id. at 995 (quoting 42 U.S.C. § 2000cc-1(a))
(citing 42 U.S.C. § 2000cc-2(b)).

Having found that daily, outdoor, group worship is a
religious exercise for purposes of this RLUIPA claim, this Court
turns to the "substantial burden" analysis.  The Ninth Circuit
has stated:

> Although RLUIPA does not define what
> constitutes a "substantial burden" on religious
> exercise, see 42 U.S.C. § 2000cc-5, in the context
> of a land use suit brought under RLUIPA, we have

49

explained that "for a land use regulation to impose a 'substantial burden,' it must be 'oppressive' to a 'significantly great' extent. That is, a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise," <u>San Jose Christian Coll. v. City of Morgan Hill</u>, 360 F.3d 1024, 1034 (9th Cir. 2004). In addition, the Supreme Court has found a substantial burden as "where the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." <u>Thomas v. Review Bd. of the Ind. Employment Sec. Div.</u>, 450 U.S. 707, 717–18, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981) (ruling in First Amendment context). Although such "compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." <u>Id.</u> at 718, 101 S. Ct. 1425.

<u>Id.</u> (alterations in <u>Warsoldier</u>).

Defendants acknowledge that inmate practitioners of the Native Hawaiian religion are not permitted to engage in daily, outdoor, group worship. Defendants argue that this is not a substantial burden on the Daily Outdoor Worship Plaintiffs' religious exercise because Defendants provide them with sufficient opportunities to engage in group religious activities. According to Defendants' evidence, Saguaro allows general population inmates, who do not pose a safety and security risk, to participate in weekly religious programming. [Thomas Decl. at ¶ 13.] At Saguaro, there are weekly hula classes, weekly ritual/religion classes, and weekly language classes available to inmates who practice the Native Hawaiian religion. Each class is 1.5 hours. [<u>Id.</u> at ¶ 46.] Defendants emphasize the

practitioners' ability to pray on their own during their outdoor recreation time. [Id. at ¶ 34.]

First, Plaintiffs dispute the availability of the regular classes that Defendants rely upon.  For example, Warden Thomas testified in deposition that, when Plaintiff Davis submitted a grievance about being removed from the Hawaiian language class, the Saguaro staff denied the grievance because, inter alia, Plaintiff Davis was on a waiting list for a language class and the language class "has nothing to do with [his] religion."  [Manley Responsive Decl., Exh. 18 (Excerpts of Warden Todd Thomas's 4/5/13 Depo. ("Pltfs.' Excerpts of Thomas Depo.")) at 244-46; id., Exh. 21 (Pltf. Davis's Inmate/Resident Grievance dated 9/27/11).]

Further, Plaintiff Davis states:

24.  Although Saguaro offers some Native Hawaiian classes, I have suffered spiritual injury because these classes have not allowed me to engage in my sincerely-held religious beliefs about group worship.

25.  This weekly session is held indoors, not outside which is where I sincerely believe I must worship.

26.  I am permitted to attend one (1) weekly Native Hawaiian class, **either** a hula class **or** a chants/rituals class.  Although I must practice both hula and chant to exercise my Native Hawaiian religious beliefs, I am forced to do one or the other by the prison.

27.  There is often not enough room in the Native Hawaiian classes for all of us who want to participate.

51

28.   Furthermore, I suffered spiritual injury when the prison had a special list that it used to determine who could come to Native Hawaiian class and who could not.

[Davis. Decl. at ¶¶ 24-28 (emphases in original).]  He states that the inability to engage in daily, outdoor, group worship, "preferably during sunrise," has caused him "spiritual injury." [Id. at ¶¶ 22-23.]  The other Daily Outdoor Worship Plaintiffs describe substantively identical beliefs and experiences about daily, outdoor, group worship in general.  [Galdones Decl. at ¶¶ 26-31; Hughes Decl. at ¶¶ 22-28;[22] Kaahu Decl. at ¶¶ 25-30;[23] Kane Decl. at ¶¶ 32-35, 37-38, 41-43.[24]]

Warden Thomas acknowledges that the Native Hawaiian hula class and the Native Hawaiian ritual class are held in the Saguaro chapel, which only holds up to sixty people.  The chapel is the largest room available for Saguaro programs.  [Thomas Reply Decl. at ¶¶ 47-48.]  There are 179 inmates at Saguaro that have registered as practitioners of the Native Hawaiian religion. [Id. at ¶ 11.]

---

[22] Plaintiff Hughes states that he has "never been allowed to attend [the Hawaiian language class] regularly.  [He] was told by prison officials that [he] was on a waiting list for it over a year ago."  [Hughes Decl. at ¶ 29.]

[23] Plaintiff Kaahu states that he "suffered spiritual injury" when he was in a mandatory program that was "held at the same time as Native Hawaiian class."  [Kaahu Decl. at ¶ 31.]

[24] Plaintiff Kane states that neither Red Rock nor Saguaro allowed him to participate in daily, outdoor, group worship. [Kane Decl. at ¶¶ 32-33, 43.]

Insofar as Defendants rely on the weekly classes as support for their argument that the policy/custom of prohibiting daily, outdoor, group worship for practitioners of the Native Hawaiian religion is not a substantial burden, there is a genuine issue of fact as to whether the Daily Outdoor Worship Plaintiffs actually have access to those classes.  Further, to the extent that their religious exercise requires daily, group worship outdoors, Defendants' policy/custom of providing weekly classes indoors constitutes a complete prohibition of this religious exercise.  The Ninth Circuit has stated:

> We have little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise. See Murphy v. Mo. Dep't of Corrs., 372 F.3d 979, 988 (8th Cir. 2004) (concluding that a ban on "communal worship" substantially burdened inmate's religious exercise, thereby precluding summary judgment); Meyer v. Teslik, 411 F. Supp. 2d 983, 989 (W.D. Wis. 2006) (holding that ban on group worship substantially burdened inmate's religious exercise and noting that, "It is difficult to imagine a burden more substantial than banning an individual from engaging in a specific religious practice").

Greene v. Solano Cnty. Jail, 513 F.3d 982, 988 (9th Cir. 2008).

In light of this legal precedent and the evidence presented in this case, this Court concludes that Defendants are not entitled to summary judgment on the issue of whether their policy/custom constitutes a substantial burden on the Daily Outdoor Worship Plaintiffs' religious exercise.

Defendants argue that, even assuming, *arguendo*, that the Daily Outdoor Worship Plaintiffs can establish their prima facie case, Defendants are entitled to summary judgment as to Count XXII because Defendants' policy/custom of prohibiting daily, outdoor, group worship is the least restrictive means of furthering a compelling governmental interest. Defendants argue that prison resources and scheduling do not permit them to allow the practitioners of the Native Hawaiian religion from gathering outdoors on a daily basis. They argue that Saguaro uses six additional staff for each of the four annual outdoor gatherings for the practitioners of the Native Hawaiian religion. Allowing daily outdoor worship for them would require the permanent addition of six staff persons. Further, Saguaro would be required to allow daily worship for the thirteen other religious groups in the facility. [Thomas Decl. at ¶¶ 38-39.] Defendants contend that "[t]here are not enough hours in the day to accomplish daily worship for all religious groups on a daily basis on top of chow time, head counts, and other types of programming." [Id. at ¶ 39.]

"Prison security is a compelling governmental interest." Greene, 513 F.3d at 988 (citing Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005)). The Ninth Circuit, however, has also stated:

> "[N]o longer can prison officials justify
> restrictions on religious exercise by simply

54

> citing to the need to maintain order and security
> in a prison." Greene v. Solano County Jail, 513
> F.3d 982, 989 (9th Cir. 2008).  They now must
> demonstrate that they "actually considered and
> rejected the efficacy of less restrictive measures
> before adopting the challenged practice."
> Warsoldier, 418 F.3d at 999.

Alvarez v. Hill, 518 F.3d 1152, 1156-57 (9th Cir. 2008)

(alteration in Alvarez).

The Daily Outdoor Worship Plaintiffs point to the fact that Saguaro had a "faith-based pod" that allows Christian inmates to participate in daily worship.  [Joint Pltfs.' Responsive CSOF at ¶ 143.]  Defendants emphasize that the faith-based pod was non-denominational and was open to inmates of any faith.  [Defs.' Reply, Defs. Response to Pltfs.' Facts (doc. 466) ("Defs.' Reply CSOF") at ¶ 143.]  It was a voluntary program that used "Christian-based material," i.e. curriculum, and "was operated under Christian principles.  [Manley Responsive Decl., Exh. 23 (Excerpts of 4/4/13 Charles F. Miller Depo. ("Joint Pltfs.' Excerpts of Miller Depo.")) at 223-24.]  Charles Miller, who was the Saguaro Chaplain before his retirement, was an advisor to the coordinator of the faith-based pod.  [Id. at 10, 222-23.]  The Daily Outdoor Worship Plaintiffs argue that he was a Christian Chaplain.  See, e.g., Joint Pltfs.' Excerpts of Miller Depo. at 57 (Miller gave the sermon for "[q]uite a few of" the Christian services); id. at 66-67 (Miller also provided services at the Samoan-language Christian services).  This raises

55

the question of whether Saguaro considered a pod for practitioners of the Native Hawaiian religion and whether that would safely facilitate group worship for them.

The Daily Outdoor Worship Plaintiffs also submitted a schedule of Saguaro's religious services, dated April 18, 2009. [Manley Responsive Decl., Exh. 24.]  The Native Hawaiian language class is not listed on this schedule, and the Native Hawaiian hula class and the Native Hawaiian rituals and ceremonies class are on the same day.  There are three services for "Christian Non Denominational," two on Sunday and one on Saturday, as well as a "Samoan Christian" service on Saturday.  [Id.]  Chaplain Miller testified that the Samoan Christian service was the same as the other Christian services, except that it was in the Samoan language.  [Joint Pltfs.' Excerpts of Miller Depo. at 66.] Defendants submitted a schedule effective as of January 1, 2014. [Thomas Reply Decl., Exh. A.]  There is now only one "Christian Non Denominational" service on Sunday, but the other services discussed above are the same.  In addition, there is "Bible Study" on Friday.  [Id.]  Thus, there appears to be two, or possibly three, days when Christian inmates can engage in group worship, but only one day that inmate practitioners of the Native Hawaiian religion can participate in what Saguaro deems as religious services.

Plaintiffs also pointed to evidence that, at Red Rock, there was a "Buddhist meditation" Monday through Friday from 7:00 to 8:15 a.m.  [Manley Responsive Decl., Exh. 13 (Excerpts of 4/3/13 Bruno Stolc Depo. ("Stolc Depo.")) at 117; id., Exh. 16 (CCA Programs and Religious Services - AK-CA-HI-WA Units, submitted as exhibit in Stolc's Depo.).]  Defendants emphasize that this program only involved one Buddhist inmate and was discontinued within a few months.  The inmate performed self-meditation while sitting still on the ground.  [Defs.' Reply, Decl. of Warden Stolc ("Stolc Reply Decl.") at ¶¶ 7-9.]  Even accepting Defendants' explanation, the practice raises the question of whether daily, outdoor worship for practitioners of the Native Hawaiian religion, in small groups, is a viable means to further the compelling governmental interest.

In light of this evidence, this Court finds that there are genuine issues of fact as to whether Defendants' policy/custom of prohibiting the practitioners of the Native Hawaiian religion from participating in daily, outdoor, group worship was the least restrictive means of furthering the compelling governmental interest in prison security.  This Court therefore DENIES Defendants' Motion as to Count XXII.

### 2.   **Federal Free Exercise Claim**

The analysis of whether a prison regulation violates inmates' right to freely exercise their religion, as guaranteed

by the United States Constitution, is more deferential to the government than the RLUIPA analysis.

>"When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penalogical interests."  Turner v. Safley, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987); see also Ward v. Walsh, 1 F.3d 873, 876-77 (9th Cir. 1993) (holding that Turner still applies to free exercise claims of prisoners after Employment Division, Dep't of Human Resources v. Smith, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990)).  Turner sets forth four factors to be balanced in determining whether a prison regulation is reasonably related to legitimate penalogical interests:

>> (1) Whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it";

>> (2) Whether there are "alternative means of exercising the right that remain open to prison inmates";

>> (3) Whether "accommodation of the asserted constitutional right" will "impact . . . guards and other inmates, and on the allocation of prison resources generally"; and

>> (4) Whether there is an "absence of ready alternatives" versus the "existence of obvious, easy alternatives."

> Turner, 482 U.S. at 89-90, 107 S. Ct. 2254 (quoting Block v. Rutherford, 468 U.S. 576, 586, 104 S. Ct. 3227, 82 L. Ed. 2d 438 (1984)).

Shakur v. Schriro, 514 F.3d 878, 883-84 (9th Cir. 2008)

(alterations in Shakur).

Even viewing the record in the light most favorable to the Daily Outdoor Worship Plaintiffs, Defendants have established the first and third <u>Turner</u> factors.  In light of the dispute regarding the accessibility of the Native Hawaiian classes, this Court finds that there is a genuine issue of fact as to the second <u>Turner</u> factor.  In light of the evidence discussed within the RLUIPA least restrictive means analysis, this Court finds that there is a genuine issue of fact as to the fourth <u>Turner</u> factor.  This Court therefore DENIES Defendants' Motion as to Count I.

### 3.   **Federal Equal Protection Claim**

> The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This is "essentially a direction that all similarly situated persons should be treated alike."  <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985).  An Equal Protection claim can be stated in one of two ways.  First, a plaintiff can allege that "defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class."  <u>See</u> <u>Barren v. Harrington</u>, 152 F.3d 1193, 1194-95 (9th Cir. 1998) (citing <u>Washington v. Davis</u>, 426 U.S. 229, 239-40 (1976)). . . .

<u>Kaeo-Tomaselli v. Pi`ikoi Recovery House for Women</u>, No. CIV. 11-00670 LEK, 2011 WL 5572603, at *2 (D. Hawai`i Nov. 16, 2011).  "If the statute employs a suspect class (such as race, religion, or national origin) or burdens the exercise of a constitutional right, then courts must apply strict scrutiny, and ask whether

59

the statute is narrowly tailored to serve a compelling governmental interest." Ball v. Massanari, 254 F.3d 817, 823 (9th Cir. 2001) (citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 219, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995)).

Based upon the evidence discussed in connection with the Daily Outdoor Worship Plaintiffs' RLUIPA claim that Defendants treated inmates of other religions more favorably, this Court finds that there is a genuine issue of fact as to whether Defendants acted with an intent or purpose to discriminate against the Daily Outdoor Worship Plaintiffs because of their religion. Further, there is a genuine issue of fact as to whether Defendants' policy/custom is narrowly tailored to serve the compelling governmental interest of prison security. This Court therefore DENIES Defendants' Motion as to Count VI.

### 4. **State Free Exercise Claim**

The analysis of state free exercise claims is related to the analysis of federal free exercise claims. The Hawai`i Supreme Court has stated:

> In order to find an unconstitutional infringement on Appellant's religious practices [in violation of the first amendment to the United States Constitution and article I, section 4 of the Hawai`i Constitution],
>
> > it [is] necessary to examine whether or not the activity interfered with by the state was motivated by and rooted in a legitimate and sincerely held religious belief, whether or not the parties' free exercise of religion had been burdened by the regulation, the

60

> > extent or impact of the regulation on the
> > parties' religious practices, and whether or
> > not the state had a compelling interest in
> > the regulation which justified such a burden.
>
> State ex rel. Minami v. Andrews, 65 Haw. 289, 291,
> 651 P.2d 473, 474 (1982).  Accord Wisconsin v.
>
> Yoder, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d
> 15 (1972). . . .
>
> . . . .
>
> > As a preliminary matter, "it is necessary in a
> > free exercise case for one to show the coercive
> > effect of the [law] as it operates against him in
> > the practice of his religion."  School District of
> > Abington Township v. Schempp, 374 U.S. 203, 223
> > [83 S. Ct. 1560, 1572, 10 L. Ed. 2d 844] (1963).
> > Accord Thomas v. Review Board, Indiana Employment
> > Security Division, 450 U.S. 707, 717-18 [101 S.
> > Ct. 1425, 1431-32, 67 L. Ed. 2d 624] (1981);
> > Koolau Baptist Church v. Department of Labor, 68
> > Haw. 410, 418], 718 P.2d [267,] 272 (1986). . . .
>
> > . . . Appellants must show a "substantial burden"
> > on religious interests.  Koolau, 68 Haw. at [418],
> > 718 P.2d at 272; Wisconsin v. Yoder, 406 U.S. at
> > 218 [92 S. Ct. at 1534]. . . .

Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan, 87

Hawai`i 217, 247, 953 P.2d 1315, 1345 (1998) (alterations in

Sullivan) (quoting Dedman v. Board of Land & Natural Resources,

69 Haw. 255, 260-61, 740 P.2d 28, 32 (1987), cert. denied, 485

U.S. 1020, 108 S. Ct. 1573, 99 L. Ed. 2d 888 (1988)).

For the same reasons as those discussed in connection

with the Daily Outdoor Worship Plaintiffs' RLUIPA claim and their

federal free exercise claim, this Court finds that there are

genuine issues of material fact as to Plaintiffs' state free

exercise claim regarding daily, outdoor, group worship.[25]  This Court therefore DENIES Defendants' Motion as to Count XI.

### 5.   State Equal Protection Claim

The strict scrutiny standard also applies to Plaintiffs' state equal protection claim regarding daily, outdoor, group worship.  See Nagle v. Bd. of Educ., 63 Haw. 389, 392, 629 P.2d 109, 111-12 (1981).  For the same reasons set forth in connection with the Daily Outdoor Worship Plaintiffs' federal equal protection claim, this Court finds that there are genuine issues of material fact as to Plaintiffs' state equal protection claim regarding daily, outdoor, group worship.  This Court therefore DENIES Defendants' Motion as to Count XVI.

### B.   Claims Regarding the Observance of Makahiki

### 1.   RLUIPA

This Court has found that the observance of the opening and closing days of the Makahiki season is a religious exercise for purposes of RLUIPA.  This Court has found that the following components of the observance of the opening and closing days of the Makahiki season are religious exercises: an outdoor sunrise ceremony, prayers, chanting, dancing, offerings, cleansing ceremonies, `awa drinking ceremonies, games and competitions,

---

[25] This Court denied Defendants' motion to dismiss for failure to exhaust as to Plaintiffs' state law claims because the Prison Litigation Reform Act of 1996 ("PLRA") does not apply to state law claims.  4/11/13 Order, 2013 WL 1568425, at *9 (citing 42 U.S.C. § 1997e(a)).

ceremonial feasts, and sacramental offerings of special foods to honor Lono.  Although this Court has found that there are genuine issues of material fact as to other components of the Makahiki celebrations and as to the specific content and duration of the components, for purposes of Defendants' Motion, this Court will assume that the components of the Makahiki observance, as Plaintiffs describe them, are religious exercises for purposes of RLUIPA.

Warden Thomas describes Saguaro's Makahiki program and policies as follows:

> 15.  General population inmates who have appropriately and formally designated their religious preference as Native Hawaiian religious practitioners, and who do not present safety and security threats to facility operations, are permitted to attend the opening and closing Makahiki celebrations at [Saguaro] . . . .

> 16.  The general population Native Hawaiian religious practitioners who have attended the Makahiki ceremony preparation classes are permitted to play religiously significant roles in the celebration.

> 17.  Those who fail to attend the preparation classes are not permitted to play religiously significant roles in the celebration, but are still permitted to observe the ceremonies and participate in the chants and prayers to the level of mastery achieved by that particular inmate.

> 18.  The Makahiki ceremonies begin at approximately sunrise and last until two or three o'clock in the afternoon. . . .

> 19.  . . . [T]he ceremonies at [Saguaro] are performed outside on one of the facility recreation yards.  The recreation yard also

accommodates . . . multiple practice sessions leading up to these celebrations.  During these activities, the recreation yard is closed to other inmate populations.

.  .  .  .

21.  At [Saguaro], general population inmates celebrating Makahiki are permitted to construct an altar to Lono with materials appropriate for the correctional setting – but not of rocks.

22.  Ceremonial food offerings that are provided by the Volunteer Spiritual Advisor are also permitted, but only one or two pieces of this sacramental food offering are consumed by the inmates.  Upon the advice of Advisor Haili, this is appropriate for inmates to practice the Native Hawaiian religion in the correctional setting.

23.  While the inmates are permitted to celebrate a communal meal after the service, no special menu is provided as none is required of the religion.

24.  Upon the advice of Advisor Haili, this is appropriate for inmates to practice the Native Hawaiian religion in the correctional setting because it is the communal aspect of the meal that is religiously significant – not what foods are on the menu.

25.  While the regular facility menu is served to the inmates celebrating the opening or closing of the Makahiki, additional items are added to the menu such as extra rice or a special dessert such as pudding or cake.  This is not required by the Native Hawaiian religion, but is provided by CCA prison officials as a show of support for the celebrations.

[Thomas Reply Decl. at ¶¶ 15-25.]  In addition, as previously

noted, Haili typically travels to Saguaro for the opening and

closing celebrations of the Makahiki season.  [Defs.' Responsive

Excerpts of Haili 5/31/13 Depo. at 288.]

Based on Plaintiffs' demands for the Makahiki celebrations, [Second Amended Complaint at ¶ 49,] this Court agrees with Defendants that Plaintiffs merely ask this Court to order Defendants to require Saguaro, in addition to what Saguaro is currently providing: to comply with specific time lengths for components of the Makahiki celebrations; to add a procession; and to provide specific ceremonial foods during the ceremonial feast. First, it appears that a procession was included in a 2013 Makahiki ceremony, although the genesis of the procession was that Saguaro instructed the group to move because that recreation yard was needed for another group of inmates. [Defs.' CSOF, Decl. of Jamie D. Guzman ("Guzman Decl."), Exh. 1 (Excerpts of Trans. of 5/31/13 Depo. of Ka`iana Haili ("Defs.' Excerpts of Haili 5/31/13 Depo.") at 318.[26]] Defendants have apparently taken the position that the procession is now a regular part of the Makahiki celebrations. [Mem. in Supp. of Defs.' Motion at 5 ("Advisor Haili has testified that he is satisfied with the schedule and timing of the ceremonies as well as the ability to perform a procession.").] This Court will consider Defendants' representation as a binding admission. Thus, the dispute as to Plaintiffs' request for prospective relief as to the RLUIPA claim

---

[26] Exhibit 1 to the Guzman Declaration also includes Defendants' excerpts of the transcript of the May 8, 2013 deposition of Ka`iana Haili ("Defendants' Excerpts of Haili 5/8/13 Deposition").

regarding Makahiki celebrations is limited to the duration and content of the recognized components of the Makahiki celebration.

Plaintiffs have not identified any evidence that their religious exercise has suffered substantial burden because the components of the Makahiki celebrations at Saguaro are shorter than requested in the Second Amended Complaint. Further, they have not identified any evidence that their religious exercise has suffered substantial burden because the specific foods provided for the sacrament and for the feast are determined based on availability at the facility as opposed to the foods listed in the Second Amended Complaint. This Court therefore finds that there is no genuine issue of fact as to the substantial burden inquiry in the RLUIPA analysis. Plaintiffs thus cannot establish their prima face case as to their RLUIPA claim regarding the observance of Makahiki, and Defendants are entitled to summary judgment.

Defendants' Motion is GRANTED as to Plaintiffs' claims in Count XXIII.

### 2.  **Free Exercise Claims**

As this Court previously recognized, the federal free exercise analysis and the state free exercise analysis are more deferential than the RLUIPA analysis. Insofar as this Court has concluded that Plaintiffs' RLUIPA claim regarding the observance of Makahiki fails, this Court also concludes that the Joint

Plaintiff's federal free exercise claim and state free exercise claim regarding the observance of Makahiki fail as a matter of law.  This Court therefore GRANTS Defendants' Motion as to Count II and Count XII.

### 3.   Equal Protection Claims

Plaintiffs have not presented any evidence that Defendants treated inmates of other religions more favorably in comparable situations, *i.e.* there is no evidence that other inmate religious groups have comparable annual ceremonies and Defendants provided those ceremonies with duration and content accommodations that Defendants denied Plaintiffs.  This Court therefore concludes that Plaintiffs' federal equal protection claim and state equal protection claim based on the observance of Makahiki fail as a matter of law.  Defendants' Motion is GRANTED as to Plaintiffs' claims in Count VII and Count XVII.

### C.   Claims Regarding Access to Sacred Items

Saguaro has a list of the types of religious items that all inmates are permitted to keep in their cells ("the Retention List").  Pursuant to the Retention List, practitioners of the Native Hawaiian religion may keep the following items in their cells: "sea salt, a ti leaf lei, coconut oil, a lava lava and an amulet."  [Thomas Decl. at ¶ 52.]  In addition, they may keep "written religious materials to include books, genealogy, chants and prayers.  General population Native Hawaiian practitioners

may also check out a ukulele from the chapel." [Thomas Reply Decl. at ¶ 122.] Saguaro "is working to identify a vendor for the amulets and is also working to locate a vendor for coconut oil." [Thomas Decl. at ¶ 52.] In addition,

> 126. For formal communal religious ceremonies conducted at [Saguaro], the following sacred items are available for use and stored in the prison chapel: coconut bowls, koa bowls, woven bowls, uli`uli, maracas, quido, wai ohe (bamboo), kala`au (brown sticks), egg shakers, cloth mat, kukui nut leis, koa sticks, leihulu, twine, kukui nuts and coconut fiber, sponge brushes, raffia, bamboo stamps, Hawaiian salt, blankets, lama wood and traditional Native Hawaiian dress.

> 127. In addition to the above, Native Hawaiian religious practitioners at [Saguaro] are permitted access to an extensive library of Native Hawaiian religious and cultural texts for checkout.  CDs, DVDs, cassette tapes, flash cards, video tapes and a dictionary are also available to the practitioners. . . .

[Thomas Reply Decl. at ¶¶ 126-27.]

Plaintiffs argue that their lack of daily access to *malo*, *kihei*, *pā`ū*, *kūpe`e*, *lei*, amulets/personal sacred objects, *pa`akai*, *kala*, `*ōlena*, *ti* leaf, and *moena*, and their lack of access to specific items for group worship activities, see items listed *supra* section II.C.3., violates their rights under RLUIPA and the federal and state constitutions.

### 1.   RLUIPA

This Court has found that Plaintiffs' access to the sacred items identified in their RLUIPA claim is a religious exercise.  This Court will first address the items that

68

Plaintiffs argue that they must have daily access to, *i.e.*, they argue that Defendants must allow Plaintiffs to keep these items in their cells.

### a.   Daily Access Items

*Ti* leaf *lei* and *pa`akai* (sea salt) are allowed pursuant to the Retention List, and Plaintiffs cannot establish a substantial burden as to those items.  Defendants are therefore entitled to summary judgment as to the portion of Plaintiffs' RLUIPA claim based on access to *ti* leaf *lei* and *pa`akai*.

Defendants acknowledge that an amulet and coconut oil are permitted pursuant to the Retention List, but those items are not available because Saguaro has not yet identified vendors that can provide those items.  Insofar as Defendants admit Plaintiffs can possess these items in their cells but do not have current access these items, and in light of Plaintiffs' declarations, this Court will assume, for purposes of Defendants' Motion, that Plaintiffs' religious exercise is substantially burdened by their lack of daily access to a personal amulet and to coconut oil. Defendants have a compelling interest in maintaining prison security, and certain types of amulets may be used as weapons or to conceal contraband, and certain types of oils may be flammable or may be used in an alcohol-making process.  Even if coconut oil itself is not flammable and does not produce alcohol, there is a danger that an unapproved provider may try to mix prohibited

69

liquids with the coconut oil.  Plaintiffs have not identified any evidence that they need individually unique sources of coconut oil.  Thus, this Court finds that requiring an approved vendor for coconut oil is the least restrictive means available. Defendants are therefore entitled to summary judgment as to the portion of Plaintiffs' RLUIPA claim based on the lack of daily access to coconut oil.

Plaintiffs, however, have submitted evidence that a religiously significant amulet must come from a *kahu*, *kumu*, or *kupuna*, not a vendor.  Further, there is no evidence that Defendants have considered whether a vendor could provide amulets with individual significance.  For example, could a vendor design a Saguaro-approved amulet according to a design provided by a *kahu*, *kumu*, or *kupuna*?  There is also no evidence as to whether Defendants considered a case-by-case inspection system for amulets that the Joint Plaintiffs obtain directly from a *kahu*, *kumu*, or *kupuna*.  This Court therefore finds that there are genuine issues for trial as to the least restrictive means analysis of Plaintiffs' lack of daily access to a personal amulet.  Defendants are not entitled to summary judgment as to the portion of Plaintiffs' RLUIPA claim regarding daily access to personal amulets.

Defendants presented evidence that Saguaro allows practitioners of the Native Hawaiian religion to keep *malo* and

*kihei* in the prison chapel for use during ceremonies.  According to Defendants, Haili advised the facility that those items are not for daily personal worship.  The *malo* and *kihei* are "kept in a bag marked with the inmate's name."  [Thomas Decl. at ¶ 51.]

Although Plaintiffs stated that they sincerely believe that they need daily access to *malo* and *kihei*, they state that their religious beliefs **would be violated if** they were forced to share their *malo* and *kihei*.  See, e.g., Davis Decl. at ¶¶ 30, 35. There is no evidence that Plaintiffs are being asked to share communal *malo* and *kihei*.  Based on the evidence that Saguaro maintains inmates' personal *malo* and *kihei* in the chapel, this Court finds that the burden on Plaintiffs' religious exercise is not substantial.  Defendants are therefore entitled to summary judgment as to the portion of Plaintiffs' RLUIPA claim based on the lack of daily access to *malo* and *kihei*.

Plaintiffs state that *malo*, *kihei*, and *pā`ū* are spiritually significant because *mana* attaches to certain items of clothing, and *kūpe`e* and *lei* are spiritually significant because wearing them shows respect for the gods.  See, e.g., Davis Decl. at ¶ 44.  There is, however, no evidence of the specific role *pā`ū* plays that is different from the role of *malo* and *kihei*, nor is there evidence of the specific role that *kūpe`e* plays that is different from the role of *lei*.  See discussion of *ti* leaf *lei* *infra*.

Defendants contend that: "Altering [the Retention List] to include all the items Plaintiffs allege in the Second Amended Complaint would have a negative impact on prison resources, as it would require more frequent cell searches for modified weapons and contraband, and potentially lead to increased bartering and violence among inmates." [Thomas Decl. at ¶ 52.] Defendants also contend that inmates' possessions must be limited because there is limited space in the inmate cells.

> 119. Inmate cells at [Saguaro] measure 7 foot by 14 foot and are designed for double occupancy. Cells are outfitted with two inmate bunks, a sink, a toilet and a small table with two stools.
>
> 120. Inmate personal property is limited due to available space in the cell and for safety, fire and health considerations. [Saguaro] inmates are restricted to personal property that fits in two facility-issued storage boxes that are 20 inches long, 15 inches wide and 11 inches deep. All personal property including clothes, hygiene, commissary, books, personal items and legal materials must be stored in these boxes. . . .

[Thomas Reply Decl. at ¶¶ 119-20.]

Even assuming that Plaintiffs' lack of daily access to *pā`ū* and *kūpe`e* constitutes a substantial burden on their religious exercise, Defendants have a compelling interest in the inmates' safety and in prison security, and it is reasonable for Saguaro to limit inmates' possessions to further those interests. Even viewing the record in the light most favorable to Plaintiffs, considering the in-cell possession of *lava lava* and *lei* and the storage of personal *malo* and *kihei* in the chapel,

72

this Court finds that the policy/custom of prohibiting in-cell possession of *pāʻū* and *kūpeʻe* is the least restrictive means available.  Defendants are therefore entitled to summary judgment as to the portion of Plaintiffs' RLUIPA claim based on the lack of daily access to *pāʻū* and *kūpeʻe*.

As to the items the Plaintiffs have argued are necessary for purification and cleansing, *paʻakai* (sea salt) and *ti* leaf *lei* are available.  Defendants are therefore entitled to summary judgment as to the portion of Plaintiffs' RLUIPA claim based on the lack of daily access to *paʻakai* and *ti* leaf.

Defendants have not presented any evidence addressing *kala* (seaweed), which Plaintiffs use for cleansing and religious purification.  Viewing the record in the light most favorable to Plaintiffs, there are genuine issues of fact as to both the substantial burden analysis and the least restrictive means analysis.  Defendants therefore are not entitled to summary judgment as to the portion of Plaintiffs' RLUIPA claim based on the lack of access to *kala* (seaweed).

Warden Thomas stated that ginger is prohibited because it can be "used to ferment and manufacture alcohol."  [Thomas Reply Decl. at ¶ 117.]  Even if this Court assumes that Plaintiffs' religious exercise is substantially burdened by their lack of daily access to *ʻōlena* (yellow ginger), Defendants have a compelling interest in maintaining safety and security, and the

ban on ginger is the least restrictive means available.

Defendants are therefore entitled to summary judgment as to the

portion of Plaintiffs' RLUIPA claim based on the lack of daily

access to `ōlena.

As to *moena* (woven floor mats made from *lauhala*, grass,

or other natural fibers), Warden Thomas stated:

> As to the possession of grass mats in-cell by
> Native Hawaiian practitioners, I have considered
> but rejected such personal in-cell possession
> where grass mats, made of grass, present a fire
> hazard because of the flammable nature of dried
> grass, which is an increased concern as compared
> to Muslim prayer rugs – not made of
> grass. Grass mats, because of their lightweight
> nature and material makeup, pose an increased risk
> – as compared to Muslim prayer rugs – in being
> used by inmates to cause slip and fall hazards to
> prevent officer entry into cells in emergency
> situations.

[Thomas Reply Decl. at ¶ 125.]  Even if this Court assumes that

Plaintiffs' religious exercise is substantially burdened by their

lack of daily access to *moena*, Defendants have a compelling

interest in maintaining safety and security, and the ban on mats

made of grass, or similar materials, is the least restrictive

means available.  Defendants are therefore entitled to summary

judgment as to the portion of Plaintiffs' RLUIPA claim based on

the lack of daily access to *moena*.

### b.   Communal Worship Items

Plaintiffs assert that the remainder of the items at

issue in Count XXIV are necessary for group worship.  Two of

those items, *lama* wood and `*apu* (coconut shell bowls), are available for formal communal religious ceremonies and are stored in the Saguaro chapel.  Further, Plaintiffs also refer to *kapa* (cloth), but cloth mats and blankets are also available at the chapel.  [Thomas Reply Decl. at ¶ 126.]  Defendants are therefore entitled to summary judgment as to the portion of Plaintiffs' RLUIPA claim based on the lack of access to *lama* wood, *kapa*, and `*apu* for group worship.

Plaintiffs also refer to *ti* shoots, but they have not identified evidence of what *ti* shoots are specifically used for (as opposed to what *ti* leaf is used for).  Thus, it is a close question whether the lack of access to *ti* shoots for communal worship constitutes a substantial burden on Plaintiffs' religious exercise.  Viewing Plaintiffs' declarations in the light most favorable to Plaintiffs, however, this Court finds that there are genuine issues of material fact as to the substantial burden analysis.  Further, Defendants have not presented evidence regarding the reason for the prohibition of *ti* shoots, which this Court assumes, for purposes of Defendants' Motion, that Haili can bring to Saguaro in the same manner that he brings *ti* leaf *lei*. This Court therefore concludes that there are triable issues of fact as to the portion of Plaintiffs' RLUIPA claim regarding communal access to *ti* shoots.

Most of the other communal worship items that Plaintiffs seek access to are, or are similar to, musical instruments - drums, flutes, and horns.  Warden Thomas stated that "a pole,[27] flute or horn becomes a sharpened spear or shank" and drums can be used to store contraband.  [Thomas Decl. at ¶ 53.]  Further, the Saguaro chapel offers other musical instruments, including, *inter alia*, ukulele, maracas, and egg shakers.  [Thomas Reply Decl. at ¶¶ 122, 126.]  Even if this Court assumes that Plaintiffs' religious exercise is substantially burdened by their lack of daily access to the musical instruments identified in Count XXIV, Defendants have a compelling interest in maintaining safety and security in the facility, and the instruments at issue in this case may used as weapons or to conceal contraband.

Plaintiffs, however, argue that the ban on the Native Hawaiian instruments is not the least restrictive means available because Saguaro allows inmates of other faiths to have access to similar instruments.  Plaintiffs point out that, although Native Hawaiian practitioners are not allowed a `*ohe hano ihu* (bamboo nose flute) in the chapel, inmates who practice Drudism are allowed to keep a wooden flute in their cells.  [Joint Pltfs.' Responsive CSOF, Decl. of Richard Subia ("Subia Decl.") at

---

[27] One of the communal items at issue in Count XXIV is a *kāhili*, a pole with a decorated, cylindrical top.

76

¶ 74.[28]]  In addition, although Saguaro does not allow the

different types of Native Hawaiian drums identified in the Second

Amended Complaint, Saguaro allows Native American inmates to have

a ceremonial hand drum in the chapel.  [Manley Responsive Decl.,

Exh. 49 (memorandum dated 5/1/09 from Warden Thomas to the

Chaplaincy Department regarding "NATIVE AMERICAN FAITH PROPOSAL")

at 1.]  This Court agrees that the evidence of accommodations for

similar instruments for other religious groups raises a genuine

issue of fact as to the question of whether Saguaro's prohibition

of Native Hawaiian drums and flutes is the least restrictive

means available.

Plaintiffs, however, have not presented evidence

raising a triable issue of fact as to the question of whether the

prohibition of the Native Hawaiian horns and horn-like items is

the least restrictive means available to further the compelling

interest in safety and security.  This Court therefore finds that

there is no dispute of fact that those items can be used as

weapons, and this Court finds that the complete prohibition of

the *pū kani* (conch shell) and *pū`ohe* (bamboo shell horn) in the

chapel is the least restrictive means available to further the

compelling interest in prison safety and security.  Similarly,

--------

[28] Subia is Plaintiffs' expert witness.  [Subia Decl. at
¶ 2.]  Subia has "26 years of experience with the California
Department of Corrections and Rehabilitation (CDCR) encompassing
administration, management, supervision, and line-staff duties
and responsibilities."  [Id. at ¶ 4.]

77

the *kāhili* (pole with cylindrical top) may also be used as a weapon, and Plaintiffs have not presented evidence raising a triable issue of fact as to the question of whether the prohibition of *kāhili* in the chapel is the least restrictive means available.  This Court therefore finds that there is no dispute of fact that the *kāhili* can be used as a weapon, and its complete prohibition in the chapel is the least restrictive means available to further the compelling interest in prison safety and security.

### c.  Summary of RLUIPA Sacred Items Claim

This Court DENIES Defendants' Motion as to the portions of Count XXIV based on Plaintiffs' lack of access to: personal amulets, *kala* (seaweed), *ti* shoots, *pahu* (tree stump drum), *ipu* (gourd drum), *ipu heke* (double gourd drum), `*ohe kā*`*eke*`*eke* (percussion instrument), *pūniu* (small knee drum), and `*ohe hano ihu* (bamboo nose flute).  This court GRANTS Defendants' Motion as to all other items at issue in Count XXIV.

### 2.  Federal Free Exercise Claim

As to the portion of Plaintiffs' federal free exercise claim based on the lack of daily access to personal amulets, *pahu* (tree stump drum), *ipu* (gourd drum), *ipu heke* (double gourd drum), `*ohe kā*`*eke*`*eke* (percussion instrument), *pūniu* (small knee drum), and `*ohe hano ihu* (bamboo nose flute), this Court finds that Defendants have not established the second and fourth

factors of the Turner analysis.  As to the portion of Count III based on the lack of daily access to *kala* and *ti* shoots, this Court finds that there are genuine issues of fact as to all of the Turner factors.  This Court therefore concludes that Defendants are not entitled to summary judgment as to the portions of Count III based on: daily access to a personal amulet and to *kala*; and communal access to *ti* shoots, *pahu* (tree stump drum), *ipu* (gourd drum), *ipu heke* (double gourd drum), `*ohe kā`eke`eke* (percussion instrument), *pūniu* (small knee drum), and `*ohe hano ihu* (bamboo nose flute).

As to the remainder of Count III, insofar as the federal free exercise analysis is more deferential than the RLUIPA analysis, the grant of summary judgment to Defendants as to the remainder of Count XXIV also requires summary judgment in favor of Defendants as to the remainder of Count III.

### 3.   Federal Equal Protection Claim

As to Count VIII, Plaintiffs argue that the denial of access to the Native Hawaiian practitioners' sacred items violates their federal equal protection rights because Defendants authorize substantially similar items for inmates of other faiths.  Plaintiffs have identified evidence that Saguaro approved less restrictive in-cell retention lists for Wiccan inmates, Muslim inmates, and Asatru inmates.  [Joint Pltfs.' Responsive CSOF at ¶ 137 (citing Pltfs.' Excerpts of Miller Depo.

at 138-57; Manley Responsive Decl., Exhs. 25, 41, 56; id., Exh. 81 at Nos. 1, 3, 5-6, 8).]  As discussed *supra*, Saguaro allows inmates who practice Drudism to keep a wooden flute in their cells and allows Native American inmates to have a ceremonial hand drum in the chapel.

Defendants have presented evidence explaining the reasons why some of the comparable items are allowed for other religions.  For example, as discussed previously, *moena* are fire and slip-and-fall hazards, but Muslim prayer rugs are not because of the difference in the materials.  Defendants, however, have not presented evidence addressing all of the distinctions.  For example, Defendants have not established a reason why Muslim inmates have access to prayer oils, but the Native Hawaiian practitioners do not have access to coconut oil because of difficulties finding an appropriate vendor.  Defendants also have not explained the different policies/customs regarding drums and flutes.

This Court therefore finds that there are genuine issues of fact as to the question of whether any difference in the restrictions on the Native Hawaiian practitioners' in-cell retention list and in the restrictions on their communal worship items, as compared to the restrictions for inmates of other religions, survives strict scrutiny.  Thus, Defendants are not entitled to summary judgment as to Plaintiffs' federal equal

protection claim regarding access to sacred items.  The only exceptions to this ruling are the portions of Count VIII regarding the following items, because Saguaro allows Plaintiffs to have the access requested in the Second Amended Complaint: *ti* leaf, *lei*, block of *lama* wood, *pa`akai* (sea salt), *kapa* (cloth), and `*apu* (coconut shell bowl).  In addition, this Court CONCLUDES that Defendants have established that the prohibition of *moena* (floor mats made of woven *lauhala*, grasses, or natural fibers) survives strict scrutiny.

This Court therefore GRANTS Defendants' Motion as to the portions of Plaintiffs' federal equal protection claim regarding: *ti* leaf, *lei*, block of *lama* wood, *pa`akai*, *kapa*, `*apu*, and *moena*.  Defendants' Motion is DENIED as to the remaining portions of Count VIII.

### 4.   State Free Exercise Claim

As to the portions of Count XIII based on the denial of daily access to personal amulets and *kala* and the denial of communal access to *ti* shoots, *pahu* (tree stump drum), *ipu* (gourd drum), *ipu heke* (double gourd drum), `*ohe kā`eke`eke* (percussion instrument), *pūniu* (small knee drum), and `*ohe hano ihu* (bamboo nose flute), for the same reasons as those discussed in connection with Count XXIV and Count III, this Court finds that there are genuine issues of material fact as to the portions of Plaintiffs' state free exercise claim regarding these items.

81

This Court therefore DENIES Defendants' Motion as to those portions of Count XIII.

As to the remainder of Count XIII, insofar as the state free exercise analysis is more deferential than the RLUIPA analysis, the grant of summary judgment to Defendants as to the remainder of Count XXIV also requires summary judgment to Defendants as to the remainder of Count XIII.

### 5.   **State Equal Protection Claim**

The strict scrutiny standard also applies to Plaintiffs' state equal protection claim regarding access to sacred items.  For the same reasons as those set forth in the analysis of Plaintiffs' federal equal protection claim, this Court finds that there are genuine issues of material fact as to Plaintiffs' state equal protection claim regarding access to sacred items, except as to the items that Saguaro allows and as to *moena*.  This Court therefore GRANTS Defendants' Motion as to the portions of Plaintiffs' state equal protection claim regarding: *ti* leaf, *lei*, block of *lama* wood, *pa`akai* (sea salt), *kapa* (cloth), *`apu* (coconut shell bowl), and *moena* (floor mats made of woven *lauhala*, grasses, or natural fibers).  Defendants' Motion is DENIED as to the remaining portions of Count XVIII.

### D.   **Claims Regarding Access to a Sacred Outdoor Space with a Stone Altar**

The Second Amended Complaint alleges that: "A critical tenet of Native Hawaiian religion essential to the expression of

Plaintiffs' faith is to establish an out-of-doors altar composed of at least two spiritually significant stones as a focal point for specific religious protocol activities." [Second Amended Complaint at ¶ 51.] Insofar as this Court has already addressed Plaintiffs' claims regarding the ability to engage in daily group worship outdoors, this Court construes Plaintiffs' claims regarding access to a sacred outdoor space as addressing whether Defendants must provide Plaintiffs with a designated outdoor space with a permanent stone altar. The altar that Plaintiffs seek "should be of interlinking rocks, approximately 4 feet by 4 feet in dimension." [Pltfs.' CSOF at ¶ 68 (citing Pltfs.' Excerpts of Haili 5/31/13 Depo. 297-98).] Haili testified that permanently affixing or connecting the rocks together, such as with cement, would be offensive to the Native Hawaiian religion. [Defs.' Excerpts of Haili 5/31/13 Depo. at 299-300.]

1. **RLUIPA**

The Outdoor Altar Plaintiffs have established that using a permanent space with a stone altar is a religious exercise. Viewing the record in the light most favorable to the Outdoor Altar Plaintiffs, this Court finds, for purposes of Defendants' Motion, that the denial of access to a permanent place with a stone altar constitutes a substantial burden on the Outdoor Altar Plaintiffs' religious exercise.

Warden Thomas has stated:

Providing inmates access to essentially, a rock pile, is providing inmates access to a pile of weapons that can be used to severely, permanently and fatally injure inmates or facility personnel. This risk is unreasonable and would constitute an obvious unsound correctional practice if permitted.  One boulder placed on an existing recreation yard, as Plaintiffs recently suggest, would still be dangerous, there is nothing to keep other inmates from invading the area, angering the practioners [sic] and causing inmate conflict, fights and assaults over religious territory.

111. In sum, it is sound correctional practice and the standard of care in a correctional setting to preclude the introduction of a loose rock altar into a secure facility, in order to prevent serious injury or death to inmates and staff.  Loose rocks in a prison yard pose a danger as a weapon.  I specifically considered the danger of rocks utilized in outdoor altars and chose not to permit them for this reason.  At other facilities I have worked, inmates have been beaten in the head, or legs been broken by rocks.  And at [Saguaro], an inmate's leg was broken with a rock the size of one's hand. . . .

[Thomas Reply Decl. at ¶¶ 110-11.]  Thus, Defendants have submitted evidence that Saguaro has prohibited the Outdoor Altar Plaintiffs' stone altar because it is necessary for its compelling governmental interest in prison safety and security.

The Outdoor Altar Plaintiffs argue that the prohibition of their altar is not the least restrictive means available to further the compelling interest in safety, as evidenced by the fact that Saguaro allows the Native American inmates to utilize rocks in their sweat lodge ceremonies.  Warden Thomas responds:

84

> The allowance and restriction are distinguishable. The rocks used in the sweat lodge ceremony are heated over fire and then water is poured over them to create steam in the sweat lodge for purification purposes. Because the rocks used in the sweat lodge ceremony are heated over fire, there is less risk that an inmate will pick up the fire heated rocks, severely burning his hands, in order to use the rock as a weapon.

[Id. at ¶ 109.] Further, the sweat lodge ceremony occurs only quarterly and has significant security restrictions. [Id. at ¶¶ 101-07.] A "federally approved Native American volunteer" leads the ceremonies, which "increases the likelihood that the unobservable activities in the sweat lodge are sincere and not used to traffic contraband, plan disturbances, coordinate gang activity or plan or carry out assaults of inmates or personnel." [Id. at ¶ 103.] One or two correctional officers staff the area outside the sweat lodge, and the attendance ranges from ten to twenty inmates, who are searched before entering and after leaving the ceremony to prevent trafficking of contraband and/or weapons. In addition, Saguaro staff utilizes video surveillance. [Id. at ¶¶ 104-07.] In contrast, the Outdoor Altar Plaintiffs seek daily access to an altar of interlocking, but unaffixed, rocks. Even viewing the record in the light most favorable to Plaintiffs, this Court finds that the Native American use of rocks during their sweat lodge ceremonies is distinguishable from the access to the rock altar that the Outdoor Altar Plaintiffs seek.

85

The Outdoor Altar Plaintiffs also present evidence that the Native American inmates had an outdoor area for smudging. Chaplain Miller described smudging as follows: "They used to take, like a grass and they ignite it, and then they use the smoke from that as part of their religious exercise." [Pltfs.' Excerpts of Miller Depo. at 184.]  Other inmates do not generally go into the yard used for the smudging ceremony because the yard is "so small that nobody else would really fit in it."  [Id. at 186.]  There is no evidence that the smudging ceremony involved the use of loose rocks that could be used as weapons.  Thus, the allowance of the smudging ceremonies is not relevant to the issue of whether the prohibition on the stone altar that the Outdoor Altar Plaintiffs seek was the least restrictive means available to further the compelling interest in safety and security.

The Outdoor Altar Plaintiffs also argue that the prohibition of the Native Hawaiian rock altar is not the least restrictive means available because Saguaro allows the Asatru/Odinist inmates to have an altar.  Warden Thomas responds:

> What Plaintiffs demand and what is permitted for the Asatru/Odinist faith group is distinguishable where the Asatru/Odinist altar is made of wood and is not made of non-affixed objects that can be used by inmates as easily accessible weapons. Moreover, the altar is moveable in that it is wheeled out of storage on a cart for use in celebrations, and then wheeled back to the chapel storage closet when not in use, so we are able to keep the altar secure when not in use.

[Id. at ¶ 112 (citation omitted).]  Even viewing the record in

86

the light most favorable to the Outdoor Altar Plaintiffs, this Court finds that the Asatru/Odinist use of an altar is distinguishable from the access to the rock altar that the Outdoor Altar Plaintiffs seek.

Thus, this Court finds that Defendants have established that Saguaro's prohibition of the rock altar that the Outdoor Altar Plaintiffs seek is the least restrictive means available, particularly in light of the fact that Saguaro does allow the Native Hawaiian practitioners to use a small altar to Lono (albeit without rocks) during the Makahiki ceremonies. Defendants are therefore entitled to summary judgment as to Plaintiffs' RLUIPA claim regarding access to a sacred space with a stone altar.  Defendants' Motion is GRANTED as to Count XXV.

### 2.   Free Exercise Claims

As this Court previously recognized, the federal free exercise analysis and the state free exercise analysis are more deferential than the RLUIPA analysis.  Insofar as this Court has concluded that the Outdoor Altar Plaintiffs' RLUIPA claim regarding access to a sacred space with a stone altar fails, this Court also concludes that the Outdoor Altar Plaintiff's federal free exercise claim and Plaintiffs' state free exercise claim regarding access to a sacred space with a stone altar fail as a matter of law.  This Court therefore GRANTS Defendants' Motion as to Count IV and Count XIV.

### 3.  <u>Equal Protection Claims</u>

Plaintiffs have presented evidence that other religious groups are treated more favorably, *i.e.* the Native American inmates are allowed to use rocks in sweat lodge ceremonies, the Native American inmates have a yard for smudging ceremonies, and Asatru/Odinist inmates are allowed to have an altar while Saguaro does not allow Plaintiffs the stone altar at issue in this case. This Court, however, has found that Defendants have proven that the situations are distinguishable and that there are legitimate safety and security reasons explaining the differences in treatment.  This Court therefore concludes that the Outdoor Altar Plaintiff's federal equal protection claim and Plaintiffs' state equal protection claim regarding access to a sacred space with a stone altar fail as a matter of law.  This Court therefore GRANTS Defendants' Motion as to Count IX and Count XIX.

### E.  <u>Claims Regarding Access to a Spiritual Advisor</u>

The Second Amended Complaint alleges that "[a] critical tenet of Native Hawaiian religion essential to the expression of Plaintiffs' faith is to regularly meet with a respected *kahu* (religious) leader to assist in their worship activities." [Second Amended Complaint at ¶ 52.]

### 1.  <u>RLUIPA</u>

The Spiritual Advisor Plaintiffs have established that regular access to a spiritual advisor is a religious exercise for

purposes of RLUIPA.  The Ninth Circuit, however, has held that, where the factual allegations of the complaint showed only that the plaintiffs sought "additional religious accommodations beyond those already provided by the prison to facilitate the religious exercise of their . . . faith," the plaintiffs did not plead a substantial burden on their religious exercise.  Hartmann v. Cal. Dep't of Corr. & Rehab., 707 F.3d 1114, 1125 (9th Cir. 2013). Thus, the Ninth Circuit held that the complaint failed to state a RLUIPA claim based on the lack of a paid full-time chaplain of the plaintiffs' religion.  In so holding, the Ninth Circuit also noted that the plaintiffs benefitted from the services of a volunteer chaplain of their religion as well as from the services of the staff chaplains.  Id.

As previously noted, Haili travels to Saguaro approximately four times a year to assist in the Makahiki observance and other occasions.  He conducts individual consultations with inmates during these trips.  [Thomas Decl. at ¶ 49.]  Another practitioner of the Native Hawaiian religion, Kini Burke, comes with Haili to assist in the programming, when Burke is able to do so.  Burke is also a volunteer, and he usually only comes two times a year, for the opening and closing of the Makahiki season.  [Defs.' Excerpts of Haili 5/31/13 Depo. at 300-01.]  Further, the Spiritual Advisor Plaintiffs also have access to the Saguaro chaplain.  Warden Thomas states:

89

> any [Saguaro] inmate, no matter his religious
> designation, may request spiritual guidance from
> the facility chaplain.  Furthermore, inmates are
> permitted to correspond with spiritual advisors of
> their choice via written correspondence.  Inmates
> may also place spiritual advisors on their
> approved telephone call lists.  Finally, inmates
> may request contact visits (subject to restriction
> for segregation inmates) with spiritual advisors
> via written request, subject to confirmation of
> religious credentials by the facility chaplain,
> successful passing of applicable security
> background checks and approval of the warden.

[Thomas Dec. at ¶ 40.]  Chaplain Miller testified that he was

responsible for "the overall care of all the spiritual needs

throughout the prison for both staff and inmates."  [Guzman

Decl., Exh. 11 (Excerpts of 4/4/13 Depo. of Charles F. Miller

("Defs.' Excerpts of Miller Depo.")) at 10.]  Chaplain Miller had

oversight over the activities of the Native Hawaiian

practitioners, including the Makahiki ceremonies.  [Id. at 23.]

He also testified:

> [A] chaplain is - If you're working with the
> Mormons, you're supporting the Mormons.  If you're
> working with the Native Hawaiians, you're
> supporting the Native Hawaiians.  The role of a
> chaplain is you're not showing preference to any
> one group.  At the time you're meeting or
> supporting that group, that's what you do, you
> support them.  That's the idea of being a
> chaplain, is that you can work with multiple
> faiths without putting one faith above another.

[Id. at 211-12.]

This Court understands that a *kahu* has an integral role

in the practice of the Native Hawaiian religion and that more

frequent access to a Native Hawaiian spiritual advisor would be

90

beneficial to the Spiritual Advisor Plaintiffs' religious exercise.  However, even viewing the record in the light most favorable to the Spiritual Advisor Plaintiffs, the record establishes that they benefit from the volunteer services already provided by Haili and Burke and, at least to some extent, from the services of the Saguaro chaplain.  Thus, Plaintiffs merely seek additional accommodations beyond what Saguaro provides to facilitate their religious exercise.  Pursuant to <u>Hartmann</u>, such allegations in a complaint would not be enough to survive a motion to dismiss.  This Court also concludes that the evidence is insufficient to raise a genuine issue of material fact as to the substantial burden analysis.  This Court therefore concludes that the Spiritual Advisor Plaintiffs' RLUIPA claim fails as a matter of law, and this Court GRANTS Defendants' Motion as to Count XXVI.

### 2.  **Federal Free Exercise Claim**

The Ninth Circuit in <u>Hartmann</u> also held that the plaintiffs failed to state a First Amendment free exercise claim. The Ninth Circuit emphasized that "it is well-settled that the First Amendment does not require prison administration to provide inmates with the chaplain of their choice." <u>Id.</u> at 1122-23 (some citations omitted) (citing <u>Cruz v. Beto</u>, 405 U.S. 319, 322 n.2, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972) ("A special chapel or place of worship need not be provided for every faith regardless

91

of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand.")).

Based on the reasoning in Hartmann, this Court concludes that "[t]he Free Exercise Clause does not require [Saguaro] to provide [the Spiritual Advisor] Plaintiffs with more than that which they are currently receiving — *i.e.*, the services of staff chaplains and a volunteer [Native Hawaiian religion] chaplain."  See id. at 1123.  This Court therefore concludes that the Spiritual Advisor Plaintiffs' federal free exercise claim fails as a matter of law, and this Court GRANTS Defendants' Motion as to Count V.

### 3.   **Federal Equal Protection Claim**

The Ninth Circuit in Hartmann also rejected the plaintiffs' equal protection claim.  The Ninth Circuit noted that the Equal Protection Clause does not require "that all prisoners . . . receive identical treatment and resources."  Id. (some citations omitted) (citing Cruz, 405 U.S. at 322 n.2, 92 S. Ct. 1079).  As with the plaintiffs in Hartmann, the Spiritual Advisor Plaintiffs' access to a volunteer spiritual advisor of the Native Hawaiian religion and to the Saguaro chaplain, even if the chaplain is a chaplain of other religions, "is fatal to their claim."  See id.  Thus, "[a]s with their Free Exercise claim, the Equal Protection Clause does not entitle [the Spiritual Advisor] Plaintiffs to more than what . . . they already receive."  See

id. at 1124.  This Court therefore concludes that the Spiritual Advisor Plaintiffs' federal equal protection claim fails as a matter of law, and this Court GRANTS Defendants' Motion as to Count X.

### 4.   State Constitutional Claims

Although Hartmann is not controlling as to the analysis of Plaintiffs' state free exercise claim and Plaintiffs' state equal protection claim, Hartmann is persuasive because the state free exercise analysis and the state equal protection analysis are similar to the federal free exercise analysis and the federal equal protection analysis.  This Court therefore concludes that Plaintiffs' state free exercise claim and state equal protection claim fail for the same reasons as those set forth in Hartmann. This Court therefore concludes that Plaintiffs' state free exercise claim and Plaintiffs' state equal protection claim fail as a matter of law.  This Court GRANTS Defendants' Motion as to Count XV and Count XX.

### F.   Summary of Rulings

Defendants' Motion is HEREBY GRANTED as to Counts II, IV, V, VII, IX, X, XIV, XV, XVII, XX, XXII, XIX, XXIII, XXV, and XXVI.

Defendants' Motion is HEREBY DENIED as to Counts I, VI, XI, XVI, and XXII.

93

Defendants' Motion is HEREBY GRANTED IN PART AND DENIED IN PART as to Counts III, VIII, XIII, XVIII, and XXIV.

## CONCLUSION

On the basis of the foregoing, Defendants' Motion for Summary Judgment, filed July 31, 2013, is HEREBY GRANTED IN PART AND DENIED IN PART, Plaintiffs' Motion for Partial Summary Judgment Against Defendants as to Their Claims Under the Religious Land Use and Institutionalized Persons Act, filed October 31, 2013, is HEREBY GRANTED IN PART AND DENIED IN PART, and Plaintiff Robert Holbron's Counter-Motion for Summary Judgment on His Claims, filed December 23, 2013, is HEREBY DENIED WITHOUT PREJUDICE.

The motions are DENIED WITHOUT PREJUDICE as to: 1) any claims seeking damages and any claims seeking retrospective equitable relief; 2) any claims seeking prospective declaratory and injunctive relief regarding Red Rock; 3) Plaintiff Poaha's claims seeking prospective declaratory and injunctive relief regarding Saguaro; 4) Plaintiff Holbron's claims seeking prospective declaratory and injunctive relief regarding restricted custody at Saguaro; and 5) Plaintiff Galdones's request for prospective declaratory and injunctive relief as to his state law retaliation claim.

This Court set forth all of its rulings regarding Plaintiffs' Motion *supra* Discussion section II.F, and this Court

94

set forth all of its rulings regarding Defendants' Motion *supra*

Discussion section III.F.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAI`I, March 31, 2014.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

RICHARD KAPELA DAVIS, ET AL. V. NEIL ABERCROMBIE, ET AL.; CIVIL
NO. 11-00144 LEK-BMK; ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND
DENYING IN PART PLAINTIFF ROBERT HOLBRON'S COUNTER-MOTION FOR
SUMMARY JUDGMENT ON HIS CLAIMS; AND GRANTING IN PART AND DENYING
IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST
DEFENDANTS AS TO THEIR CLAIMS UNDER THE RELIGIOUS LAND USE AND
INSTITUTIONALIZED PERSONS ACT